# 23-1081-CV

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT



HERMÈS INTERNATIONAL, HERMÈS OF PARIS, INC.,

*Plaintiffs-Appellees,*

*v.*

MASON ROTHSCHILD,

*Defendant-Appellant.*

*On Appeal from the United States District Court
for the Southern District of New York
(Honorable Jed S. Rakoff)*

## PAGE PROOF BRIEF FOR DEFENDANT-APPELLANT

Rhett O. Millsaps II
Christopher J. Sprigman
Mark P. McKenna *(admission pending)*
Rebecca Tushnet
Mark A. Lemley
LEX LUMINA PLLC
745 Fifth Avenue, Suite 500
New York, NY 10151
646-898-2055

*Attorneys for Defendant-Appellant*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES................................................................................iv

STATEMENT OF JURISDICTION ......................................................................1

ISSUES PRESENTED .........................................................................................1

STATEMENT OF THE CASE ..............................................................................2

    A.  Background...............................................................................................5

        1.  Hermès and the Birkin Handbag..........................................................6

        2.  Mason Rothschild and His Art...............................................................7

        3.  Rothschild's *MetaBirkins* Art Project.................................................10

    B.  Procedural History .................................................................................16

        1.  The Motion to Dismiss Decision .........................................................16

        2.  The Summary Judgment Decision .......................................................17

            a.  The "Artistic Relevance" Factor .................................................18

            b.  The "Explicitly Misleading" Factor ............................................18

            c.  Evidence of Confusion................................................................20

        3.  The Trial.............................................................................................21

            a.  The Jury Instructions..................................................................21

            b.  Exclusion of Gopnik and Admission of Kominers .....................25

            c.  Evidence of Confusion................................................................26

        4.  Rothschild's Post-Trial Motions .........................................................26

    C.  Rulings Presented for Review ................................................................27

SUMMARY OF ARGUMENT ............................................................................28

ARGUMENT ................................................................................................31

    I.   THE DISTRICT COURT ERRED IN DENYING
        ROTHSCHILD'S MOTION TO DISMISS.............................................31

        A.  *Rogers* Required Dismissal on the Pleadings ......................................34

            1.  It is Clear From Hermès' Complaint that the
               *MetaBirkins* Title is Artistically Relevant to the
               Artworks.............................................................................36

            2.  Hermès' Complaint does not Allege any Explicitly
               Misleading Use .....................................................................38

            3.  The Supreme Court's *VIP* Decision Confirms that
               *Rogers* Applies Here ............................................................42

            4.  *Twin Peaks* Does Not Apply Here .................................45

            5.  *Rogers* Also Required Dismissal of Hermès'
               Dilution and Cybersquatting Claims.............................47

        B.  The District Court Misconstrued *Dastar*, Which
           Separately Required Dismissal of Hermès' Claims..........................48

    II.  THE DISTRICT COURT ERRED IN DENYING
        ROTHSCHILD'S MOTION FOR SUMMARY JUDGMENT.................51

        A.  Undisputed Evidence Showed the *MetaBirkins* Title is
           Artistically Relevant ...........................................................52

         B.  Discovery Produced No Evidence of an Explicitly
           Misleading Use ...................................................................52

         C.  Even if *Twin Peaks* Applied, Hermès Has No
           "Particularly Compelling" Evidence of Confusion..........................53

III. THE DISTRICT COURT'S JURY INSTRUCTIONS WERE CONTRARY TO *ROGERS* AND PREJUDICIAL TO ROTHSCHILD ............................................................................60

    A.   The Jury Instructions Erroneously Framed the First Amendment as a Defense to Infringement...........................................61

    B.   The Jury Instructions Erroneously Invited the Jury to Conflate Intent to Confuse With Intent to Reference .........................62

IV. THE DISTRICT COURT ABUSED ITS DISCRETION IN EXCLUDING GOPNIK'S EXPERT TESTIMONY AND ADMITTING KOMINERS' EXPERT TESTIMONY .............................66

V.   THE DISTRICT COURT ERRED IN DENYING ROTHSCHILD'S MOTIONS FOR JUDGMENT AS A MATTER OF LAW...................................................................................75

CONCLUSION .....................................................................................76

CERTIFICATE OF COMPLIANCE .....................................................78

# TABLE OF AUTHORITIES

**Page(s)**

**C**ases

*Alcantar v. Foulk*,
No. 1:14-cv-00747 LJO MJS (HC), 2016 WL 3001242
(E.D. Cal. May 25, 2016) ...................................................................70

*AM Gen., LLC* v. *Activision Blizzard, Inc.*,
450 F. Supp. 3d 467 (S.D.N.Y. 2020) ........................................*passim*

*Anderson News, L.L.C. v. American Media, Inc.*,
899 F.3d 87 (2d Cir. 2018) .................................................................66

*Bleistein v. Donaldson Lithographing Co.*,
188 U.S. 239 (1903) ...........................................................................71

*Brancusi v. United States*,
54 Treas. Dec. 428 (Cust. Ct. 1928) ...................................................71

*Bretford Mfg., Inc. v. Smith System Mfg. Corp.*,
419 F.3d 576 (7th Cir. 2005) .............................................................49

*Brown v. Elec. Arts, Inc.*,
724 F.3d 1235 (9th Cir. 2013) ...........................................................40

*Car-Freshner Corp. v. Am. Covers, LLC*,
980 F.3d 314 (2d Cir. 2020) ..............................................................61

*Castillo v. G&M Realty L.P.*,
950 F.3d 155 (2d Cir. 2020) ..............................................................71

*Champion v. Moda Operandi, Inc.*,
561 F. Supp. 3d 419 (S.D.N.Y. 2021) ...............................................33

*Cliffs Notes, Inc. v. Bantam Doubleday Dell Pbl'g Grp., Inc.*,
886 F.2d 490 (2d Cir. 1989) ..............................................................31

*Cohen v. G&M Realty L.P.*,
Case No. 13-CV-05612 (FB), Case No. 15-CV-3230 (FB) (RLM),
2017 WL1208416 (E.D.N.Y. Mar. 31, 2017) ....................................68

iv

*Com. v. United Books, Inc.*,
453 N.E.2d 406 (Mass. 1983) ...........................................................71

*Crowley v. Chait*,
322 F. Supp. 2d 530 (D.N.J. 2004) ....................................................67

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
539 U.S. 23 (2003) ....................................................................*passim*

*Daubert v. Merrell Dow Pharma.*,
509 U.S. 579 (1993) ..........................................................................67

*Deputy v. Lehman Bros.*,
345 F.3d 494 (7th Cir. 2005).............................................................69

*Dr. Seuss Enters., L.P. v. ComicMix LLC*,
983 F.3d 443 (9th Cir. 2020)..............................................................35

*Drimal v. Tai*,
786 F.3d 219 (2d Cir. 2015)...............................................................31

*ETW Corp. v. Jireh Publ'g, Inc.*,
332 F.3d 915 (6th Cir. 2003).................................................6, 35, 40

*GoSMiLE, Inc. v. Dr. Jonathan Levine, D.M.D. P.C.*,
769 F. Supp. 2d 630 (S.D.N.Y. 2011) ...............................................55

*Grubhub Inc. v. Kroger Co.*,
No. 1:21-cv-05312, 2022 WL 2774986 (N.D. Ill. May 25, 2022) .....55

*Hangarter v. Provident Life & Acc. Ins. Co.*,
373 F.3d 998 (9th Cir. 2004)..............................................................67

*Harley-Davidson, Inc. v. Grottanelli*,
164 F.3d 806 (2d Cir. 1999)...............................................................44

*Hermès Int'l v. Rothschild*,
590 F. Supp. 3d 647 (S.D.N.Y. 2022) ..........................................17, 50

*In re Pfizer Inc. Securities Litig.*,
819 F.3d 642 (2d Cir. 2016)...............................................................66

*Jack Daniel's Props., Inc. v. VIP Prods. LLC,*
    599 U.S. 140 (2023) ...................................................................*passim*

*Kumho Tire Co., Ltd. v. Carmichael,*
    526 U.S. 137 (1999) ................................................................66

*Lamparello v. Falwell,*
    420 F.3d 309 (4th Cir. 2005) ..................................................47

*Louis Vuitton Malletier S.A. v. Warner Bros. Ent. Inc.*,
    868 F.Supp.2d 172 (S.D.N.Y. 2012) ...............................33, 36, 38, 47

*Luke Records v. Navarro,*
    960 F.2d 134 (11th Cir. 1992) .................................................72

*Mattel, Inc. v. MCA Recs., Inc.*,
    296 F.3d 894 (9th Cir. 2002) ..........................................6, 37, 43, 44

*Medici Classics Productions, LLC v. Medici Grp., LLC,*
    683 F. Supp. 2d 304 (S.D.N.Y. 2010) .................................54

*MGFB Props., Inc. v. Viacom Inc.*,
    54 F.4th 670 (11th Cir. 2022) ................................................33, 35, 40

*MGFB Props., Inc. v. ViacomCBS Inc.*,
    No. 5:19-cv-257-RH-MJF, 2021 WL 4843905
    (N.D. Fla. Sept. 22, 2021) .....................................................54

*Phx. Entm't Partners v. J-V Successors, Inc.*,
    305 F. Supp. 3d 540 (S.D.N.Y. 2018) .................................51

*Phx. Entm't Partners, LLC v. Rumsey*,
    829 F.3d 817 (7th Cir. 2016) ..........................................50, 51

*Polaroid Corp. v. Polaroid Elecs. Corp.*,
    287 F.2d 492 (2d Cir. 1961) ...................................................*passim*

*Pulse Entm't Corp. v. David*,
    No. CV 14-4732 (C.D. Cal. Sept. 17, 2014) ....................51

*Reply All Corp. v. Gimlet Media, Inc.*,
    No. 15-CV-4950 (WFK)(PK), 2020 WL 13536220
    (E.D.N.Y. Feb. 12, 2020) ......................................................54

*Rogers v. Grimaldi*,
  875 F.2d 994 (2d Cir. 1989) ........................................................*passim*

*Sarkees v. E. I. Dupont De Nemours & Co.*,
  15 F.4th 584 (2d Cir. 2021) ...................................................66

*Schaefer v. State Ins. Fund*,
  207 F.3d 139 (2d Cir. 2000) ...................................................51

*Slep-Tone Entertainment Corp. v. Wired for Sound Karaoke & DJ
  Servs., LLC*,
  845 F.3d 1246 (9th Cir. 2017) ................................................51

*Smith v. California*,
  361 U.S. 147 (1959) ...............................................................71

*Tiffany & Co. v. Costco Wholesale Corp.*,
  971 F.3d 74 (2d Cir. 2020) .....................................................60

*Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.*,
  996 F.2d 1366 (2d Cir. 1993) ...............................................*passim*

*Two Hands IP LLC v. Two Hands Am., Inc.*,
  563 F. Supp. 3d 290 (S.D.N.Y. 2021) ...................................54

*U.S. v. Onumonu*,
  967 F.2d 782 (2d Cir. 1992) ...................................................72

*U.S. v. Ten Erotic Paintings*,
  432 F.2d 420 (4th Cir. 1970) .................................................71

*U.S. v. United Foods, Inc.*,
  533 U.S. 405 (2001) ...............................................................37

*United States v. Arthur*,
  51 F.4th 560 (5th Cir. 2022) .................................................69

*United States v. Vesey*,
  338 F.3d 913 (8th Cir. 2003) .................................................68

*United We Stand Am., Inc. v. United We Stand, Am. New York, Inc.*,
  128 F.3d 86 (2d Cir. 1997) .....................................................44

*Univ. of Ala. Bd. of Trs. v. New Life Art, Inc.*,
  683 F.3d 1266 (11th Cir. 2012) ............................................................6, 35, 44

*Voilas v. General Motors Corp.*,
  73 F. Supp. 2d 452 (D.N.J. 1999) ....................................................67

*W.W.W.Pharm. Co., Inc. v. Gillette Co.*,
  808 F. Supp. 1013 (S.D.N.Y. 1992) ..................................................55

*Williams v. UMG Recordings, Inc.*,
  281 F. Supp. 2d 1177 (C.D. Cal. 2003) ..........................................49

*Woods v. START Treatment & Recovery Ctrs., Inc.*,
  864 F.3d 158 (2d Cir. 2017) ............................................................60

*Yudkin v. State*,
  182 A.2d 798 (Md. 1962) ...................................................................72

**Constitutional Provisions**

First Amendment to the United States Constitution ..........................................*passim*

**Statutes**

28 U.S.C. § 1291 .................................................................................................1

28 U.S.C. § 1331 .................................................................................................1

15 U.S.C. § 1125 (Lanham Act § 43(a)) ...........................................................49

**Rules**

Fed. R. App. P. 4(a)(4)(A)(i) .............................................................................1

Fed. R. App. P. 4(a)(4)(A)(v) ...........................................................................1

FRCP Rule 12(b)(6) ....................................................................................1, 34

FRCP Rule 30(b)(6) .........................................................................................18

## Other Authorities

6 McCarthy on Trademarks and Unfair Competition
(5th ed. 2022) § 31:144.50 ..........................................................................33, 57

Committee on Model Jury Instructions, Ninth Circuit, Manual of
Model Civil Jury Instructions for the Ninth Circuit 15.19A .............................22

Lynn M. Jordan & David M. Kelly, *Another Decade of* Rogers
v. Grimaldi: *Continuing to Balance the Lanham Act with the*
*First Amendment Rights of Creators of Artistic Works*,
109 TRADEMARK REP. 833, 871 (2019)..............................................................34

*Merriam-Webster Dictionary*, "overt",
https://www.merriam-webster.com/dictionary/overt .........................................38

Stacey L. Dogan & Mark A. Lemley, *Grounding Trademark Law*
*Through Trademark Use,* 92 Iowa L. Rev. 1669, 1684 (2007).........................43

Timothy Perrin, *Expert Witness Testimony: Back to the Future*,
29 U.RICH.L.REV. 1389, 1457 (1995) ..............................................................67

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331 over this civil action arising under federal trademark and anti-cybersquatting laws. The court entered final judgment on February 14, 2023, in favor of Plaintiffs-Appellees Hermès International and Hermès of Paris, Inc. (together, "Hermès"). ECF145. On June 23, 2023, the court denied Defendant-Appellant Mason Rothschild's motion for judgment as a matter of law or new trial and entered an order of permanent injunction. ECF191;ECF190. Timely notice of appeal was filed on July 21, 2023, in accordance with Fed. R. App. P. 4(a)(4)(A)(i) and (v). ECF194. This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1.      Whether the district court erred in denying Defendant-Appellant Mason Rothschild's Rule 12(b)(6) motion to dismiss the complaint in its entirety for failure to state a claim under *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989), and/or *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003), on the grounds that Rothschild's subjective intent in choosing Hermès' Birkin handbag as the subject of his *MetaBirkins* artworks presented an issue of fact in determining whether the *MetaBirkins* title was artistically relevant to the artworks, and that application of the *Polaroid* factors set out in *Polaroid Corp. v. Polaroid Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961), was necessary to determine under

*Rogers* whether use of the *MetaBirkins* title was "explicitly misleading" as to the source or content of the artworks.

2.      Whether the district court erred in denying Defendant Mason Rothschild's motions for summary judgment and judgment as a matter of law on all claims on the ground that Rothchild's subjective intent presented a triable issue of fact, where the undisputed evidence showed that the *MetaBirkins* title was artistically relevant to the artworks, and there was no evidence of any explicitly misleading use of the Birkin mark.

3.      Whether it was reversible error for the district court (a) to structure the jury instructions and verdict form in a way that treated the First Amendment as a defense to infringement, dilution, and cybersquatting; and/or (b) to instruct the jury to evaluate the artist's subjective intent to determine whether First Amendment protection applied.

4.      Whether it was reversible error for the district court to exclude Rothschild's art expert from testifying at trial.

5.      Whether it was reversible error for the district court to deny Rothschild's motion to exclude Hermès' economics expert to testify at trial.

## STATEMENT OF THE CASE

This appeal raises fundamental questions about the application of this Court's seminal precedent, *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989), to

reduce the risk that the Lanham Act may unduly restrict First Amendment protection of freedom of expression, particularly for artists who reference the corporate brands that saturate modern American culture.

The district court (Hon. Jed S. Rakoff) made a critical doctrinal error that runs through every dispositive decision below: though it recognized even at the pleading stage that *Rogers* must apply in this case, the court repeatedly failed to apply *Rogers*' two objective factors. Rather than asking (i) whether the use of Hermès' "Birkin" mark had any artistic relevance to Rothschild's *MetaBirkins* artworks, and (ii) whether the use of the mark was *explicitly* misleading as to the artworks' source or content, s*ee* 875 F.2d at 999, the court focused on Rothschild's subjective intent in choosing to reference Hermès' Birkin handbag in his artwork. Proper application of *Rogers* would have required dismissal of all Hermès' claims as a matter of law.[1] Because the district court wrongly focused on questions of intent, however, it forced Rothschild to go through extensive discovery and a jury trial against a multi-billion-dollar luxury goods maker to decide whether the First Amendment protected him and his artwork.[2] This onerous, costly, and speech-

---

[1] The Supreme Court's holding in *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003), independently requires dismissal of all of Hermès' claims for the reasons discussed below. The Court need not reach this issue, however, under *Rogers*.

[2] The district court's decision denying Rothschild's motion to dismiss is reported at 603 F. Supp. 3d 98 (S.D.N.Y. 2022). Its summary judgment decision, issued on the

chilling procedure is directly at odds with *Rogers*' purpose of creating an objective, speech-protective framework.

After a weeklong trial, the jury deliberated over three days. On the second day of deliberations, the jury sent a note indicating that it might be hung on whether the First Amendment applied, and asking the judge to advise it on the consequences if it found the First Amendment applied. ECF161(1086).[3] The jury eventually returned a verdict against Rothschild, awarding Hermès $133,000.[4] The jury effectively was led to this result by the court's jury instructions, which again erroneously focused on Rothschild's subjective intent. Specifically, the court (i) instructed the jury that "if Hermès proves that Mr. Rothschild actually intended to confuse potential customers, he has waived any First Amendment protection"; and (ii) framed the First Amendment as a defense to infringement—an approach at odds with *Rogers* and that no court in this Circuit has ever taken. ECF143;ECF144.

The district court made additional reversible errors during and after trial. At trial, the court erroneously excluded the expert testimony of Rothschild's art expert, Dr. Blake Gopnik, despite his eminent qualifications and the obvious

---

fourth day of trial, is not yet reported but is available at 2023 WL 1458126 (S.D.N.Y. Feb. 2, 2023).

[3] [Citations beginning "A-" are to the Joint Appendix; citations beginning "SPA-" are to the Special Appendix; and citations beginning "ECF" are to the district court docket.]

[4] Hermès asked the jury to award at least $232,000. ECF159(995-996).

relevance of his testimony to the central issues in the case but allowed Hermès' economics expert effectively to testify that *MetaBirkins* were not art—an area in which he was admittedly unqualified. ECF151(3);ECF153(335-37). This prejudiced Rothschild, as demonstrated by numerous public social media posts by the jury foreperson immediately following trial, which denigrated Rothschild as an artist and incorrectly stated that Andy Warhol obtained permission from the Campbell's Soup Company before creating his iconic *Campbell's Soup Cans* artworks (while suggesting that Rothschild should have done likewise). ECF170-1;ECF170-2;ECF170-3;ECF170-4.

Following trial, the district court made the same doctrinal errors in denying Rothschild's motion for judgment as a matter of law or new trial.[5]

## A.    Background

This Court recognized decades ago that "[t]itles, like the artistic works they identify, are of a hybrid nature, combining artistic expression and commercial promotion," and that "the expressive element of titles requires more protection than the labeling of ordinary commercial products." *Rogers*, 875 F.2d at 998. As a consequence, and "[b]ecause overextension of Lanham Act restrictions in the area of titles might intrude on First Amendment values," courts "must construe the Act

---

[5] The decision is not yet reported but is available at 2023 WL 4145518 (S.D.N.Y. June 23, 2023).

narrowly to avoid such conflict." *Id*. The Court thus set out in *Rogers* a two-part, objective test to insulate expressive works from speech-chilling trademark claims. Specifically, *Rogers* holds that the Lanham Act does not apply to titles "unless the title has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless the title *explicitly* misleads as to the source or the content of the work." *Id*. at 999 (emphasis added).

The *Rogers* framework has been adopted by every circuit to have considered the proper test for evaluating application of the Lanham Act to artistic works like the *MetaBirkins*. *See, e.g.*, *Mattel, Inc. v. MCA Recs., Inc.*, 296 F.3d 894, 901-02 (9th Cir. 2002); *Univ. of Ala. Bd. of Trs. v. New Life Art, Inc.*, 683 F.3d 1266, 1277-79 (11th Cir. 2012); *ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 926-28 (6th Cir. 2003). The Supreme Court's recent decision in *Jack Daniel's Props., Inc. v. VIP Prods. LLC* confirms that *Rogers* applies to this case: in *VIP*, the Court distinguished non-trademark uses like Rothschild's use of *MetaBirkins* from trademark uses that fall outside of *Rogers*. *See* 599 U.S. 140, 154-56 (2023). Faithful application of *Rogers* to the facts of this case requires dismissal of all of Hermes' claims.

### 1.     Hermès and the Birkin Handbag

Appellee Hermès is a global purveyor of high-priced luxury goods. Chavez(16-18, 20). Hermès' Birkin handbag (the "Birkin"), at issue in this case, is

made from leather or more exotic animal skins; its price ranges from $12,000 to $200,000 depending on the materials used. Chavez(57-58). Hermès has never sold a Birkin completely covered in fur. Chavez(84-85);ECF149(215-216).

Hermès sells Birkins only in Hermès' retail stores, not on its website, and customers usually must join a waiting list to purchase. Chavez(73-74). Hermès has sold over $100,000,000 worth of Birkins per year in the U.S. for the last ten years. Chavez(90).

Hermès advertises the Birkin in high-end fashion magazines, financial magazines, and other publications targeted at the wealthy. Chavez(105). Demand for Birkins far exceeds supply, such that third-party Birkin resale prices are higher than Hermès' original retail prices. Chavez(57-59). The Birkin has become a cultural symbol of rarefied wealth through prolific references in media and pop culture. ECF24(¶¶40,74);Chavez (69-70);Pl.Trial.Ex.10.

### 2. Mason Rothschild and His Art

Appellant Mason Rothschild, born Sonny Estival, is a 28-year-old, self-taught artist whose inspirations include the late artist and designer Virgil Abloh and artist Daniel Arsham. ECF149(225-226, 246-247, 260-261, 263). Rothschild also is chief marketing officer and co-owner, with his fiancée, of the well-known Terminal 27 boutique, art gallery, and event space in Los Angeles. ECF149(236,252-256); Def.Trial.Ex.609.

Rothschild is represented as an artist by Creative Artists Agency (CAA), one of the largest talent agencies in the world. ECF153(316). Last year, SCOPE Art Show commissioned Rothschild to create artwork connected to non-fungible tokens (NFTs) to serve as tickets to SCOPE's show at Art Basel in Miami; he created a series of digital animations of cartoonish pool floats that he titled *Floaties* as a cheeky reference to climate change. ECF153(317-319);Def.Trial.Ex. 526.



NFTs are units of data stored on a blockchain, which is a distributed ledger that records and shows the complete transaction history of NFTs stored on it. ECF151(78-79). When NFTs are created, or "minted," they are listed on an NFT marketplace where NFTs can be sold or traded in accordance with "smart contracts"—computer code on the blockchain that governs NFT transfers. ECF24(¶¶ 61,63);ECF151(81-82). An NFT can be linked to a digital media file, such as an image, movie, or music file, in which case the NFT is like a deed of ownership for the linked media. ECF151(81);ECF149(127). In such cases, most

people think of and refer to the image or other linked media as "an NFT."
ECF151(80);ECF149(127).

Rothschild first became aware of the burgeoning NFT art world around the
end of 2020 when another artist invited him to join Foundation, a then invitation-
only marketplace for NFT artists. ECF149(257-258). In early 2021, Rothschild
hired a technical assistant to help him create his first NFT artworks: two digital, 3D
images of degraded concrete chairs draped in clear plastic in a collection titled *Do
Not Sit*. Rothschild sold both NFT artworks on Foundation—one for 1 ETH, the
equivalent of $3,000-$4,000 at the time. ECF149(258-264);Def.Trial.Ex. 523.



A few months later, Rothschild and a collaborator produced another NFT
artwork: a digital animation titled *Baby Birkin*, which depicts a fetus gestating
inside a translucent Birkin.



The idea for *Baby Birkin* came to Rothschild because Hermès' "Baby Birkin" handbag was being widely referenced in culture at the time, from the Kardashians to a then-popular Gunna song. Rothschild's *Baby Birkin* NFT caught the attention of the press, including *Vogue.* It sold at auction for the equivalent of $23,500; it soon resold for the equivalent of $47,000. ECF153(272-274);Pl.Trial.Ex. 82;ECF24(¶72).

### 3. Rothschild's *MetaBirkins* Art Project

The response to *Baby Birkin* and activity around the fashion industry's fur-free initiatives inspired Rothschild's follow-up NFT art project at issue in this case. ECF153(275-276). In December 2021, during Art Basel Miami, Rothschild released a series of 100 digital images titled *MetaBirkins* and linked to NFTs. The *MetaBirkins* artworks depict imaginary Birkin bags entirely covered in cartoonish fur and sitting on white pedestals, with some of the images also incorporating other

artistic elements, such as the *Mona Lisa* and van Gogh's *The Starry Night*.
Pl.Trial.Ex.227;ECF153(277,279,282);ECF24(¶109);(ECF73-59).



The *MetaBirkins* NFTs are static, two-dimensional pictures, just as they
appear above. They are not virtual wearables; they are not usable as handbags in
digital environments. ECF149(136-137);ECF153(288-89).

In the weeks leading up to the release of *MetaBirkins*, Rothschild previewed
and promoted his forthcoming artwork on numerous platforms where he identified
himself as the artist behind the project, including:

- on a website at www.metabirkins.com, which stated, *inter alia*:

    Creator Mason Rothschild began working on
    MetaBirkins shortly after the success of Baby Birkin, a

> one-of-one NFT covered by Forbes and Vogue that sold
> at auction for 5.5 ETH. In response to the community
> demand, Rothschild developed a new series, this time
> inspired by the acceleration of fashion's "fur free"
> initiatives and embrace of alternative textiles.
>
> MetaBirkins will be launching at Art Basel Miami Beach
> and available to mint for 0.1 ETH.

Pl.Trial.Ex.227;ECF153(277-279). The website also displayed the slogan "Not Your Mother's Birkin" when the cursor hovered over some of the *MetaBirkins* images. ECF153(411-412);ECF24(¶ 95). When Rothschild received Hermès' "cease and desist letter, [he] placed a prominent disclaimer on the *MetaBirkins* website stating that his project was 'not affiliated, associated, authorized, endorsed by, or in any way officially connected with Hermès, or any of its subsidiaries or affiliates." *Rothschild*, 2023 WL 1458126, at *6.

- in a "MetaBirkins" server on Discord, a public chat platform where Rothschild communicated directly and frequently with a community of other NFT artists and collectors. ECF153(279-283);ECF155(541-542,545-546).

- on Rothschild's personal Instagram and Twitter accounts (both @MasonRothschild). ECF153(280-281,293,426).

- on a @MetaBirkins Twitter account that Rothschild created, which linked to Rothschild's personal Twitter account, stating at the top,

"MetaBirkins is a collection of unique MetaBirkin NFTs. Made by @MasonRothschild." ECF24(¶87);ECF24-31.

- on a @MetaBirkins Instagram account that Rothschild created, which linked to Rothschild's personal Instagram account, stating at the top, "MetaBirkins is a collection of 100 unique NFTs – living on the Ethereum blockchain @masonrothschild." ECF24(¶83);ECF24-28.

Rothschild also promoted *MetaBirkins* ahead of their release directly to individuals in his social and professional networks, asking others, including celebrities and "whales" (*i.e.*, prominent NFT art collectors), to promote *MetaBirkins*. ECF153(293-294,408). Rothschild privately discussed with his associates approaching Hermès about a collaboration. ECF153(298-299). Publicly, Rothschild regularly communicated with his community of NFT art collectors, running contests on Discord and social media for "whitelist" spots—*i.e.*, opportunities to mint a *MetaBirkins* NFT upon release. ECF153(282-283). Rothschild's *MetaBirkins* community grew to tens of thousands of NFT art enthusiasts hoping to obtain one of less than 100 *MetaBirkins* whitelist spots.[6] ECF155(542-546).

---

[6] Rothschild gave some whitelist spots to friends, celebrities, and influencers to help promote *MetaBirkins*. ECF153(284).

On December 2, 2021, Rothschild released the *MetaBirkins*, selling them each for only 0.1 ETH—approximately $450 at the time—though he undoubtedly could have sold them for much more considering the hype that he had successfully built around them and the amounts for which his prior NFT artworks sold. Rothschild did this as an artistic experiment; he wanted to explore where people place value in the Birkin—*i.e.*, in the handcrafted physical object or in the image it projects? ECF153(285). His question was answered when one *MetaBirkin* resold for the equivalent of $45,000 soon after minting; Rothschild received a 7.5% royalty on such resales. ECF153(285-286).[7] Dr. Gopnik, noted art critic, historian, and Warhol biographer, recognized the *MetaBirkins* project as "Business Art" in the vein of Warhol, Marcel Duchamp, and other artists who have deliberately engaged with the intersection of art and commerce. ECF65-1(9-15).

On December 6, 2021, Rothschild gave an interview to *Yahoo Finance* in which he discussed his experiment and the success of *MetaBirkins*. *Yahoo* published both the video of the interview, which displayed the caption "ARTIST MASON ROTHSCHILD LAUNCHES 100 METABIRKINS NFTS," and the transcript of the interview with the headline, "NFT artist: 'MetaBirkins' project

---

[7] Rothschild kept one *MetaBirkin* for himself, which he did not list for resale and still has today. ECF153(287).

aims to create 'same kind of illusion that it has in real life'." Pl.Trial.Ex.
244;ECF24-25.



Around the same time, reporters from *Financial Times* and *Business of
Fashion* contacted Hermès to ask whether it had any connection to *MetaBirkins*;
Hermès responded to the former but not to the latter. ECF157(784-788). Four
outlets—*Elle*, *L'Officiel*, *New York Post*, and *Challenges* (a French publication)—
published articles mistakenly reporting that Hermès was behind *MetaBirkins*; all
four were corrected by Hermès, Rothschild, or both. ECF157(789-801). At
Rothschild's direction, Rothschild's publicist sent emails to correct the mistaken
press articles that they caught, attaching the official press release for *MetaBirkins*
titled "ARTIST MASON ROTHSCHILD UNLEASHES 100 'METABIRKINS'
NFTS DURING ART BASEL MIAMI 2021." ECF73-59;ECF72-87;ECF72-
92;ECF73-32(109-111);ECF153(303-304). The first sentence of the *MetaBirkins*
press release stated, "As a follow up to his infamous 'Baby Birkin' NFT with

collaborator Eric Ramirez, Los Angeles-based artist Mason Rothschild debuts a new series." ECF73-32(112).

### B. Procedural History

Hermès sent Rothschild a cease-and-desist letter on December 16, 2021. Pl.Trial.Ex.20. Although Rothschild responded through undersigned counsel, and the parties engaged in settlement discussions, Rothschild learned through the press that Hermès had sued him. Hermès then sent process servers to Rothschild's workplace to question his employees and customers rather than emailing Rothschild's counsel to ask if we would accept service. Pl.Trial.Ex.21;ECF149(210-214);ECF153(311-13).

 Hermès filed its original complaint on January 14, 2022, asserting federal claims for trademark infringement, dilution, and cybersquatting and parallel state law claims. ECF1. In response to Rothschild's first motion to dismiss, Hermès filed an amended complaint on March 2, 2022, asserting the same claims. ECF24. Rothschild moved to dismiss the amended complaint.

### 1. The Motion to Dismiss Decision

The district court ruled that *Rogers* applies in this case, expressly rejecting Hermès' argument that Rothschild's use of the *MetaBirkins* title was a trademark use because Rothschild's alleged promotional uses of the title were no different from the use of the film title at issue in *Rogers*. ECF50(9-12). But despite the

obvious artistic relevance of the *MetaBirkins* title to the images, and despite Hermès' failure to allege any explicitly misleading use of the Birkin mark, the court denied Rothschild's motion to dismiss on the grounds that Rothschild might have "entirely intended to associate the 'MetaBirkins' mark with the popularity and goodwill of Hermès' Birkin mark, rather than intending an artistic association." ECF50(14).

### 2. The Summary Judgment Decision

Following extensive discovery, both parties filed summary judgment motions.[8] The district court summarily denied the motions on December 30, 2022, stating that it would issue an opinion with its reasons on January 20, 2023, and that trial would start on January 30, 2023. ECF104. The court did not issue its opinion, however, until the end of the day on February 2, 2023—the fourth day of trial and the day before the court's charging conference. ECF140;ECF155(586).

With a voluminous record before it—much of it consisting of Rothschild's private communications with friends and associates about his desire to make money with his art—the court reaffirmed its motion-to-dismiss ruling that Hermès' "claims should be assessed under the two-part test articulated in *Rogers*" because "the MetaBirkins images themselves, with their depiction of Birkin bags covered

---

[8] Rothschild also filed a motion to certify interlocutory appeal of the decision denying his motion to dismiss, which the district court denied. *See Hermès Int'l v. Rothschild*, 590 F. Supp. 3d 647 (S.D.N.Y. 2022).

with fur, suggest that they were originated as a form of artistic expression."
ECF140(2,8-10,15-18). But the court again focused on Rothschild's subjective
intent, while purportedly applying *Rogers*' two objective factors, in denying
Rothschild's motion for summary judgment.

### a.    The "Artistic Relevance" Factor

Rothschild submitted a declaration explaining the artistic relevance of the
*MetaBirkins* title to the artworks, as well as an expert report from Dr. Gopnik
explaining the same from the independent perspective of a noted art critic and
historian. ECF66(3);ECF65-1(16-18). Even Hermès' Rule 30(b)(6) witness, its
global general counsel Nicolas Martin, was obliged to admit that the *MetaBirkins*
title is relevant to the artworks on a most basic level because it is descriptive of the
imaginary Birkin bags depicted. ECF65-4(85-86). The court nonetheless ruled that
there was "a genuine factual dispute as to whether Rothschild's decision to center
his work around the Birkin bag stemmed from genuine artistic expression or,
rather, from an unlawful intent to cash in on a highly exclusive and uniquely
valuable brand name." ECF140(21).

### b.    The "Explicitly Misleading" Factor

Despite the voluminous discovery materials that Hermès submitted with its
summary judgment papers, Hermès could not point to a single piece of evidence
showing a use of the *MetaBirkins* title that was *explicitly* misleading as to the

source or content of *MetaBirkins*. This was made most apparent at Mr. Martin's deposition, when he was unable to point to any explicitly misleading use. ECF65-4(114-118). Conversely, there was ample evidence in the record that Rothschild had always identified himself as the artist who created *MetaBirkins*. *See* pp. 11-15, *supra*.

The district court nonetheless ruled, citing *Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.*, 996 F.2d 1366, 1379 (2d Cir. 1993), that there was a triable issue of fact because the "explicitly misleading" issue had to be determined by the likelihood of confusion factors applied to normal trademark cases set out in *Polaroid Corp.*, 287 F.2d 492. ECF140(22). The court explained, "Put another way, the most important difference between the *Rogers* consumer confusion inquiry and the classic consumer confusion test is that consumer confusion under *Rogers* must be clear and unambiguous to override the weighty First Amendment interests at stake." ECF140(23). The court went on to note that the *Polaroid* factors require a fact-intensive analysis, declaring, "One may expect, then, that in most cases involving *Rogers* there would remain genuine issues of material fact with respect to many or most of its factors, even at the late stages of litigation" (ECF140(23-24))—in contravention of the clear purpose of *Rogers* itself, and despite the fact that the Court in *Rogers* and countless courts applying *Rogers* over

the last 30 years resolved those cases on motions to dismiss or for summary judgment without applying the *Polaroid* factors. *See* pp. 33-34, *infra*.

Finally, despite itself stating that "consumer confusion under *Rogers* must be clear and unambiguous to override the weighty First Amendment interests at stake," the court went on to rule that Hermès' consumer confusion study that purported to find 18.7% net confusion among potential consumers of NFTs (ECF67;ECF67-1(1-39))[9]—but which was deeply flawed in multiple ways, as Rothschild's survey expert cogently explained (ECF65-9)—coupled with scattered, ambiguous statements of unidentified individuals on social media and a few mistaken press reports were sufficient evidence of confusion to deny Rothschild summary judgment and send the case to trial. ECF140(24).

### c.    Evidence of Confusion

Hermès' produced no evidence that any *MetaBirkins* purchaser or Hermès customer was ever confused about the source of *MetaBirkins*, or that Rothschild ever told anyone that *MetaBirkins* came from Hermès. *See* ECF149(198-99). The entirety of Hermès' purported evidence of confusion consisted of: (i) ambiguous statements on social media by unidentified individuals; (ii) inquiries from reporters

---

[9] The court made no mention of Hermès' other confusion survey of luxury handbag purchasers that found a net confusion rate of 3.6% (*i.e.*, no confusion), which Hermès' survey expert conducted but chose not to mention in his expert report. ECF157(776-77);ECF159(921-22).

and four mistaken press reports; (iv) Dr. Bruce Isaacson's survey of luxury handbag purchasers that found 3.6% net confusion (*i.e.*, no confusion); and (v) Dr. Isaacson's survey of potential NFT purchasers that purported to find 18.7% net confusion, but which was beset by errors identified by Dr. Neal that, corrected, yielded a net confusion level of 9.3%. ECF159(966-71);(ECF65-9). Dr. Neal testified that experts consider a number below 15% to indicate a lack of confusion. ECF159(917)

### 3. The Trial

The district court conducted an eight-day jury trial from January 30 to February 8, 2023. At trial, the parties presented evidence and argument concerning the following issues relevant to this appeal:

### a. The Jury Instructions

At trial, the parties presented the case over six days; the jury deliberated over three days, sending this note on the second day of deliberations:

> Dear Judge Rakoff, No. 1, if the jury decides that Mr. Rothschild infringed and diluted the trademark and is liable for cybersquatting, yet feels there is a First Amendment protection, is he able to continue selling the NFTs, as well as keep ownership of the www.metabirkins.com?
>
> No. 2, if we are unanimous on the first three charges [trademark infringement, dilution, cybersquatting], but can't resolve the First Amendment issue, what happens?

ECF161(1086). The note was followed by a colloquy between Rothschild's counsel and the district court, in which Rothschild's counsel pointed out that "the jury appears to be engaged in logrolling with [Rothschild's] First Amendment rights, meaning they appear from this question to be determining whether the First Amendment protects his artistic expression in part by what they think the consequences are." ECF161(1088). Rothschild's counsel further pointed out that "this is an artifact, Your Honor, again, of the way you structured the jury instructions," and asked for judgment as a matter of law, which was denied. ECF161(1088-1089).

The district court's jury instructions erroneously and foreseeably led the jury to treat the First Amendment as an attempt to excuse conduct they already had determined to be infringement, which is contrary to *Rogers* and prejudiced Rothschild. Although the court repeatedly and correctly ruled that *Rogers* governs, the court rejected Rothschild's proposed jury instructions and special verdict form, which would have correctly instructed the jury first to apply *Rogers*' two objective factors to decide whether the First Amendment barred Hermès' claims, and to turn to the question of liability only if the jury found it did not. ECF138;ECF139.[10]

---

[10] Rothschild's proposed instructions and verdict form track the order in the Ninth Circuit's model for *Rogers* cases. *See* Committee on Model Jury Instructions, Ninth Circuit, Manual of Model Civil Jury Instructions for the Ninth Circuit 15.19A.

Instead, over Rothschild's objections, the court instructed the jury first to apply the *Polaroid* factors to determine whether Rothschild was liable for infringement, dilution, and cybersquatting under ordinary standards, and then—if it found liability on any of the claims—to decide "whether, nonetheless, Mr. Rothschild is protected from liability on any claim because, in creating the MetaBirkins NFTs, he engaged in artistic expression protected under the First Amendment to the U.S. Constitution." ECF143(21);ECF144;ECF157(857-64);ECF159(897). The court's original draft instructions even used the heading "First Amendment Defense." ECF157(849). Although the court ultimately changed this to "First Amendment Protection," the court itself later fell into the same trap that the flawed ordering inevitably laid for the jurors, stating on the morning of closing arguments and first day of jury deliberations, "But I did add to Instruction No. 9, where I am describing the basic claims, a sentence to flag the First Amendment *defense* was coming." ECF159(898) (emphasis added).

Additionally, the substance of the court's instructions, contrary to *Rogers* and over Rothschild's repeated objections, focused on Rothschild's subjective intent. After extensive argument at the charging conference, the court entirely removed the "artistic relevance" prong from the instructions because it finally decided that "no reasonable juror could conclude that there wasn't any artistic

expression in Mr. Rothschild's stuff." ECF159(900).[11] This left only the "explicitly misleading" prong of *Rogers* for the jury to decide. The court provided revised instructions for this just before the parties gave closing arguments, stating that "the more I thought about the Rogers test… the more I thought that on the facts of this case the real question is the defendant's intent." ECF159(898). The court's revised instruction focused not on whether Rothschild had made an *explicitly* (*i.e.*, overtly) misleading use of the Birkin mark, but on whether his use of the mark "was intentionally designed to mislead potential consumers into believing that Hermès was associated with Mr. Rothschild's MetaBirkin projects." ECF159(899).

Because the court made clear that it had determined, over Rothschild's many prior objections, that Rothschild's intent was the issue, and the court stated that all prior objections to the instructions were preserved, ECF159(899), Rothschild's counsel stated that the revised "instruction gives the jury words they can use to actually apply the principle, and we are satisfied with it." ECF159(901). Particularly considering the court's exclusion of Dr. Gopnik's testimony, this

---

[11] Rothschild was forced to defend himself at trial not knowing what issues were being tried for the first four days, as the district court had not issued its summary judgment opinion. ECF155(586). The court's failure to inform Rothschild in advance of trial of the issues that he and Hermès needed to prove prejudiced Rothschild's ability to defend himself in innumerable ways—he would have objected to much more of the evidence that Hermès presented had he known at the outset what issues the court would give to the jury.

charge was prejudicial to Rothschild, as the jury had no guidance in differentiating between an artistic intent to reference from a commercial intent to associate.

### b. Exclusion of Gopnik and Admission of Kominers

On the morning of the first day of trial, the district court granted Hermès' motion *in limine* to exclude the testimony of Rothschild's art expert, Dr. Gopnik, on the grounds that "in his report and in his deposition he fails to identify in any meaningful fashion what his methodology is for he [sic] applied it in this case…" ECF153(335). The district court relied on a few selected quotes plucked by Hermès from Gopnik's hours-long deposition and ignored Gopnik's impeccable qualifications, the methods normally used in the field of criticism, and the comparative methodology displayed in his expert report. ECF153(335-36); *see* ECF65-1. This left the jury without guidance from any witness at trial qualified to opine on Rothschild's conduct in the context of art history, and thus the jury had no objective frame of reference by which to evaluate, as erroneously instructed by the district court, whether Rothschild actions showed an intent to confuse or to make a legitimate artistic reference.

Gopnik's exclusion was especially pernicious because the court allowed, over Rothschild's objection, Hermès' economics expert to testify that *MetaBirkins* effectively was a brand, not art. *See* pp. 72-74, *infra*.

### c. Evidence of Confusion

At trial, Hermès presented the same purported evidence of confusion as it did on summary judgment (*see* B(2)(c), *supra*), with only one addition: a report by the head of Hermès' U.S. operations that some students in a class he teaches had asked him if Hermès was behind *MetaBirkins*. ECF159(966-71).

### 4. Rothschild's Post-Trial Motions

After the jury returned its verdict for Hermès and the court entered judgment, Rothschild filed two post-trial motions.

First, Rothschild moved for permission to interview the jurors based on material public statements made by the jury foreperson on social media immediately following trial suggesting that the foreperson likely relied on factually incorrect, extraneous information during jury deliberations. ECF170. Specifically, in response to comparisons by others of *MetaBirkins* to Warhol's *Campbell's Soup Cans* paintings, she stated, "Campbell's supported Warhol. It was their choice. It was their brand. Apples and Oranges." ECF170-1(1); "[Warhol] wasn't commissioned but [Campbell's] gave their blessing. See even YOU have consumer confusion. lol!" ECF170-2(2); and "The [MetaBirkins] jpgs attached infringed on a TM. Totally different than Warhol. Warhol had the blessing of Campbell's. And his artistic intent was never misleading." ECF170-3(1).

Warhol's *Campbell's Soup Cans* series predictably came up twice during the trial, *see* ECF149(137-39);ECF155(571-576), but because the court excluded Gopnik from testifying, there was no witness competent to testify about the comparison with *MetaBirkins*, Warhol's intent, or the fact that Warhol did not seek Campbell's permission before making his paintings.

Second, Rothschild filed a renewed motion for judgment as a matter of law ("JMOL") or, in the alternative, a new trial based on *Rogers*' objective factors, the evidence presented at trial, and the jury's note regarding the First Amendment issue. ECF172. The district court denied the motion, gratuitously stating, "In effect, the jury found that Rothschild was simply a swindler." ECF191(2). There is zero evidence suggesting that Rothschild ever cheated anybody, and the jury's note regarding the First Amendment and award of far less in damages than Hermès requested shows that the court's epithet was wholly unwarranted.

## C. Rulings Presented for Review

Rothschild appeals from the final judgment (ECF145) and order of permanent injunction (ECF190), as well as the following rulings:

- Denial of Rothschild's motion to dismiss. ECF50.

- Denial of Rothschild's motion for summary judgment. ECF140.

- The district court's rejection of Rothschild's proposed jury instructions and verdict form (ECF138;ECF139); its ordering of the jury instructions

and verdict form placing the questions of liability on Hermès' claims before the First Amendment questions, which it framed as a defense; and its focus of the "explicitly misleading" instruction on Rothschild's intent rather than overt conduct. ECF143(13-22);ECF(144).

- Exclusion of Dr. Gopnik's testimony at trial. ECF151(3);ECF153(335-37).

- Admission at trial of Dr. Kominers' testimony. ECF149(117-122);ECF153(269,336-37).

- Denial of Rothschild's motion for judgment as a matter of law during the trial. ECF157(810-843);ECF159(1053-1076);ECF161(1088-1089).

- Denial of Rothschild's post-trial motion for judgment as a matter of law or, in the alternative, a new trial. ECF191.

## SUMMARY OF ARGUMENT



René Magritte, *The Treachery of Images* (1929)

Magritte's treacherous image is not a pipe, and Rothschild's *MetaBirkins* are not handbags. *MetaBirkins* are artworks depicting fanciful, fur-covered Birkins that

exist only in Rothschild's imagination. The district court held Rothschild liable for making these artworks, and for giving them a title that describes them.

That result cannot stand. Rothschild did not use Hermès' marks to identify the source of any goods. He used those marks in the title and content of his artworks. Under this Court's controlling precedent, the use of a trademark in the title or content of an expressive work does not violate the Lanham Act unless that use has "no artistic relevance to the underlying work whatsoever" or "explicitly misleads as to the source or the content of the work." *Rogers*, 875 F.2d at 999. *Rogers* is the law of this case, and the Supreme Court's recent decision in *VIP*, 599 U.S. 140, only confirms that it applies here.

Properly applied, *Rogers* required dismissal on Rothschild's motions to dismiss or for summary judgment, or, at the very latest, on Rothschild's motions for judgment as a matter of law, and it compels reversal of the judgment below. The *MetaBirkins* title is unquestionably artistically relevant to the *MetaBirkins* images. And there has never been any evidence that Rothschild made any *explicitly* misleading use of Hermès' marks. Of course, it is possible that some consumers, looking at Rothschild's artworks and seeing the title *MetaBirkins*, might *infer* a connection with Hermès. But *Rogers* made clear that Rothschild's First Amendment rights cannot be overridden just because some people may make an incorrect inference.

Unfortunately, the district court failed to properly apply *Rogers* and instead applied an intent-based test throughout the case. This approach is inimical to *Rogers'* speech-protective framework, which does not inquire into artistic intent and demands dismissal of trademark infringement claims where, as here, the challenged use objectively is artistically relevant and not explicitly misleading, without reference to the *Polaroid* factors. Even if the *Polaroid* factors were relevant in a true *Rogers* case, however, an intent focus instead of a focus on "particularly compelling" evidence of confusion is reversible error.

The district court made other errors at trial that require reversal, including issuing jury instructions that incorrectly framed the First Amendment as a *defense* to infringement, rather than a rule of construction that shapes the plaintiff's case, and erroneously excluding the testimony of Rothschild's art expert while permitting Hermès' economics expert to testify, in effect, that *MetaBirkins* was a brand rather than art.

Additionally, the Supreme Court's decision in *Dastar*, 539 U.S. 23, independently bars all of Hermès' claims, which are based on the allegation that Rothschild's use of the *MetaBirkins* name and the design of the Birkin will cause confusion about the origin of Rothschild's intangible artworks. Under *Dastar*, only confusion about the origin of tangible goods is actionable under the Lanham Act. There are no tangible goods at issue in this case.

Finally, *Rogers* bars Hermès' dilution and cybersquatting claims, which are based on the same speech by Rothschild. *See Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Grp., Inc.*, 886 F.2d 490, 495 (2d Cir. 1989) (concluding the Rogers test is "generally applicable" to Lanham Act claims against works of artistic expression).

## ARGUMENT

## I.   THE DISTRICT COURT ERRED IN DENYING ROTHSCHILD'S MOTION TO DISMISS

This Court reviews the denial of Rothschild's motion to dismiss *de novo*. *Drimal v. Tai*, 786 F.3d 219, 223 (2d Cir. 2015).

In its order denying Rothschild's motion to dismiss, the district court correctly ruled that *Rogers* applies. ECF50(11) ("Because Rothschild is selling digital images of handbags that could constitute a form of artistic expression, balancing the First Amendment concerns with Lanham Act protection requires applying the Rogers test."). The district court also correctly rejected, as a matter of law, Hermès' attempt to distinguish *Rogers* by arguing that Rothschild was using Hermès' marks as a source identifier and not the title of an artwork:

> Hermes tries to distinguish Rogers on the ground that Rothschild uses the 'MetaBirkins' mark as a source identifier on social media to promote and advertise the NFTs, as a URL, and to identify a website, arguing that the First Amendment does not protect unauthorized use of another's mark as a source identifier. But this does little to distinguish Rogers or explain why the Rogers test does not apply here. Using the title of the artwork for social media and online accounts

> dedicated to selling the artwork is just like the marketing and
> advertising approved in <u>Rogers</u>.

ECF50(11-12) (citing *Rogers*, 875 F.2d at 998).[12] This is precisely the distinction

that the Supreme Court recently made in *VIP*. 599 U.S. at 154.

But after correctly identifying *Rogers* as the governing law, the district court

failed to apply it. The court insisted, instead, on a wholly different inquiry: whether

Rothschild "entirely intended to associate the 'MetaBirkins' mark with the

popularity and goodwill of Hermès' Birkin mark, rather than intending an artistic

association." ECF50(13-14).

That was error. The *Rogers* test is objective, and no allegations in the

complaint plausibly alleged that Rothschild's use of the asserted marks had no

artistic relevance whatsoever or was explicitly misleading—both questions on

which Hermès had the burden of proof. The district court's distortions of *Rogers*

ended up turning the precedent on its head: while this Court designed *Rogers* to

---

[12] The district court also correctly rejected Hermès' argument that *Rogers* didn't apply because Rothschild was selling his art, *see* ECF50(12) ("<u>Rogers</u> is not inapplicable simply because Rothschild sells the images -- the movie studio defendant in <u>Rogers</u> sold the film at issue."), or because he authenticated his art using NFTs. *See id.* ("Neither does Rothschild's use of NFTs to authenticate the images change the application of <u>Rogers:</u> because NFTs are simply code pointing to where a digital image is located and authenticating the image, using NFTs to authenticate an image and allow for traceable subsequent resale and transfer does not make the image a commodity without First Amendment protection any more than selling numbered copies of physical paintings would make the paintings commodities for purposes of <u>Rogers</u>.").

offer prophylactic protection to speech interests and promote early resolution, the district court believed that *Rogers* basically disabled courts from granting either a motion to dismiss or summary judgment. According to the district court, "[o]ne may expect, then, that in most cases involving *Rogers* there would remain genuine issues of material fact with respect to many or most of its factors, even at the late stages of litigation." ECF140(23-24).

This was error both as a matter of precedent and as a matter of logic. *See VIP*, 599 U.S. at 157 (The *Rogers* test "offers an escape from the likelihood-of-confusion inquiry and a shortcut to dismissal"). Courts in this Circuit and elsewhere have uniformly decided cases either on a motion to dismiss—*see, e.g., Champion v. Moda Operandi, Inc.*, 561 F. Supp. 3d 419, 436 (S.D.N.Y. 2021); *Louis Vuitton Malletier S.A. v. Warner Bros. Ent. Inc.*, 868 F. Supp. 2d 172, 183-84 (S.D.N.Y. 2012)—or on a motion for summary judgment. *See Rogers,* 875 F.2d at 1005; *MGFB Props., Inc. v. Viacom Inc.,* 54 F.4th 670, 688 (11th Cir. 2022) (Brasher, J., concurring) (*Rogers* avoids need for "extensive fact-finding"; "certainty is especially important in an area like this one where even the prospect of liability has the effect of chilling constitutionally protected speech"); *see also* 6 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION (5th ed. 2022) ("McCarthy") § 31:144.50 ("A trademark infringement claim brought against the use of a mark in an expressive work can be dismissed under the *Rogers* rule by a

motion for summary judgment or a Rule 12(b)(6) motion to dismiss for failure to state a claim."); Lynn M. Jordan & David M. Kelly, *Another Decade of* Rogers v. Grimaldi: *Continuing to Balance the Lanham Act with the First Amendment Rights of Creators of Artistic Works*, 109 TRADEMARK REP. 833, 871 (2019) ("Nearly every case applying *Rogers* has done so on either a motion to dismiss or on summary judgment.").

The court also misconstrued *Dastar*, which separately required dismissal as a matter of law.

## A.  *Rogers* Required Dismissal on the Pleadings

Under *Rogers*, use of a trademark in the title or content of an expressive work does not violate the Lanham Act unless that use has "no artistic relevance to the underlying work whatsoever" or, if it has some artistic relevance, if it "explicitly misleads as to the source or the content of the work." 875 F.2d at 999. Applying that standard, this Court affirmed summary judgment for the defendants on Lanham Act claims brought by Ginger Rogers against use of her name in the title of the film "Ginger and Fred." *Id.* at 1001-02. That title was artistically relevant to the movie: "The central characters in the film [were] nicknamed 'Ginger' and 'Fred,' and these names [were] not arbitrarily chosen just to exploit the publicity value of their real-life counterparts but instead ha[d] genuine relevance to the film's story." *Id.* at 1001. And the title "contain[ed] no *explicit*

indication that Rogers endorsed the film or had a role in producing it." *Id.* (emphasis added).

Crucially, *Rogers* distinguishes between *explicitly* misleading uses and uses that might merely cause some consumers to draw an incorrect inference. Because only explicitly misleading uses can lead to liability, *Rogers* rejected as irrelevant evidence that consumers were confused by the film's title: "The survey evidence… indicates at most that some members of the public would draw the incorrect inference that Rogers had some involvement with the film. But that risk of misunderstanding, not engendered by any overt claim in the title, is so outweighed by the interests in artistic expression as to preclude application of the Lanham Act." *Id.*

Courts in this Circuit have applied *Rogers* for more than 30 years in dozens of cases, and the basic framework has been adopted by every circuit to have considered trademark claims against expressive works. *See, e.g., MGFB Props.*, 54 F.4th 670; *Dr. Seuss Enters., L.P. v. ComicMix LLC*, 983 F.3d 443 (9th Cir. 2020); *Univ. of Alabama*, 683 F.3d 1266; *ETW Corp.*, 332 F.3d 915.

A faithful application of *Rogers*' objective test required dismissal on the pleadings in this case.

### 1. It is Clear From Hermès' Complaint that the *MetaBirkins* Title is Artistically Relevant to the Artworks

There has never been any reasonable dispute that the *MetaBirkins* title is artistically relevant to the *MetaBirkins* artworks. It is clear on the face of Hermès' complaint that the title describes the images' content. The district court acknowledged that "[t]he threshold for 'artistic relevance' is intended to be low and will be satisfied unless the use 'has no artistic relevance to the underlying work whatsoever.'" ECF50(13)(quoting *Rogers*, 875 F.2d at 999). But in evaluating artistic relevance, the district court improperly focused on Rothschild's *intent*, refusing to dismiss because Hermès had alleged that Rothschild "entirely intended to associate the 'MetaBirkins' mark with the popularity and goodwill of Hermès' Birkin mark, rather than intending an artistic association." ECF50(13-14).

But *Rogers* does not make artistic relevance a question of intent; the majority opinion does not use the word "intent" when describing the legal standard. 875 F.2d at 999. Hermès has never cited—and Rothschild has been unable to find—a single case in which a court applying *Rogers* ordered discovery regarding the artist's intent.[13] Artistic relevance is determined objectively, by

---

[13] The district court cited *Louis Vuitton*, 868 F. Supp. 2d at 178, in support of its improper focus on artistic intent. ECF50(13-14). But that court expressly rejected the plaintiff's argument that discovery was needed "to determine whether Warner Bros. intended to use an authentic Louis Vuitton bag or Diophy's knock-off bag" in the film at issue, ruling that the use was artistically relevant on its face because

looking at the artwork and assessing whether the use of the mark in the title has any relevance to the artwork's content. The *MetaBirkins* title is artistically relevant in the most straightforward possible way: it describes the content of Rothschild's artworks. That is precisely the sort of artistic relevance "Ginger and Fred" had; the title referred to the nicknames of the central characters of the film, and because those characters were aspiring dancers, the names had "genuine relevance to the film's story." *Rogers*, 875 F.2d at 1001.

The *Rogers* Court's focus on the title's connection to the movie's story shows that the artistic relevance inquiry is meant to test that *speech* is really what the defendant is selling. In other words, "artistic relevance" tracks the distinction between commercial and noncommercial speech. Noncommercial speech is speech that is itself the object of sale, while commercial speech is speech that sells something else. *See, e.g., U.S. v. United Foods, Inc.*, 533 U.S. 405, 409 (2001); *Mattel*, 296 F.3d at 905-07. *Rogers* draws exactly that distinction: "the title 'Ginger and Fred,'" this Court said, "[was] clearly related to the content of the movie and [was] not a disguised advertisement for the sale of goods or services or a collateral commercial product." 875 F.2d. at 1004-05.

_____

"the significance of the airport scene relies on Alan's bag— authentic or not— looking like a Louis Vuitton bag." 868 F. Supp. 2d at 178.

*Rogers* did not inquire into the defendants' "intent" in choosing to create a movie about characters nicknamed Ginger and Fred—the Court evaluated artistic relevance in relation to the work the artists chose to make. Likewise, the *Louis Vuitton* court accepted the producers' choice to create a scene that focused on the authenticity of a Louis Vuitton bag and evaluated artistic relevance in light of that choice. Rothschild was entitled to the same consideration. The title "MetaBirkins" has incontrovertible artistic relevance to the *MetaBirkins* images.

### 2.    Hermès' Complaint does not Allege any Explicitly Misleading Use

There has never been any plausible allegation, let alone evidence, that Rothschild's use of the *MetaBirkins* title for his artworks depicting imaginary fur-covered Birkins was *explicitly* misleading.[14] *Rogers* defines an explicitly misleading use as one with an "overt"—*i.e.*, "open to view; manifest"[15]—

---

[14] Rothschild is aware of no authority explaining what it would mean to use trade dress in the design of a consumer product in an explicitly misleading way. It cannot be that merely imitating the trade dress, especially in the imprecise and highly stylized way that Rothschild has done in *MetaBirkins*, could qualify as explicitly misleading. *See, e.g., AM Gen*., LLC v. *Activision Blizzard, Inc.*, 450 F. Supp. 3d 467, 486 (S.D.N.Y. 2020) ("Given the improbability of confusion between a vehicle and a video game—or, in the case of the contested toys, between a plastic figurine and a full-blown military machine—this Court grants Defendants' motion for summary judgment on Plaintiff's federal and New York trade dress claims.").

[15] *See Merriam-Webster Dictionary*, "overt", https://www.merriam-webster.com/dictionary/overt (visited November 3, 2023).

"indication of authorship or endorsement." 875 F.2d at 999, 1001. The *Rogers*

Court gave examples of explicitly misleading titles: "Nimmer on Copyright" for a

treatise not authored by Nimmer, or "Jane Fonda's Workout Book" for a book Jane

Fonda had nothing to do with. *Id*. at 999. Those titles are explicitly misleading

because they overtly claim a connection that does not exist. Likewise, titles

containing references that falsely and explicitly claim endorsement—*e.g.*, "an

authorized biography"—might be actionable. *Id*.

    *Rogers* contrasted those titles with the "[m]any titles" that "include a well-

known name without any overt indication of authorship or endorsement—for

example, the hit song 'Bette Davis Eyes,' and the film 'Come back to the Five and

Dime, Jimmy Dean, Jimmy Dean.'" *Id*. "To some people, th[o]se titles might

implicitly suggest that the named celebrity had endorsed the work or had a role in

producing it." *Id.* at 999-1000. But no such implicit suggestion is actionable: "the

slight risk that such use of a celebrity's name might implicitly suggest endorsement

or sponsorship to some people is outweighed by the danger of restricting artistic

expression, and the Lanham Act is not applicable." *Id*. at 1000.

    This distinction between explicit and implicit misleadingness is central to

*Rogers*. Ginger Rogers presented evidence of confusion among the film's

publicists as well as a survey that purported to show that 38% of respondents

mistakenly believed Rogers was associated with the film and 14% believed that

Rogers was directly involved in making the film. *Id.* at 1001 n.8. Given that

evidence, this Court acknowledged "there [was] no doubt a risk that some people

looking at the title 'Ginger and Fred' might think the film was about Rogers and

Astaire in a direct, biographical sense." *Id.* at 1001. This Court nonetheless

rejected Rogers' claim, because the title "contain[ed] no *explicit* indication that

Rogers endorsed the film or had a role in producing it." *Id*. (emphasis added). The

survey evidence "indicate[d] at most that some members of the public would draw

the incorrect inference that Rogers had some involvement with the film." *Id*.

"[T]hat risk of misunderstanding, not engendered by any overt claim in the title,

[was] so outweighed by the interests in artistic expression as to preclude

application of the Lanham Act." *Id*. *See also MGFB Props.*, 54 F.4th at 682 ("We

reject this [survey] evidence because any misunderstanding represented by the

survey data was not engendered by any overt claim.") (internal quotation omitted);

*Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1245-46 (9th Cir. 2013) ("Adding survey

evidence changes nothing. The test requires that the use be *explicitly* misleading to

consumers.") (emphasis in original); *ETW Corp.*, 332 F.3d at 937 & n.19

(affirming grant of summary judgment to defendant despite evidence that over

60% of respondents thought that artwork's subject was affiliated or connected with

plaintiff or approved or sponsored it); *AM Gen*., 450 F. Supp. 3d at 480 ("no

amount of evidence showing *only* consumer confusion can satisfy the 'explicitly

misleading' prong of the *Rogers* test because such evidence goes only to the 'impact of the use' on a consumer") (emphasis in original).

The *MetaBirkins* title does not explicitly state that Hermès is the source of, or authorized, Rothschild's artworks. The *MetaBirkins* title simply uses the Birkin mark to describe what is shown in the artworks. If *Rogers* is misread to suggest that mere use of a mark in a title could be *explicitly* misleading, then *Rogers* would not actually provide any protection to expressive content at all. *See Brown*, 724 F.3d at 1245 ("if the use of a mark alone were sufficient it would render *Rogers* a nullity") (cleaned up).

In rejecting Rothschild's motion to dismiss, the district court erroneously concluded that Hermès had alleged that Rothschild made statements that were "plausibly interpreted as explicitly [sic] misstatements and that this engendered the confusion on the part of consumers," citing paragraph 94 and Hermès' complaint Exhibit Y—neither of which contains any explicitly misleading statement. ECF50(18).

Paragraph 94 of Hermès' complaint quotes a selected portion of the *MetaBirkins* website out of context with the whole. ECF24(26-27). The quoted portion—which describes the *MetaBirkins* artworks as "a tribute to Hermes' most famous handbag, the Birkin, one of the most exclusive, well-made luxury accessories"—did not contain any *explicitly* misleading statement regarding the

source of *MetaBirkins*. Moreover, the screenshot attached to the complaint shows on its face that the website expressly and prominently identified Rothschild as the creator of *MetaBirkins*, stating:

> Creator Mason Rothschild began working on MetaBirkins shortly after the success of Baby Birkin, a one-of-one NFT covered by Forbes and Vogue that sold at auction for 5.5 ETH. In response to the community demand, Rothschild developed a new series, this time inspired by the acceleration of fashion's "fur free" initiatives and embrace of alternative textiles. […]

ECF24-21.

Complaint Exhibit Y is the published video transcript of Rothschild's December 6, 2021 interview with *Yahoo Finance*. ECF24-25. This exhibit, too, contains no explicitly misleading statement; rather, it prominently and expressly identifies *MetaBirkins* as an art project created by Rothschild. The headline reads, "NFT artist: 'MetaBirkins' project aims to create 'same kind of illusion that it has in real life'," the first sentence of the article states, "MetaBirkins NFT Series Artist Mason Rothschild joins Yahoo…", and the interview begins by identifying Rothschild as "the artist behind the MetaBirkin." ECF24-25(2).

### 3. The Supreme Court's *VIP* Decision Confirms that *Rogers* Applies Here

The Supreme Court's recent *VIP* decision confirms that *Rogers* governs this case. The question in *VIP* was whether the plaintiff had to satisfy the *Rogers* test before the case could proceed to the question of likelihood of confusion. 599 U.S.

at 152–53. The Court concluded it did not, holding that *Rogers* does not apply when the defendant uses a mark "in the way the Lanham Act most cares about: as a designation of source of the infringer's own goods." *Id*. at 153.[16] The Court found that VIP used "its Bad Spaniels trademark and trade dress as source identifiers of its dog toy." *Id*. at 159–60. VIP did so by highlighting the name and logo on the product's packaging, and by explicitly claiming that "Bad Spaniels" was its trademark. *Id*. The Court specifically distinguished VIP's use from Fellini's use of Ginger Rogers name in the title of *Ginger & Fred*. *Id*. at 153-55, citing *Rogers*, 875 F.2d at 998-1000. *Rogers* and the other cases in which the *Rogers* test had appropriately been applied, the Court held, were cases in which "the defendant has used the mark" in a "non-source-identifying way." 599 U.S. at 155-56, *quoting* Stacey L. Dogan & Mark A. Lemley, *Grounding Trademark Law Through Trademark Use,* 92 Iowa L. Rev. 1669, 1684 (2007); *see* Dogan and Lemley, *supra*, at 1683–1684, & n.58. So *Rogers* was properly applied to Danish pop band Aqua's use of the Barbie name in the title and lyrics of the "Barbie Girl" song because that was "not [use as] a source identifier: the use did not 'speak to the song's origin.'" *VIP*, 599 U.S. at 154 (quoting *Mattel*, 296 F.3d at 900, 902) (cleaned up). Likewise, *Rogers* applied to artist Daniel Moore's use of the

---

[16] The Supreme Court explicitly declined to decide whether *Rogers* "has merit in other contexts." *VIP*, 599 U.S. at 153.

University of Alabama's name and uniforms in his depiction of Alabama football games; Moore did not use the name or uniforms as trademarks, but "solely to 'memorialize' a notable event in 'football history.'" *Id*. at 154 (quoting *Univ. of Alabama*, 683 F.3d at 1279).

Those uses stand in contrast with ones where trademarks are used to designate source. *Id*. at 155. In those cases, courts "routinely conduct likelihood-of-confusion analysis, without mentioning *Rogers*." *Id.* (citing *United We Stand Am., Inc. v. United We Stand, Am. New York, Inc.*, 128 F.3d 86, 93 (2d Cir. 1997) ("offshoot political group's use of the trademark 'United We Stand America' got no *Rogers* help" because the defendant was using it "as a mark, to suggest the same source identification as the original political movement.") (cleaned up); *Harley-Davidson, Inc. v. Grottanelli*, 164 F.3d 806, 812-13 (2d Cir. 1999).

Rothschild's use of Hermès' marks is indistinguishable from the cases the Supreme Court identified as involving non-trademark uses. Like the defendants in *Rogers*, *Mattel*, and *Univ. of Alabama*—and unlike VIP— Rothschild used Hermes' marks in the title and content of *artworks*, not to sell other goods. And unlike VIP, Rothschild never claimed that *MetaBirkins* was a mark, nor did he use the title or the trade dress on packaging, on a hang tag, or in any other way in

which marks are typically used as source identifiers. Rothschild was selling only speech, and he made clear that he was its source.[17] *See* pp. 11-15, *supra*.

### 4. *Twin Peaks* Does Not Apply Here.

While the district court began its analysis of Rothschild's motion to dismiss by correctly holding that *Rogers* applied, ECF50(11), it erred in ruling that consideration of the "explicitly misleading" factor required application of the *Polaroid* factors. ECF50(14-17); *see Polaroid,* 287 F.2d 492. As the district court itself noted, this Court in *Rogers* did not apply the *Polaroid* factors to assess explicit misleadingness (or for any other purpose). ECF50(15).

The district court cited *Twin Peaks*, 996 F.2d 1366, in support of its argument that applying *Rogers* required application of the *Polaroid* factors. ECF50(15). But *Twin Peaks* deals with the special case of title-versus-title conflicts; it is not a general reinterpretation of *Rogers*. Judge Newman wrote the opinions in both *Rogers* (1989) and *Twin Peaks* (1993). In *Rogers*, Judge Newman specifically exempted title-versus-title conflicts from the protective *Rogers* rule, noting that "[t]his limiting construction would not apply to misleading titles that

---

[17] It changes nothing that Rothschild made his artwork available on a website using the metabirkins.com domain name. That domain name simply corresponded to the title of his artworks; he did not use that website to sell anything other than his artworks; and the website expressly identified Rothschild as the source. *See* Pl.Trial.Ex.227.

are confusingly similar to other titles." 875 F.2d at 999 n.5. *Twin Peaks* presented precisely that title-versus-title conflict: there, the plaintiff's work was titled "Twin Peaks," and defendant's work was titled "Welcome to Twin Peaks: A Complete Guide to Who's Who and What's What." 996 F.2d at 1371. The first line of Judge Newman's *Twin Peaks* opinion noted the conflict: "This appeal requires *adjustment of the competing rights of authors* under circumstances where the work of a second author contains both comment on a well-known work of a first author and substantial portions of the normally protectable expression contained in the first work." *Id*. at 1370 (emphasis added).

This understanding of *Twin Peaks* fits the facts in that case and aligns it with this Court's earlier holding in *Rogers*. In this case, there are no "competing rights of authors"—*only Rothschild is an author.* Hermès has only trademark rights, and it is *Rogers*, and not *Twin Peaks*, that applies where trademark rights must be weighed against an author's right in his creative expression.

More fundamentally, requiring consideration of the *Polaroid* factors in every case involving use of trademarks in connection with artistic works would eviscerate the protective purpose of the *Rogers* framework—to allow courts to resolve these kinds of cases early as a matter of law to avoid chilling artists' First Amendment rights. *See VIP*, 599 U.S. at 157 (The *Rogers* test "offers an escape from the likelihood-of-confusion inquiry and a shortcut to dismissal"). This Court

should take this opportunity to clarify that *Rogers* applies generally to cases involving the use of marks in the title or content of works of creative expression, and that *Twin Peaks* applies in special cases where both parties use the mark in a title (which is not the situation in this case).

5. ***Rogers* Also Required Dismissal of Hermès' Dilution and Cybersquatting Claims**

*Rogers* precludes Hermès' dilution claims as well, especially given that dilution implicates no countervailing interest in consumer protection. *See AM Gen.*, 450 F. Supp. 3d at 488 (dismissing AM General's federal and state dilution claims as barred by *Rogers*); *Louis Vuitton*, 868 F. Supp. 2d at 184 (same). Hermès' cybersquatting claims fail under *Rogers* for the same reason: none of these claims should succeed against Rothschild's protected artistic speech. There was no allegation or evidence that Rothschild ever used or contemplated using the metabirkins.com website for any purpose other than to promote the *MetaBirkins* artworks, and in doing so Rothschild was acting within his rights under the First Amendment in promoting his artwork on a website bearing the title of that artwork and identifying Rothschild as its source. *See Lamparello v. Falwell*, 420 F.3d 309, 316 (4th Cir. 2005) ("a court must evaluate an allegedly infringing domain name in conjunction with the content of the website identified by the domain name").

**B.** **The District Court Misconstrued *Dastar*, Which Separately Required Dismissal of Hermès' Claims**

Hermès' fundamental complaint is that, because Rothchild depicted imaginary Birkins and called the images *MetaBirkins*, consumers would believe that Hermès was the origin of the artwork, or that Hermès had some relationship with the art project. *See* ECF143(15) (instructions to jury that "Hermès contends that Rothschild's use of the Birkin name and/or the handbag's distinct visual appearance is likely to confuse potential consumers into thinking that the MetaBirkins NFTs are made and sold or otherwise connected with, associated with, sponsored by or approved by Hermès.").

Even if *Rogers* weren't dispositive, Hermes' claim would be barred by the Supreme Court's decision in *Dastar*, 539 U.S. 23, which holds that only confusion about the source of *tangible* goods, as opposed to communicative products like artwork, is actionable under the Lanham Act. *Dastar* was decided in 2003, after this Court's decision in *Rogers* and several subsequent decisions applying *Rogers* more broadly to artistic works. But even without *Rogers*, the rule of *Dastar* is equally clear: confusion as to the origin of intangible creative content, such as Rothschild's *MetaBirkins*, is not actionable under the Lanham Act.

Dastar copied footage from the *Crusade in Europe* television series and re-used that footage in its own video series without attribution. According to Fox, that constituted reverse passing off: *i.e.*, Dastar was passing off Fox's content as though

it were Dastar's own, thereby falsely designating the origin of the video series in violation of § 43(a) of the Lanham Act. *Id.* at 27.

The Supreme Court rejected that claim. According to the Court, as used in the statute, "origin of goods" refers only to "the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods." *Id*. at 37. "Goods" are, by definition, tangible things. Thus, while the concept of origin "might be stretched…to include not only the actual producer" but also the party who stood behind production of the physical product, "origin of goods" is "incapable of connoting the person or entity that originated the ideas or communications that 'goods' embody or contain." *Id.* at 31–32.

The Court's construction of the meaning of "origin" in the Lanham Act was animated by its concern that Fox might use trademark law to gain control over content for which it no longer had copyright protection. *Id*. at 33-34. But *Dastar's* rule is based on the meaning of the phrase "origin of goods" in the statute. The holding is not limited to cases involving formerly copyrighted works, or even cases in which a valid copyright exists. *See Bretford Mfg., Inc. v. Smith System Mfg. Corp.*, 419 F.3d 576 (7th Cir. 2005); *Williams v. UMG Recordings, Inc.*, 281 F. Supp. 2d 1177, 1185 (C.D. Cal. 2003). *Dastar* teaches that only misrepresentations of the origin of physical goods are actionable under the Lanham Act. Other sorts of

misrepresentations, including but not limited to misrepresentations of the origin of creative content, are not actionable. *See Phx. Entm't Partners, LLC v. Rumsey*, 829 F.3d 817, 828 (7th Cir. 2016) ("Even as to [communicative goods like documentary videotapes and karaoke tracks], the Court made clear that the 'good' whose 'origin' is material for purposes of a trademark infringement claim is the 'tangible product sold in the marketplace' rather than the creative content of that product.").

The district court fundamentally misunderstood *Dastar* at every stage, insisting that "*Dastar* said nothing at all about the general applicability of the Lanham Act to intangible goods." *Rothschild*, 590 F. Supp. 3d at 654. But that is *Dastar* through the looking glass: in fact, the Supreme Court's central holding in that case is *precisely* about "the general applicability of the Lanham Act." The *Dastar* Court defined "goods" as tangible goods and distinguished intangible content precisely because Fox alleged that the intangible content *was the relevant good* in that case. 539 U.S. at 31 ("the gravamen of respondents' claim is that, in marketing and selling Campaigns as its own product" without attribution, Dastar falsely designated the origin of its video). There is no distinction between intangible goods and their creative content: an intangible "good" *is its content*.

No reasonable jury could have found Hermès' claims to relate to any tangible goods— Hermès' Lanham Act claims *are about the images*, and, as the district court found, the NFTs are inseparable from the images. ECF140(14)

("[U]ndisputed evidence in the record indicates that consumers did in fact understand themselves to be purchasing exclusive ownership of the digital image alongside the NFT."); ECF149(136-37) (Q: "The images that we have seen of the MetaBirkins, the colorful imaginary Birkin fur bags, those are the images that you -- those are what you mean when you talk about MetaBirkins NFTs, correct?" A. "That is correct."). Those claims are therefore barred by *Dastar*. *See Slep-Tone Entertainment Corp. v. Wired for Sound Karaoke & DJ Servs., LLC* (9th Cir. 2017) (per curiam) (alleged confusion caused by the content of copyrighted music files not actionable under *Dastar*); *Rumsey*, 829 F.3d at 829 (rejecting plaintiff's claim of confusion over origin of digital copies of karaoke tracks based on use of plaintiff's registered mark in the content of the copies; any confusion was "not about the source of the tangible good sold in the marketplace"); *see also Phx. Entm't Partners v. J-V Successors, Inc.*, 305 F. Supp. 3d 540 (S.D.N.Y. 2018) (adopting the reasoning of *Rumsey*); *Pulse Entm't Corp. v. David*, No. CV 14-4732 (C.D. Cal. Sept. 17, 2014) Dkt. #19 (*Dastar* barred false designation of origin claim based on explicit misattribution to wrong creator).

## II.    THE DISTRICT COURT ERRED IN DENYING ROTHSCHILD'S MOTION FOR SUMMARY JUDGMENT

The district court's denial of Mr. Rothschild's motion for summary judgment is reviewed *de novo*. *Schaefer v. State Ins. Fund*, 207 F.3d 139, 142 (2d Cir. 2000).

### A. Undisputed Evidence Showed the *MetaBirkins* Title is Artistically Relevant

At summary judgment, the undisputed evidence confirmed what was obvious from the pleadings and what the court ultimately ruled at trial: the *MetaBirkins* title is artistically relevant at the most basic level because it describes the artworks, and on another level because of the "meta" prefix. *See* ECF66(¶12); ECF65-1(16-18). Even Hermès' Mr. Martin had admitted that "there is some link between the [*MetaBirkins*] title and what I see" in the images. ECF65-4(85-86).

### B. Discovery Produced No Evidence of an Explicitly Misleading Use

Because artistic relevance is obvious, and Hermès never plausibly alleged that Rothschild's use of the Birkin mark or trade dress was explicitly misleading, the district court should have ended this case by granting Rothschild's motion to dismiss. The district court only compounded its error by refusing to grant Rothschild's motion for summary judgment following a disruptive, expensive six-month period of discovery that left Hermès in exactly the same position it was in at the pleading stage—without any evidence of explicit misleadingness. *See* ECF140(22-24).

The title *MetaBirkins* is not itself explicitly misleading. *See* section I(A)(2), *supra*. And crucially, discovery failed to produce even a shred of evidence that Rothschild ever told anyone that his artworks came from Hermès. Hermès' Mr. Martin could point to no example of an explicitly misleading use at his deposition

(ECF65-4(11-13)), and he admitted at trial that he was aware of no evidence that Rothschild had ever claimed that *MetaBirkins* came from Hermès. ECF149(198). This testimony by Hermès' chief lawyer should have ended the case. The uncontroverted evidence is that Rothschild only ever identified himself as the creator of *MetaBirkins*. *See* pp. 11-15, *supra*.

### C. Even if *Twin Peaks* Applied, Hermès Has No "Particularly Compelling" Evidence of Confusion

As noted above, *Twin Peaks* applies to the narrow subset of cases involving title-versus-title conflicts and is not relevant here. The district court should not have admitted any evidence on confusion at all—it should have applied *Rogers*' objective test and dismissed Hermès' claims. But even if this Court were to determine that *Twin Peaks* applied, Rothschild was entitled to summary judgment in his favor. Because the *MetaBirkins* title is artistically relevant to Rothschild's images—as the district court even ultimately ruled at trial (ECF159(900))—Rothschild could be found liable under the *Twin Peaks* standard only if Hermès established a "particularly compelling" likelihood of confusion. *Twin Peaks*, 996 F.2d at 1379 ("[T]he finding of likelihood of confusion must be particularly compelling to outweigh the First Amendment interest recognized in *Rogers*."). Evidence of likely confusion that would satisfy an ordinary *Polaroid* analysis is not "particularly compelling." *Id.*; *AM Gen.*, 450 F. Supp. 3d at 478.

No reasonable jury could have found that Hermès established a "particularly compelling" likelihood of confusion—indeed, the jury should not have found that Hermès established even the ordinary level of actionable confusion appropriate to a case that doesn't involve protected speech. For one thing, *Hermès failed to identify a single confused purchaser*. Hermès' confusion evidence, aside from its surveys, consisted of scattered statements by journalists and unidentified individuals on social media. *See, e.g.*, ECF157(785-94);ECF155(578-79);Pl.Trial.Ex.279; ECF159(966-71). This kind of unreliable evidence does not reflect likely consumer confusion in a case where noncommercial speech is at issue. *See, e.g., MGFB Props., Inc. v. ViacomCBS Inc*., No. 5:19-cv-257-RH-MJF, 2021 WL 4843905, at *6-7 (N.D. Fla. Sept. 22, 2021) (applying *Rogers* and holding that social media evidence was unpersuasive because actionable confusion requires that consumer decisions be affected); *Medici Classics Productions, LLC v. Medici Grp*., *LLC*, 683 F. Supp. 2d 304, 312–13 (S.D.N.Y. 2010) (inquiries and media misattribution not probative of likely consumer confusion).

These statements aren't evidence of confusion even in non-*Rogers* cases. *See Two Hands IP LLC v. Two Hands Am., Inc.*, 563 F. Supp. 3d 290, 307 (S.D.N.Y. 2021) (inquiries and mistaken social "tagging" of plaintiff not probative of consumer confusion); *Reply All Corp. v. Gimlet Media, Inc*., No. 15-CV-4950 (WFK)(PK), 2020 WL 13536220, at *6 (E.D.N.Y. Feb. 12, 2020) ("Misdirected

social media posts and unsolicited emails praising Defendant's podcast are evidence of general confusion and not mistaken purchasing decisions, damage to goodwill, or loss of control of reputation."); *GoSMiLE, Inc. v. Dr. Jonathan Levine, D.M.D. P.C.*, 769 F. Supp. 2d 630, 644-45 (S.D.N.Y. 2011) (statements from non-purchasers not probative); *W.W.W.Pharm. Co., Inc. v. Gillette Co.*, 808 F. Supp. 1013, 1020-21 (S.D.N.Y. 1992) (same); *Grubhub Inc. v. Kroger Co.*, No. 1:21-cv-05312, 2022 WL 2774986, at *5 (N.D. Ill. May 25, 2022) (anonymous social media posts not evidence of actual confusion).

Moreover, there was particular reason in this case to bar this sort of inherently unreliable evidence. Birkins are both outrageously expensive and a cultural symbol of rarified wealth—and for those reasons many people who do not have the means to purchase a Birkin or any direct experience with them are still fascinated by, and like to chatter about, Birkins. An analogous observation must be made about Rothschild's *MetaBirkins*: they were priced (on the resale market) out of reach of most people and were difficult to access in the first-sale market even for those who had the means and the technical know-how to purchase them. Thus, posts by unidentified people on social media are even less reliable than social media posts by unidentified individuals that concern products within the reach of most ordinary consumers.

The district court's mistaken decision to allow Hermès to introduce and rely on this kind of evidence clearly prejudiced Rothschild. That prejudice is apparent in a post-verdict public comment on LinkedIn by the jury foreperson:

> [S]eems [Rothschild's] goal was to try and imitate the customer and brand journey of a real world product in a digital world. Which is a cool idea. Only instead of being purely artistic about it he created an entire business and marketing plan (road map with attached utility) along with it, didn't disclaim the relationship to Hermes nor correct major media outlets published confusion that this was initiated by Hermes. He leveraged their trademarks to create hype and to profit. Then when busted, ignored a cease and desist and tried to hide under the 1st amendment. Which, IMO, sullies it for other people who are legally pursuing the outer boundaries of art in the digital world. He got greedy. It's sad. Now he is trying to use the entire premise of artistic freedom to play victim. Nobody questioned his actual artwork nor if he is or isn't an artist. It was how he used this art that waived his rights. Intent to mislead.

ECF174-12(3). These statements are troubling;[18] they show that the jury foreperson ignored the evidence that Rothschild did in fact correct mistaken media outlets—Rothschild's uncontradicted testimony at trial was that he and his public relations representative Ken Loo actively worked to correct them. *See*

---

[18] The post is rife with inaccuracies. In fact, the undisputed evidence was that upon receiving that letter, Rothschild retained counsel and quickly responded. Pl.Trial.Ex.21;ECF149(210-214);ECF153(311-13). The comment suggests that the jury considered Rothschild's assertion of his First Amendment rights as evidence of his intent to mislead. That is plainly improper. Additionally, the jury foreperson's comment disparaging Rothschild as "tr[ying] to hide under the First Amendment" reflects the problem created by the erroneous way in which the district court structured its instructions—the foreperson clearly regards the First Amendment as functioning in this case as an "excuse."

ECF153(303-304). And even if there were articles that Rothschild did not correct, Rothschild's First Amendment rights cannot be negated by a failure to correct every mistaken press report.

Nor is the Isaacson survey probative of confusion; the district court should not have credited it at all. As Dr. David Neal cogently showed, the survey is riddled with methodological mistakes that cooked the books in Hermès' favor. (ECF65-9). Even if the survey deserved full credit, however, it actually undermines Hermès' claims. The survey purports to show only 18.7% confusion. ECF67-1(42). Some courts find that level of confusion insufficient even in ordinary confusion cases; others find it barely sufficient. *See* 4 McCarthy § 32:188 ("In the author's view, survey confusion numbers that go below 20% need to be carefully viewed against the background of other evidence weighing for and against a conclusion of likely confusion."). It is plainly insufficient to meet the heightened "particularly compelling" standard of *Twin Peaks*. *See AM Gen.*, 450 F. Supp. 3d at 482 (finding "no evidence of actual confusion" despite plaintiff's survey showing 16% confusion as to AM General's association with the Call of Duty videogame, noting that "[l]ess than 20 percent confusion regarding two companies' association…does not hurdle" the requirement that evidence of confusion be particularly compelling).

But the district court should not have given Hermès' survey that much credit. *See VIP*, 599 U.S. at 163-64 ("courts should treat the results of surveys with particular caution" in cases "implicating First Amendment concerns") (Sotomayor, J., concurring). Isaacson counted as "confused" respondents who his own data showed did not actually believe that Hermès was connected to the *MetaBirkins* and were merely reading back the trademarks they saw on Isaacson's test stimulus. ECF65-9(12-21). Isaacson correctly included a follow-up question to account for this "reading back" problem, but he improperly ignored the data from this question, thereby materially inflating the level of confusion he purports to find. *Id*.

Once corrected for the failure to control for "reading back," Neal found that the level of confusion in Isaacson's survey falls to 9.3%. ECF65-9(19). That is below the level that nearly any court would find to be probative of confusion in an ordinary infringement case not involving artistic expression. It is utterly insufficient to meet the "particularly compelling" standard that *Twin Peaks* requires in a case, like this one, where the defendant's noncommercial speech interests are at stake.

The problems with Isaacson's survey go even deeper. As Neal's uncontradicted testimony at trial demonstrated, Isaacson's key confusion questions are worded in a way that inflates the purported confusion number. Specifically, Isaacson asked "What company, companies, person, or people do you think makes

or provides the items shown on the webpage [that was used as the stimulus]?" ECF65-9(20). Because the survey was purportedly about NFTs, and the respondents were purportedly purchasers of NFTs, it would have been natural and logical to ask who makes or provides the NFTs. Instead, the survey asked about "the items shown on the webpage", which is inherently ambiguous since respondents could easily interpret that phrase to refer to the artworks themselves or the real-world handbags the artworks visually reference—and indeed some did. ECF65-9(20-22). To the extent that respondents interpreted the questions to refer to the latter, their answers would not reflect confusion about who puts out the *MetaBirkins* artworks; they would reflect an accurate understanding of who puts out the physical object visually referenced in the *MetaBirkins* artworks. *Id*.

Hermès introduced no evidence that would overcome these material flaws that Neal identified. And the shortcomings of Isaacson's survey underscore the wisdom of *Rogers'* teaching that surveys purporting to find confusion from ambiguously labeled artworks should be ignored. But if *Twin Peaks* is the standard, then Isaacson's surveys actually supported Rothschild's motion for summary judgment, as it is not evidence of a particularly compelling level of confusion—in fact, it is evidence that confusion is unlikely.

## III. THE DISTRICT COURT'S JURY INSTRUCTIONS WERE CONTRARY TO *ROGERS* AND PREJUDICIAL TO ROTHSCHILD

The Second Circuit "review[s] a claim of error in the district court's jury instructions *de novo*" and will vacate the judgment "if the appellant shows that the error was prejudicial in light of the charge as a whole." *Woods v. START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 165 (2d Cir. 2017).

At trial, the district court erroneously made Rothschild's intent the focus of the entire case. The court erred in rejecting the *Rogers*-compliant jury instructions that Rothschild submitted, instead, over Rothschild's repeated objections, (i) ordering the instructions in a way that framed the First Amendment as an excuse for infringement and (ii) instructing that "if Hermès proves that Rothschild actually intended to confuse potential customers, he has waived any First Amendment protection." ECF143(13-22). [19]

---

[19] Instruction 14 also is erroneous because the district court made no attempt to distinguish between Rothschild's intent upon adopting the mark and whatever his state of mind might have been after adopting the mark. ECF143(21-22). Under Second Circuit law, the only relevant intent is the intent at the time of adopting the mark: "In analyzing whether a defendant has acted in bad faith, the question is whether the defendant attempted to exploit the good will and reputation of a senior user by *adopting* the mark with the intent to sow confusion between the two companies' products." *Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 88 (2d Cir. 2020) (emphasis added; cleaned up). A defendant's failure to remedy confusion that only later becomes apparent is not relevant to intent.

## A. The Jury Instructions Erroneously Framed the First Amendment as a Defense to Infringement

The district court's instructions, contrary to *Rogers* and over Rothschild's objections, treated the First Amendment as a technical excuse for infringement and cybersquatting. *See* pp. 21-23, *supra*. The court instructed the jury that it should first determine whether Rothschild was liable for trademark infringement, dilution, and cybersquatting under the standards that apply to those claims where no First Amendment interest is at stake. ECF143(13-22). Only *after the jury had found Rothschild to have violated the law,* the court instructed, should the jury consider whether Rothschild had "waived" his First Amendment rights because he had intended to cause the confusion that the jury had already found he caused. ECF143(21). But *Rogers* does not create a defense excusing otherwise unlawful conduct; it *replaces* the ordinary infringement rules with only two considerations: artistic relevance and explicit misleadingness. There is no precedent whatsoever in this Circuit for treating *Rogers* as a defense, or for replacing the *Rogers* factors with an unguided inquiry into the defendant's intent.[20]

---

[20] The district court's instruction gave more weight to intent than courts do even in ordinary trademark cases where no free-speech interest is at stake. Under Second Circuit law, "bad intent" is not a free-floating inquiry. For it to be relevant at all, a plaintiff must produce explicit evidence of the defendant's intent to cause confusion. But even where that intent is shown by overwhelming evidence, bad faith and an intent to deceive "do not alone determine likelihood of confusion nor provide an occasion for imposing punishment." *Car-Freshner Corp. v. Am. Covers, LLC*, 980 F.3d 314, 333 (2d Cir. 2020). But that is exactly how the court's

The jury's note during deliberations regarding the First Amendment and the foreperson's post-trial public comment that Rothschild, "when busted, ignored a cease and desist and tried to hide under the 1st amendment" show that the court's error prejudiced Rothschild. *See* pp. 21-22, 56, *supra*.

### B. The Jury Instructions Erroneously Invited the Jury to Conflate Intent to Confuse with Intent to Reference

Instruction 14 additionally contravenes *Rogers*' command that artistically relevant uses are subject to liability only when *explicitly* misleading. *See* ECF143(21-22). Moreover, the second part of the instruction especially collapsed the distinction between explicit and implicit misleadingness and invited the jury to use confusion attributable to an implicit statement as grounds to find Rothschild liable. *See id.*

The district court's use of intent was especially pernicious in this case because the court already had found that the *MetaBirkins* artworks *artistically referenced* the Birkin bag, ECF50(5-7), and at trial Rothschild confirmed that he adopted the *MetaBirkins* name in order to "reference" the Birkin bag.

> THE COURT: So maybe this has been answered, but at least to me it's unclear. The decision to use the term "MetaBirkins" was yours, yes?

--------

instructions treated intent here: if the jury found likely confusion under the ordinary test, intent removed First Amendment protection. Giving intent more weight in a case like this, where First Amendment interests are at stake, is exactly backwards.

[ROTHSCHILD]: The final decision to actually use the term, yes.

THE COURT: Okay. And you intended to associate – to indicate to the people who were accessing this that this was in some sense a reference to Birkin bags, yes?

[ROTHSCHILD]: In some ways, yes, a reference.

ECF155 (543-44). Artistic reference may incidentally result in consumer confusion, but an intent to make an artistic reference is not the same as an intent to confuse. [21] Indeed, the First Amendment protects artistic reference under *Rogers* even when it leads to confusion—as it did in *Rogers* itself. 875 F.2d at 1001.



---

[21] In his *Yahoo* interview, Rothschild made the nature of his art project quite clear. He said that in making *MetaBirkins* he "wanted to see as an experiment…I could create that same kind of illusion that it has in real life as a digital commodity." ECF24-25(2). The district court correctly pointed to this in its summary judgment opinion as evidence that "Rothschild viewed the project as a vehicle to comment on the Birkin bag's influence on modern society." ECF140(16-17). This statement has nothing to do with an intent to confuse or mislead.

There can be no doubt that Warhol intended to reference Campbell's in his iconic *Campbell's Soup Cans* series, but that does not mean Warhol intended to confuse. Brands are, unsurprisingly, frequent subjects of art. Moreover, artists overwhelmingly engage with *famous* brands and to work to leverage that fame to make their art relevant. Warhol's *Campbell's Soup Cans* wouldn't have had the same impact had he painted cans of supermarket-brand soup. But under the district court's intent test, Campbell's would have been entitled to subject Warhol to a trial on the question whether Warhol was, as the district court put it, acting with "an unlawful intent to cash in on a highly exclusive and uniquely valuable brand name." ECF140(21).

The failure to distinguish between intent to reference and intent to confuse is a pervasive problem in this case. For example, Hermès' counsel focused on various statements Rothschild made to potential business partners indicating that he was trying to arrange a collaboration with Hermès. ECF159(974-75). But as the district court noted in its summary judgment opinion, "though Rothschild sought to partner with Hermès on the project, after his attempts failed to bear fruit he did not represent to others that Hermès had agreed to work with him." ECF140(16).

Even if Rothschild's statements were false, as Hermès argued, they are not evidence of an intent to confuse. Rothschild's private statements to associates that he wanted to have Hermès' involvement indicated that Hermès *was not involved*

with the *MetaBirkins* as of the time the statements were made. Far from being evidence of Rothschild's supposed intent to confuse, those statements are evidence of Rothschild's intent to claim authorship of his own work. The district court recognized that intent in its summary judgment opinion, when it noted that "after Hermès sent to Rothschild a cease-and-desist letter outlining its allegations, Rothschild placed a prominent disclaimer on the MetaBirkins website stating that his project was 'not affiliated, associated, authorized, endorsed by, or in any way officially connected with Hermès, or any of its subsidiaries or affiliates.'" ECF140(16). The court further acknowledged that "when several publications mistakenly reported an affiliation between Hermès and the MetaBirkins project …the defendant's publicist, Kenneth Loo, reached out and asked that these publications issue corrections regarding the mistaken affiliation." *Id*. The district court noted that Hermès "ha[d] offered admissible evidence contradicting each of defendant's assertions and the evidence referenced above," but that "such evidence does little more than show that Rothschild's project was driven in part by pecuniary motives, a fact that does not bar application of the <u>Rogers</u> test". ECF140(17-18).

An intent to make money through a successful artistic reference is not the same as an intent to confuse, and none of the evidence cited by Hermès suggested the latter intent. In other words, whereas there is ample evidence showing that

Rothschild did not have an intent to confuse, Hermès offered no evidence

suggesting otherwise. *See* p. 11-15, *supra*.

## IV.   THE DISTRICT COURT ABUSED ITS DISCRETION IN EXCLUDING GOPNIK'S EXPERT TESTIMONY AND ADMITTING KOMINERS' EXPERT TESTIMONY

Exclusions of expert testimony are reviewed for abuse of discretion. This

Court has not hesitated to find abuse of discretion where the jury would have been

aided by the expert's testimony. *See*, *e.g.*, *Sarkees v. E. I. Dupont De Nemours &

Co*., 15 F.4th 584, 589-93 (2d Cir. 2021); *Anderson News, L.L.C. v. American

Media, Inc*., 899 F.3d 87, 112-13 (2d Cir. 2018); *In re Pfizer Inc. Securities Litig.*,

819 F.3d 642, 659-61 (2d Cir. 2016) (abuse of discretion to exclude expert whose

testimony fit the theory of the case).

As the Supreme Court explained in *Kumho Tire Co., Ltd. v. Carmichael*:

"Experts of all kinds tie observations to conclusions through the use of what Judge

Learned Hand called 'general truths derived from ... specialized experience.'" 526

U.S. 137, 148-149 (1999). In cases involving nonscientific methodology and

experiential knowledge, the trial court must be flexible in its application of the

*Daubert* factors in determining the reliability of an expert's testimony. *Id.* at 141.

When an expert's testimony is not scientific or technical, the reliability of that

testimony need not be based on "a particular methodology or technical

framework," but instead can be found reliable based on the expert's knowledge and

experience alone. *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1018 (9th Cir. 2004). Where the testimony is "nonscientific" in nature, "the emphasis is placed not on the methodology of the expert testimony, but on the professional and personal experience of the witness.... The methodology of proffered nonscientific testimony need not be subjected to rigorous testing for scientific foundation or peer review." *Crowley v. Chait*, 322 F. Supp. 2d 530, 539 (D.N.J. 2004) (citations omitted). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharma.*, 509 U.S. 579, 596 (1993).

The district court abused its discretion by requiring scientific rigor from an art expert in excluding Dr. Gopnik's testimony on the basis that he lacked a testable methodology. ECF151(3);ECF153(335-37). Gopnik's methodology is of the type ordinarily used by experts in the field: it is a comparative method based on extensive study and experience of artists, the art market, art history, and art criticism. *See* ECF65-1 (comparing *MetaBirkins* to other notable artworks in history). The reliability of nonscientific expert testimony "depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it." *Hangarter*, 373 F.3d at 1017 (cleaned up); *Voilas v. General Motors Corp.*, 73 F.Supp.2d 452, 461 (D.N.J. 1999) (endorsing Timothy Perrin, *Expert*

*Witness Testimony: Back to the Future*, 29 U.RICH.L.REV. 1389, 1457 (1995) ("[In the nonscientific context], the qualifications of the expert will be of particular importance. This is so because in the nonscientific world, theories are often not subject to testing or experimentation.").

In *United States v. Vesey*, for example, the court found that it was abuse of discretion to exclude an expert qualified by experience who "testified that he had extensive knowledge" of drug trafficking, used that knowledge to formulate general rules of behavior and "to explain the logic and reasoning behind that behavior," and "then applied both the rules and the reasoning behind them to the behavior of the actors in this case." 338 F.3d 913, 916-18 (8th Cir. 2003). Given the qualitative nature of the expertise, the expert sufficiently explained how his opinions resulted from reliable principles and methods. *Id*. at 918.

Likewise, it was abuse of discretion to reject Gopnik's comparative methodology on the basis that he truthfully testified that there is no consensus among art critics and historians about certain questions. ECF153(335-36). *See, e.g.*, *Cohen v. G&M Realty L.P.*, Case No. 13-CV-05612 (FB) (RLM), Case No. 15-CV-3230 (FB) (RLM), 2017 WL1208416, at *2-3 (E.D.N.Y. Mar. 31, 2017) (art experts are allowed to invoke "iconoclastic and disputable aesthetic theories," which can provide "a legal basis for the plaintiffs' expert's chosen methodology"; even courts' skepticism about premises and rigor do not merit exclusion where

experts used variety of relevant factors to reach their conclusions; "any remaining problems with the expert are for the jury to decide").

The comparative method used in art history and art criticism, and employed by Gopnik, is appropriate in obscenity cases, which also concern art. For example, in *United States v. Arthur*, the defendant's expert report compared the accused materials to "literature and art that is generally accepted as having serious artistic or literary value," and the appeals court held that excluding this testimony was error. 51 F.4th 560, 573-74 (5th Cir. 2022). "Determining whether a work has serious literary or artistic value is not a strictly scientific inquiry," and the comparative method is sufficiently reliable:

> [A]s a matter of common sense, comparing the content, as well as the literary and artistic devices used, in the charged materials with works a reasonable person would understand as having literary or artistic value is a logical method for determining whether a reasonable person would also interpret the charged materials as having such value.

*Id*. at 574. Art criticism is qualitative, not quantitative, and objections to Gopnik's comparisons should have been assessed by the jury. *See Deputy v. Lehman Bros*., 345 F.3d 494, 506–09 (7th Cir. 2005) (district court abused its discretion in excluding testimony because its concerns properly went to weight and credibility rather than to admissibility). Indeed, Hermès' expert Dr. Kominers admitted that he did not take into account the art market as a "factor" in his "empirical" analysis of the prices fetched by Rothschild's *MetaBirkins* because he "couldn't figure out a

way to do it that would be robust." ECF81-4(9-12). This inability to quantify art is precisely why Gopnik's testimony would have aided the jury.

Gopnik would have enabled the jury to understand the artistic traditions and practices in which Rothschild was operating, and works relevant to understanding his art, that laypeople usually do not know. This would have (i) corrected the foreperson's mistaken assessments of Rothschild's activities, *see* p. 56, *supra*, and her mistaken belief that Warhol, a particularly prominent artist who engaged with brands in his art, was licensed by Campbell's Soup (*see* p. 26, *supra*); and (ii) provided the broader context in which Rothschild's art and surrounding promotion of it was set. Gopnik would have explained to the jury how Rothschild's *conduct* was consistent with his stated artistic intentions. *See* ECF80(4-10) (explaining that Rothschild's aggressive promotional activities, desire to make money with his art, and use of "utilities" were all consistent with his stated artistic intentions). Gopnik's opinion was based on his understanding of the artistic conventions that Rothschild worked within, how Rothschild's work engages the artistic genres of conceptual art and business art, and how other recognized artists within those genres have approached their work in ways that are similar to what Rothschild did. *See id.*; ECF65-1(5-15); *Alcantar v. Foulk*, No. 1:14-cv-00747 LJO MJS (HC), 2016 WL 3001242, at *12 n.17 (E.D. Cal. May 25, 2016) ("There is an important difference between an expert's testimony that a specific individual possessed a

specific intent, and testimony that gives meaning to the defendant's actions.")
(cleaned up). Without Gopnik's testimony, the jury was left at sea to determine
alone if Rothchild's conduct was consistent with his stated intentions—and
Gopnik's exclusion was not harmless, as illustrated by the foreperson's misguided
public statements following trial. *See* pp. 26, 56, *supra*.

Although art is rarely litigated, courts have routinely admitted similar expert
evidence in cases requiring an understanding of the artistic context. *See, e.g.,*
*Brancusi v. United States*, 54 Treas. Dec. 428, 430-31 (Cust. Ct. 1928) (relying on
expert testimony of artists, critics, and curators to distinguish art from mere metal
"objects" for the purpose of assessing tax liability); *Castillo v. G&M Realty L.P.*,
950 F.3d 155, 166 (2d Cir. 2020) (inviting testimony of "the artistic community,
comprising art historians, art critics, museum curators, gallerists, prominent artists,
and other experts" as one way of implementing "Justice Holmes's cautionary
observation that '[i]t would be a dangerous undertaking for persons trained only to
the law to constitute themselves final judges of the worth of [visual art].'") (citing
*Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 251(1903)); *U.S. v. Ten
Erotic Paintings*, 432 F.2d 420, 420 (4th Cir. 1970) (relying on affidavits in which
art experts certified that the works in question had artistic merit); *Com. v. United
Books, Inc*., 453 N.E.2d 406, 412 (Mass.1983) (expert testimony on literary or
artistic merit admissible in obscenity case) (quoting *Smith v. California*, 361 U.S.

147, 164–165 (1959) (Frankfurter, J., concurring) ("[T]o exclude such expert testimony is in effect to exclude as irrelevant evidence that goes to the very essence of the defense and therefore to the constitutional safeguards of due process.")).

Thus, it was an abuse of discretion to exclude Gopnik's testimony, which went to the heart of the case and about which Gopnik was eminently qualified to opine. *See* ECF65-1(3-4,21-26); *Luke Records v. Navarro*, 960 F.2d 134, 138–139 (11th Cir. 1992) (reversible error to ignore expert testimony that a rap album had serious artistic value); *Yudkin v. State*, 182 A.2d 798, 802-03 (Md. 1962) (reversible error to exclude experts who would have testified that the book *Tropic of Cancer* had literary merit); *cf. U.S. v. Onumonu*, 967 F.2d 782, 788-89 (2d Cir. 1992) (excluding expert testimony about practices of smugglers was abuse of discretion and reversible error where evidence would have assisted jury in assessing what defendant reasonably believed).

Moreover, the exclusion of Gopnik's testimony was especially harmful in light of the district court's decision to allow Hermès' economics expert, Dr. Scott Kominers, to testify over Rothschild's objection. Kominers submitted a dense expert report that Hermès used to make two arguments: (i) that because *MetaBirkins* were "digital brand" NFTs rather than "art-only" NFTs, since they offered "utilities" (such as access to Rothshchild's other art projects) to

72

*MetaBirkins* owners, Rothschild used the "MetaBirkins" title as a brand, not for artistically relevant reasons;[22] and (ii) that a statistical analysis by Kominers showed that the high prices for which *MetaBirkins* resold after their release were attributable to the use of the Birkin mark. ECF89(3-5, 9).

After the district court excluded Gopnik from testifying, Rothschild moved to exclude Kominers' testimony on the grounds that it was not relevant and would only confuse the jury. (ECF149(117-21), as Kominers had admitted that he could not say what is or is not art (ECF100-2(4-6)), and he had admitted that he did not take into account the art market as a "factor" in his "empirical" analysis of the prices fetched by Rothschild's *MetaBirkins* because he "couldn't figure out a way to do it that would be robust." ECF81-4(9-12).

The district court denied Rothschild's motion and allowed Kominers to testify on both points, apparently misapprehending the purpose for which Hermès offered Kominers' testimony. ECF149(117-122);ECF153(269,336-37). The district court misperceived Kominers as an expert on the likelihood of confusion:

> [Kominers] does a comparison between how NFTs that are associated with other brands operate in the marketplace, the other brands being brands that expressly entered into the NFT marketplace. And he compares that to what happened in the MetaBirkin marketplace, and he concludes that the effect was, in his view, solely or wholly comparable to what happens to those other brands and, therefore,

---

[22] Kominers' expert report was the first time he published about this contrived distinction. *See* ECF81-4(4-6).

reflected the consumers' and the sellers' and purchasers' belief that
this was an Hermès Birkin bag product.

ECF153(336-37). But Kominers' expert report and Hermès' summary judgment
papers made clear that Kominers was offered to testify that Rothschild was using
the *MetaBirkins* title as a brand rather than for artistically relevant reasons
(ECF89(3-5, 9))—in other words, he effectively was offered to testify that
*MetaBirkins* was not art even though he had no qualifications to do so. The district
court apparently picked up on this during Kominers' testimony at trial, calling
counsel to the sidebar and stating, "I worry that he's getting close to what I forbade
earlier, which is any comment on whether or not [*MetaBirkins*] is art."
ECF157(632)

But the damage was done, as shown by the jury foreperson's factually
inaccurate comment on LinkedIn immediately following the trial. *See* p. 56, *supra*
(pointing to Kominers' "utilities" argument, among other things). The district court
abused its discretion in allowing Kominers to testify, especially after excluding
Gopnik. Had Gopnik been allowed to testify, he would have made clear that the
"utilities" that Kominers identified to insinuate that *MetaBirkins* was not protected
artistic expression in fact are "perfectly normal aspects of traditional artistic
practices." ECF80(4-5).

## V.    THE DISTRICT COURT ERRED IN DENYING ROTHSCHILD'S MOTIONS FOR JUDGMENT AS A MATTER OF LAW

In its orders denying Mr. Rothschild's motion for judgment as a matter of law ("JMOL"), the district court yet again refused to apply *Rogers*' objective test and adhered to its erroneous intent test (ECF159(1072-76);(ECF191(23-25)), even stating post-trial, "In effect, the jury found that Rothschild was simply a swindler" (ECF191(2))—an epithet wholly unsupported by the record and belied by the jury's notes on the First Amendment and award of only half the damages that Hermès requested  ECF161(1086); ECF159(995-996);ECF144.

The district court's attachment to its intent test was indefensible in the wake of *VIP*, which confirmed that *Rogers* continued to apply in full to cases like this one—where the defendant uses a mark not as a source indicator for goods, but rather in the title and content of artwork. In fact, the district court had in its motion-to-dismiss decision already recognized, many months before the Supreme Court handed down its *VIP* decision, that Rothschild was *not* making a trademark use of Hermès' marks. The district court correctly ruled from the outset, as a matter of law, that Rothschild's "[use of] the title of the artwork for social media and online accounts dedicated to selling the artwork is just like the marketing and advertising approved in <u>Rogers</u>." ECF50(11-12) (citing *Rogers*, 875 F.2d at 998).

But in its post-trial JMOL decision, the court inexplicably reversed its view—despite its prior rulings and the undisputed evidence supporting them (*see*

pp. 11-15, supra)—and stated that Rothschild *was* using the Birkin mark as a source designation "by using a website he labeled 'metabirkins.com' to sell NFTs he labeled 'MetaBirkins NFTs.' The references to Hermès' registered 'Birkin' trademarks were thus explicit and central to Rothschild's Venture." ECF191(8-9).[23]

The district court got it right the first time. For Rothschild or any artist engaging with brands, choosing the right brand is "central to [the] [v]enture" because the cultural importance of the brand is related to the cultural importance of the art. It would make no sense for Warhol, Rothschild, or any of the many other artists who engage with brands in their art to pick brands that no one cares about. Fellini's characters were nicknamed Ginger and Fred for a reason; Aqua's "Barbie Girl" had that title for the same reason.

## CONCLUSION

Rothschild respectfully requests that this Court properly apply *Rogers* and/or *Dastar*, reverse the judgment, enter judgment for Rothschild, and vacate the order of permanent injunction. In the alternative, Rothschild respectfully requests remand for a new trial.

---

[23] The court noted, but did not rule on, Hermès' argument that Rothschild waived his objections to the jury instructions. Rothschild's proposed written instructions, and the full transcript of the charging conference, show that there was no waiver. *See* ECF138;ECF139;ECF157(848-90);ECF159(897-901).

Dated: November 3, 2023               Respectfully Submitted,

 /s/ *Rhett O. Millsaps II*
Rhett O. Millsaps II
Christopher J. Sprigman
Mark P. McKenna (*admission pending*)
Rebecca Tushnet
Mark A. Lemley
LEX LUMINA PLLC
745 Fifth Avenue, Suite 500
New York, NY 10151
(646) 898-2055

*Attorneys for Defendant-Appellant*
*Mason Rothschild*

## CERTIFICATE OF COMPLIANCE WITH FRAP 32(A)

1.      This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) and this Court's Order dated November 1, 2023, granting

Appellant's motion to file an oversized brief of no more than 17,000 words

because this brief contains **16,999** words, excluding the parts of the brief

exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because

this brief has been prepared in a proportionally spaced typeface using

**Microsoft Word** in **14-point Times New Roman**.

Dated:   November 3, 2023

/s/ *Rhett O. Millsaps II*
Rhett O. Millsaps II
LEX LUMINA PLLC
745 Fifth Avenue, Suite 500
New York, NY 10151
646-898-2055