# 23-1081

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

HERMÈS INTERNATIONAL, HERMÈS OF PARIS, INC.,

*Plaintiffs-Appellees,*

—against—

MASON ROTHSCHILD,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## PAGE PROOF BRIEF OF PLAINTIFFS-APPELLEES
## HERMÈS INTERNATIONAL AND HERMÈS OF PARIS, INC.

GERALD J. FERGUSON
OREN J. WARSHAVSKY
HEATHER J. MCDONALD
BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
(212) 589-4238

DAVID B. RIVKIN, JR.
MARK W. DELAQUIL
KRISTIN A. SHAPIRO
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036
(202) 861-1731

*Counsel for Plaintiffs-Appellees Hermès International and Hermès of Paris, Inc.*

## CORPORATE DISCLOSURE STATEMENTS

Plaintiff-Appellees Hermès International is a publicly held entity that has no parent corporation, subsidiaries or affiliates which are publicly held.

Plaintiff-Appellees Hermès of Paris, Inc. is a privately held entity and identifies Hermès International as its publicly held parent corporation.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................1

STATEMENT OF THE ISSUES ................................................ 2

STATEMENT OF THE CASE ................................................... 2

    A.    Factual Background ................................................... 2

    B.    Proceedings Below .................................................... 5

SUMMARY OF ARGUMENT ................................................. 23

ARGUMENT ..................................................................... 25

I.    *ROGERS* DOES NOT REQUIRE REVERSAL ................................ 25

    A.    *Jack Daniel's* Held that *Rogers* Does Not Apply Where, As Here, a Trademark is Used as a Source Identifier....................... 26

    B.    Even if *Rogers* Applied, Rothschild's *Rogers*-Related Claims of Error Still Fail........................................................ 30

        1.    Rothschild Improperly Seeks Review of Fact-Bound Pretrial Rulings................................................. 31

        2.    The Order of the *Rogers* Instruction Was Not an Abuse of Discretion.................................................... 31

        3.    The Substance of the *Rogers* Instruction Was Not Plainly Erroneous............................................ 33

        4.    Sufficient Evidence Supports the Jury Verdict on *Rogers* ................................................................. 37

        5.    Rothschild Is Wrong that *Rogers* Applies to Cybersquatting Claims.................................... 41

II.    THE DISTRICT COURT CORRECTLY HELD THAT *DASTAR* DOES NOT PRECLUDE TRADEMARK CLAIMS CONCERNING INTANGIBLE GOODS ......................... 41

III.  THE DISTRICT COURT'S EXPERT EVIDENTIARY
      RULINGS WERE NOT AN ABUSE OF DISCRETION .................. 43

      A.   The District Court Properly Excluded Dr. Gopnik ..................... 44

      B.   The District Court Properly Admitted Dr. Kominers ................. 48

CONCLUSION ........................................................................... 50

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alcantar v. Foulk,*
No. 1:14-CV-00747, 2016 WL 3001242 (E.D. Cal. May 25, 2016) .................................................................................. 46

*Altschuler v. Univ. of Pennsylvania Sch. of L.,*
201 F.3d 430 (2d Cir. 1999) .................................................. 44

*AM Gen. LLC v. Activision Blizzard, Inc.,*
450 F. Supp. 3d 467 (S.D.N.Y. 2020) ................................... 35

*B and F System, Inc. v. LeBlanc,*
519 F. App'x 537 (11th Cir. 2013) ................................. 42, 43

*Bretford Mfg., Inc. v. Smith Sys. Mfg. Corp.,*
419 F.3d 576 (7th Cir. 2005) ................................................ 42

*Britt v. Garcia,*
457 F.3d 264 (2d Cir. 2006) .................................................. 49

*Bulman v. 2BKCO, Inc.,*
882 F. Supp. 2d 551 (S.D.N.Y. 2012) ................................... 40

*Castillo v. G&M Realty L.P.,*
950 F.3d 155 (2d Cir. 2020) .................................................. 46

*Classic Media, Inc. v. Mewborn,*
532 F.3d 978 (9th Cir. 2008) ................................................ 41

*Cliffs Notes, Inc. v. Bantam Doubleday Dell Pub. Grp., Inc.,*
886 F.2d 490 (2d Cir. 1989) ............................................ 32, 34

*Cohen v. G&M Realty L.P.,*
No. 13-C-05612, 2017 WL 1208416 (E.D.N.Y. Mar. 31, 2017) ................ 46

*Dastar Corp. v. Twentieth Century Fox Film Corp.,*
539 U.S. 23 (2003) .......................................................*passim*

*Deputy v. Lehman Bros.*,
345 F.3d 494 (7th Cir. 2003) .................................................... 46

*Dita, Inc. v. Mendez*,
No. CV 10-6277 PSG FMOX, 2010 WL 5140855 (C.D. Cal.
Dec. 14, 2010) ...................................................................... 35

*Dupree v. Younger*,
598 U.S. 729 (2023) ...........................................................31, 41

*Exxon Corp. v. Texas Motor Exch. of Houston, Inc.*,
628 F.2d 500 (5th Cir. 1980) ................................................... 39

*Gordon v. Drape Creative, Inc.*,
909 F.3d 257 (9th Cir. 2018) ...............................................36, 37

*Hope Organics LLC v. Preggo Leggings LLC*,
No. 21-CV-2416, 2021 WL 5919367 (S.D.N.Y. Dec. 15, 2021) ............... 40

*Jack Daniel's Properties v. VIP Products LLC*,
599 U.S. 140 (2023) ..........................................................*passim*

*Kelly-Brown v. Winfrey*,
717 F.3d 295 (2d Cir. 2013)....................................... 26, 29, 42

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) ............................................................... 45

*Lamparello v. Falwell*,
420 F.3d (4th Cir. 2005) ......................................................... 41

*Luke Records v. Navarro*,
960 F.2d 134 (11th Cir. 1992).................................................. 46

*Nat'l Football League v. Coors Brewing Co.*,
205 F.3d 1324 (2d Cir. 1999).................................................. 30

*Parker v. Sony Pictures Ent., Inc.*,
260 F.3d 100 (2d Cir. 2001).................................................31, 33

*Phoenix Ent. Partners, LLC v. J-V Successors, Inc.*,
305 F. Supp. 3d 540 (S.D.N.Y. 2018) ....................................... 43

*Phoenix Ent. Partners v. Rumsey,*
829 F.3d 817 (7th Cir. 2016) ..................................................... 43

*Polaroid Corp. v. Polarad Elecs. Corp.,*
287 F.2d 492 (2d Cir. 1961)........................................ 34, 35, 38

*Proctor & Gamble Co. v. Haugen,*
222 F.3d 1262 (10th Cir. 2000) ................................................. 43

*Punchbowl, Inc. v. AJ Press, LLC,*
90 F.4th 1022 (9th Cir. 2024) .................................................... 30

*Restivo v. Hessemann,*
846 F.3d 547 (2d Cir. 2017)................................................43, 45

*RJR Foods, Inc. v. White Rock Corp.,*
603 F.2d 1058 (2d Cir. 1979) .................................................... 39

*Rogers v. Grimaldi,*
875 F.2d 994 (2d Cir. 1989)..............................................*passim*

*Sara Lee Corp. v. Kayser-Roth Corp.,*
81 F.3d 455 (4th Cir. 1996) ...................................................... 39

*Slep-Tone Ent. Corp. v. Wired for Sound Karaoke & DJ Servs., LLC,*
845 F.3d 1246 (9th Cir. 2017)................................................... 43

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.,*
588 F.3d 97 (2d Cir. 2009) ....................................................... 30

*TCPIP Holding Co., Inc. v. Haar Communications, Inc.,*
244 F.3d 88 (2d Cir. 2001) ....................................................... 29

*Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.,*
531 F.3d 190 (2d Cir. 2008)....................................................... 41

*The Sports Auth., Inc. v. Prime Hosp. Corp.,*
89 F.3d 955 (2d Cir. 1996) ....................................................... 39

*Twin Peaks Productions, Inc. v. Publications Int'l,*
996 F.2d 1366 (2d Cir. 1993).............................................34, 36

*U.S. v. Onumonu,*
  967 F.2d 782 (2d Cir. 1992) ..................................................... 46

*United States v. Alvarez,*
  567 U.S. 709 (2012) ................................................................ 35

*United States v. Arthur,*
  51 F.4th 560 (5th Cir. 2022), *cert. denied*, 143 S. Ct. 846, 215 L.
  Ed. 2d 80 (2023) ................................................................46, 47

*United States v. Baker,*
  899 F.3d 123 (2d Cir. 2018) .................................................... 32

*United States v. Hansen,*
  599 U.S. 762 (2023) ................................................................ 35

*United States v. Isaacs,*
  No. 07-732, 2011 WL 13286161 (C.D. Cal. Mar. 2, 2011) ....... 45

*United States v. Isaacs,*
  565 Fed. App'x 637 (9th Cir. 2014) ......................................... 45

*United States v. Reyes,*
  795 F. App'x 10 (2d Cir. 2019) ............................................... 21

*United States v. Stagliano,*
  729 F. Supp. 2d 222 (D.D.C. 2010) ......................................... 45

*United States v. Vesey,*
  338 F.3d 913 (8th Cir. 2003) ................................................... 46

*United States v. Williams,*
  553 U.S. 285 (2008) ................................................................ 35

*Univ. of Alabama Bd. of Trustees v. New Life,*
  683 F.3d 1266 (11th Cir. 2012) ............................................... 28

*US Airways, Inc. v. Sabre Holdings Corp.,*
  No. 11 CIV. 2725 (LGS), 2022 WL 986232 (S.D.N.Y. Apr. 1,
  2022) ...................................................................................... 48

*Vans, Inc. v. MSCHF Prod. Studio, Inc.,*
  88 F.4th 125 (2d Cir. 2023) ........................................... 27, 28, 29

*Warner Bros. Ent. V. X One X Prods.*,
   840 F.3d 971 (8th Cir. 2016) ................................................. 42

*WickFire, L.L.C. v. Laura Woodruff; TriMax Media, L.L.C.*,
   989 F.3d 343 (5th Cir. 2021) ................................................. 42

*Williams v. UMG Recordings, Inc.*,
   281 F. Supp. 2d 1177 (C.D. Cal. 2003) .................................... 42

*Woods v. START Treatment & Recovery Centers, Inc.*,
   864 F.3d 158 (2d Cir. 2017) .................................................. 37

*Yuga Labs, Inc. v. Ripps*,
   No. CV 22-4355-JFW(JEMX), 2023 WL 3316748 (C.D. Cal.
   Apr. 21, 2023) ..................................................................... 43

*Zuchowicz v. United States*,
   140 F.3d 381 (2d Cir. 1998) .................................................. 48

**Statutes**

15 U.S.C. § 1125 ...........................................................*passim*

**Rules**

Fed. R. Evid. 702 ................................................................. 46

**Other Authorities**

2 McCarthy § 10:6 .............................................................. 26

2 McCarthy § 11:46 ............................................................. 29

5 McCarthy § 25A:1 ......................................................24, 42

Steve Kaczynski & Scott Kominers, *The Everything Token: How*
   *NFTs and Web3 Will Transform the Way We Buy, Sell, and Create*
   (Penguin Random House 2024) ............................................. 16

## INTRODUCTION

Using Hermès' trademarks, appellant Mason Rothschild sold a collection of 100 "MetaBirkins" non-fungible tokens ("NFTs"), with plans for hundreds more, that represented ownership of a digital equivalent of Hermès' iconic Birkin bag. Contrary to the appellant's key contention, this appeal is not about whether those digital images are "art." The jury decided this case assuming that they are. It is not even about the rights of artists to use another person's trademarks in their work more generally. The law is clear that the First Amendment does not afford artists special license to use an infringing trademark for "source identification"—*i.e.*, to brand their work, like Rothschild did with "MetaBirkins." *Jack Daniel's Properties v. VIP Products LLC*, 599 U.S. 140 (2023). Nor can they use another's trademarks in an explicitly misleading manner. *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989). This is precisely what Rothschild did, and the jury appropriately held him accountable.

As the district court explained, the jury had "no difficulty in concluding" that "Rothschild *intentionally* misled consumers into believing that Hermès was backing [his] products." ECF191(1–2). Rothschild's "entire scheme … was to defraud consumers into believing, by his use of variations on Hermès' trademarks, that Hermès was endorsing his lucrative MetaBirkins NFTs." ECF191(10). Indeed, Rothschild bragged "I don't think people realize how much you can get away [with] in art by saying 'in the style of,'" and laughed at the idea that, if Hermès had a problem with the confusion, "let them buy us off." "In effect, the jury found that Rothschild was simply a swindler," and "nothing could be better established than that the First Amendment does not eliminate liability for intentional fraud." ECF191(2, 10).

## STATEMENT OF THE ISSUES

1.     Whether *Rogers v. Grimaldi* applies to this case given the Supreme Court's holding in *Jack Daniel's Properties v. VIP Products* that *Rogers* is inapplicable where defendants use trademarks for source identification.

2.     If *Rogers* applies, whether the *Rogers* jury instruction requires reversal because it: (1) came after the instructions on the standard trademark claim elements; or (2) required Hermès to prove "that Mr. Rothschild's use of the Birkin mark was not just likely to confuse potential consumers but was intentionally designed to mislead consumers into believing that Hermès was associated with Rothschild's MetaBirkins project."

3.     Whether *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003), precludes trademark claims concerning intangible goods.

4.     Whether the district court erred in excluding the testimony of Rothschild's art expert or admitting the testimony of Hermès' economics expert.

## STATEMENT OF THE CASE

### A.     Factual Background

1.     Appellee Hermès International is a French family-owned company dating to 1837; appellee Hermès of Paris is its U.S. subsidiary (collectively, "Hermès"). ECF149(150); Chavez(48). At its founding, Hermès produced bridles, harnesses, and saddles for horses and carriages. ECF149(150). With the advent of the automobile, Hermès began producing luggage and handbags, and eventually products like jewelry and silk scarves. ECF149(151). Hermès is a fashion house creating high-quality lifestyle goods. *Id.* As such, Hermès' intellectual property rights are critical to its business and its trademarks are "invaluable." ECF149(151–52).

Hermès' fifth-generation chairman and artistic director, Mr. Jean-Louis Dumas, created the now-iconic "Birkin bag" in 1984. Chavez(44). The Birkin bag is Hermès' best-selling product and has a "phenomenal reputation … for quality, for craftsmanship, for enduring style and design." Chavez(56). The company fastidiously guards its craftsmanship and quality. Chavez(49–50). Hermès craftsmen complete years of training before they are allowed to produce their first bag. Chavez(51). It takes them 18 to 24 hours to make one Birkin bag. Chavez(50). Hermès owns trademarks in the name "Birkin" and in the configuration of the bag. Chavez(45–46).

Prices for Birkin bags range from $12,000 to $200,000, depending on materials and size. Chavez(57–58). They have been designed in a variety of colors and materials, from ostrich or alligator to fur or diamonds. Chavez(58–62). Hermès frequently collaborates with in-house and outside artists in designing its Birkin bags and other products. ECF149(167); Chavez(31–33). Because of the quality of craftsmanship and materials demanded by Hermès, it is unable to immediately satisfy customers' demand for Birkin bags. ECF149(154).

2.      Appellant Sonny Estival, who goes by the name Mason Rothschild and has legally changed his name to Mason Aston, produced "MetaBirkins NFTs." An NFT is a blockchain-based token representing ownership of an asset, often a digital image. ECF151(80–81). The digital images associated with the MetaBirkins NFTs are of bags bearing the exact configuration of a Birkin bag in different colors and materials, primarily fur. ECF149(179).



Hermès first learned about MetaBirkins NFTs in 2021, when an individual asked Hermès about "the coming launch of the MetaBirkins NFTs." ECF149(176–77). Hermès learned that Rothschild was producing a collection of 100 MetaBirkins NFTs marketed under the domain name MetaBirkins.com and on "MetaBirkins" social media accounts. ECF149(178). In one interview, Rothschild said his project was to bring the Birkin bag into the digital world as a digital commodity, treating it as a commercial product. Pl.Trial.Ex.244. He stated that it is "an experiment to see if I could create the same kind of illusion that [the Birkin bag] has in real life as a digital commodity. And I feel like I've kind of accomplished that … bringing it into the digital world with this introduction of the metaverse." *Id.* Multiple periodicals—including *Elle*, the *New York Post*, *Challenges*, and *L'Officiel*—mistakenly reported that the MetaBirkins NFTs were released by Hermès. ECF157(789).

Hermès was concerned that consumers would believe that Hermès was behind Rothschild's MetaBirkins NFTs and that the MetaBirkins NFTs would

interfere with Hermès' own plans to use NFTs. Chavez(75); ECF149(197). Other fashion houses like Gucci, Louis Vuitton, Prada, and Balenciaga had produced NFTs associated with two- and three-dimensional images of digital clothing and accessories. Chavez(75); ECF149(175); ECF157(660). Such established businesses use NFTs to attract new customers and increase customer engagement with their brands. ECF157(660–63). Hermès was exploring how it too could bring its level of quality and craftsmanship to the digital world. ECF157(706).

Hermès sent a cease-and-desist letter, but Rothschild continued marketing the MetaBirkins NFTs and teased future collections. Pl.Trial.Ex.20. Given the risks of confusion and brand dilution, Hermès decided to sue. ECF149(189–96). Hermès did not undertake this decision lightly; it is not a litigious company and has refrained from taking actions against artists who use its trademarks in non-commercial settings—including Rothschild's previous one-off "Baby Birkin" animation which was released with no branding efforts. *Id.* But Rothschild's MetaBirkins NFTs went far beyond prior projects: He was effectively hawking fake Birkin bags for the digital world.

### B.  Proceedings Below

1.  As relevant here, Hermès brought claims in the Southern District of New York for trademark infringement in violation of section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)), trademark dilution in violation of section 43(b) (*id.* § 1125(b), and cybersquatting in violation of section 43(d) (*id.* § 1125(d)). ECF24.

Rothschild moved to dismiss based on *Rogers v. Grimaldi*, which held that "the [Lanham] Act should be construed to apply to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression.… [T]hat balance will normally not support application of the

5

Act unless the title has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless the title explicitly misleads as to the source or the content of the work." 875 F.2d at 999; ECF27(4–20). He also argued that *Dastar Corp. v. Twentieth Century Fox*, 539 U.S. 23, bars trademark claims concerning intangible goods. ECF27(20–22).

The district court denied the motion to dismiss. ECF50. It held that *Rogers* applies to this case, but determined that Hermès' complaint "includes sufficient allegations of explicit misleadingness." ECF50(8). The court also rejected Rothschild's *Dastar* argument because *Dastar* merely held that "the Lanham Act does not prevent the unaccredited copying of an uncopyrighted work." ECF50(18 n.7); ECF61(11–19) (order denying Rothschild's motion for interlocutory appeal concerning *Dastar*).

After discovery, the parties filed cross-motions for summary judgment, which the district court denied. ECF104, 140. The court rejected Hermès' motion on the ground that Rothschild "has identified admissible evidence supporting its assertion that Rothschild's use of Hermès' marks did not function primarily as a source identifier that would mislead consumers into thinking that Hermès originated or otherwise endorsed the MetaBirkins collection." ECF140(13). The court rejected Rothschild's motion because there were "genuine issues of material fact" regarding whether his use of Hermès' trademarks was explicitly misleading. ECF140(19, 24).

2. The case proceeded to an eight-day jury trial. Hermès presented extensive evidence not just that Rothschild's use of Hermès' trademarks was likely to and did confuse potential consumers, but also that he used Hermès' trademarks purposefully to mislead consumers as to the source of his MetaBirkins NFTs and profit from that confusion.

a.     To start, Hermès called Rothschild. As Rothschild's own counsel admitted during opening statements, Rothschild "sometimes exaggerates and embellishes the truth." ECF151(49–50). While damning in itself, that admission is an understatement. *See e.g.*, ECF155(476–77) (Rothschild getting caught in lie on cross-examination). Rothschild's first "art" project was producing t-shirts with the names of prestigious art schools in collegiate font, causing Parsons to send him a cease-and-desist letter. ECF149(236–38). And with respect to his MetaBirkins NFTs, he bragged, "I don't think people realize how much you can get away [with] in art by saying 'in the style of.'" Pl.Trial.Ex.306(26).

The jury learned that Rothschild produced the MetaBirkins NFTs because the multi-billion-dollar NFT market was "exploding" in 2021. ECF153(371–72). Rothschild wanted the NFTs to represent digital equivalents of Birkin bags: The designer who created the images stated to Rothschild, "I can't get the similarities out as fast as I expected" and that "without the recognition they are worthless." ECF153(364); Pl.Trial.Ex.272(2–3). They used a digital blueprint of an actual Birkin bag to create the images. Pl.Trial.Ex.272(56).

 

Rothschild referred to the MetaBirkins NFTs as "bags" and "luxury product[s]," not "pictures" or "art." ECF153(366–67, 429). To further mimic Hermès' Birkin bag, Rothschild asked the designer to create the digital horse "Rodeo" charm that "first collection holders" could link to their digital bags, copying a horse charm that Hermès sells to adorn its bags. ECF155(528); ECF 157(645).

Rothschild marketed the NFTs on MetaBirkins.com and on social media accounts under the handle "MetaBirkins," including on Twitter, Instagram, and Discord—always with a prominent and repeated emphasis on the term "MetaBirkins." ECF153(407). Rothschild frequently marketed the NFTs as just "Birkins;" he only (sometimes) added the generic prefix "Meta" right before launch. Rothschild introduced the project on Twitter by announcing that he was "[r]eleasing 50, one of a kind, Birkins of varying rarity." Pl.Trial.Ex.238. And he described it on MetaBirkins.com and in the NFT marketplace description, pictured below, as "a collection of 100 unique Birkin NFTs." Pl.Trial.Ex.313(121).



The "mint screen" on the website contained an image telling customers to "secure the bag." ECF153(418); Pl.Trial.Ex.313(115). The website also prominently displayed the slogan "Not Your Mother's Birkin"—a slogan he stole both from Tiffany's and from one of his Twitter followers, to whom he falsely promised a MetaBirkins NFT. ECF153(411); Pl.Trial.Exs.100, 238. He repeated similar slogans as hashtags on the MetaBirkins Twitter account (ECF72(47)):



The computer program that created the MetaBirkins NFTs permitted Rothschild to modify the digital images associated with the NFTs. ECF151(97–99). To add drama, when Rothschild initially sold the NFTs, the images had "shroud[s] over [them]" so customers could not see the image—they just knew

that it would be of a Birkin bag. ECF153(284–85). The image of their bag would only be "reveal[ed]" days later. *Id.*



The images appeared two-dimensional to start but were made using a three-dimensional program and Rothschild bragged they were "metaverse ready cause fully 3D." ECF153(444). Rothschild retweeted a message touting MetaBirkins NFTs as a way to "Dress[] those metaverse avatars. Digital outfits and accessories. Big Brands are already experimenting with NFTs. Be early." ECF155(522); Pl.Trial.Ex.100; *see also* Pl.Trial.Ex.244 (Rothschild stating "the metaverse is allowing us to actually own these commodities in this place where we can actually show them off"). He described MetaBirkins NFTs as the "successor" to Hermès' Birkin bag for the metaverse. ECF155(525).

After the MetaBirkins NFTs proved lucrative, Rothschild asked his designer if he could "crank out" 900 more. ECF153(393). Rothschild arranged to receive money not only from the initial sales, but also royalties from every resale. ECF151(92). Internally, Rothschild and the designer referred to the act of making MetaBirkins NFTs as "print[ing] some money." Pl.Trial.Ex.272(12); Pl.Trial.Ex.242(5) ("Luxury product, luxury tax baby"); Pl.Trial.Ex.232(11) ("Were sitting on a gold mine."). Rothschild complained about "counterfeit"

MetaBirkins interfering with this revenue stream. ECF155(505); Pl.Trial.Ex.306(31) ("36k in volume for fake metabirkins on opensea"); Pl.Trial.Ex.323 (complaining about "the counterfeits on OpenSea").

To raise additional money, Rothschild falsely suggested to investors and partners that he was in communications with Hermès. He told his designer that "[w]e might [get] some help from Hermès themselves," ECF155(508); Pl.Trial.Ex.242(5), and another collaborator that "Hermès might partner with me on this, negotiating [right now]," ECF155(509); Pl.Trial.Ex.224(4), even though Rothschild had never spoken to Hermès. One potential partner asked him if it was "official with Birkin" yet; Rothschild falsely responded that he was "pushing for it." ECF155(510–11); Pl.Trial.Ex.225. He lied to another potential partner that he had a call scheduled with Hermès. ECF155(512); Pl.Trial.Ex.373(11). And he bragged to two investors that his "plug at *Vogue* has a direct line to Paris" to "make a push with Hermès." ECF155(515); Pl.Trial.Ex.306(47). When asked who his "plug" was at trial, Rothschild answered, "Um, I don't have their name," and discovery turned up no evidence that one existed. ECF155(515).

Rothschild accomplished his goal of sowing confusion about Hermès' association with his project. Rothschild bragged about the havoc: "Bro, it's crazy. Apparently the word around the media world is that this is a press stunt by Hermès and I'm, like, paid by Hermès." ECF155(524); Pl.Trial.Ex.308(1) (Rothschild admitting widespread "confusion between the Hermes Birkin and

its SUCCESSOR").[1] One customer even wrote to Rothschild asking, "Where is my purse? You guys scammed me." ECF155(578).

After selling his entire initial collection and receiving Hermès' cease-and-desist letter, Rothschild put a small disclaimer on MetaBirkins.com and on the MetaBirkins Discord page. *Id.* at 527, 554; Pl.Trial.Ex.192. Rothschild did not add a disclaimer to other pages, including the webpages where customers purchased and minted the MetaBirkins NFTs. ECF153(417–18, 423). Rothschild and his designer laughed about Hermès being upset by the confusion, saying "let them buy us off." Pl.Trial.Ex.235(10). Rothschild had no interest in ceasing his misleading use of the Birkin trademarks because it would "tank the price" of the NFTs, and consequently his royalties. Pl.Trial.Ex.271(19); Pl.Trial.Ex.235(10).

b.     Hermès also presented the testimony of five Hermès' employees who explained the confusion caused by Rothschild's conduct.

Robert Chavez, the president and CEO of Hermès of Paris, testified that Hermès "has plans to be involved with NFTs" and that other fashion houses have produced digital clothing and accessories for the metaverse. Chavez(75). He testified that he is a regular guest speaker at Columbia and NYU, and that confused students "asked how and why was this the way that Hermès entered the metaverse" after the MetaBirkins NFTs launch. Chavez(80).

---

[1] Rothschild briefly testified that he and his publicist had "corrected the press on numerous occasions where they accidentally said it was Hermès and we said, Hey, like, that's incorrect." ECF153(304). He conspicuously introduced no evidence of any corrections. To the contrary, Rothschild stopped cooperating with one reporter after she contacted Hermès, which told her it had not authorized the project. Pl.Trial.Ex.323. Luisa Vittadini, an Hermès employee, testified that Hermès corrected mistaken reports. ECF157(786–87, 794).

Nicolas Martin, the group general counsel for Hermès International, testified about the value of Hermès' trademarks and its work with artists and plans for the metaverse. ECF149(151–52, 167, 172–74). He further testified that Hermès learned about the MetaBirkins NFTs when he received a call from an individual informing him of the project, ECF149(176–77), leading Hermès to discover the collection of 100 MetaBirkins NFTs along with Rothschild's announcement that "the second collection is coming soon," ECF149(185). Finally, he explained that:

> NFT is probably part of the future of our company. The fact that our main trademark has been used by a third party without our authorization on the digital asset, which is similar to our product, if we are to enter into this new digital world, if we want to bring our most iconic handbag in this digital world, there would always be a reference to this MetaBirkin.

ECF149(197).

Luisa Vittadini, the associate director of corporate communications for Hermès International, testified about mistaken media reports in *Elle*, *L'Officiel*, *New York Post*, and *Challenges*. ECF157(789–94); Pl.Trial.Exs.45, 253, 254, 308(13), 315. For example, *Elle* published an article titled "Hermès Goes Virtual with Launch of Birkin Bags as NFTs." ECF157(790); Pl.Trial.Ex.45. The *New York Post* reported that "Hermès … has entered the metaverse" with "a VR version of its signature bag." ECF157(792–93); Pl.Trial.Ex.253.

Ambre-Elise Binoche, the social media and web director at Hermès International, also testified about Hermès' use of digital art. ECF155(593–600). For example, Hermès collaborated with the digital artist Lukas Zanotto to produce a 3D animation for Instagram. *Id.* at 594–95 (Pl.Trial.Ex.43). Binoche said Hermès was exploring the possibility of creating "metaverse" and

"miniverse" experiences for some of its customers. ECF157(2–6); Pl.Trial.Ex.41.

Finally, the jury heard from Maximilien Moulin, the head of "H Lab" at Hermès International, "an innovation laboratory within the information technology department at Hermès." ECF157(697). Moulin explained that H Lab was and is exploring "[a]ugmented reality, virtual reality, artificial intelligence, 3D, realtime 3D, metaverse, [and] NFTs." ECF157(699). Hermès believes it has "five main uses" for NFTs in its business: NFTs as "digital certificates for different products," "NFTs as proof of attendance for private events," "NFT as a virtual product for a virtual world" and "video games," "NFTs as … a virtual product itself that could be a piece of art" or serve a "decorative purpose," and "NFTs as collectible to celebrate loyalty." ECF157(701–02); Pl.Trial.Ex.27. Moulin noted that many other fashion houses are selling virtual products. *See, e.g.*, ECF157(709); Pl.Trial.Ex.28.

He explained that Hermès has developed "piece[s] of art that [are] delivered through an NFT" and "could be displayed in a virtual gallery" as products. ECF157(705). He testified that—just weeks before the MetaBirkins NFTs' launch—Hermès developed a prototype "digital twin" NFT where a customer could get "a representation in 3D of [a Birkin] bag" that they could use "as an augmented reality fixture." ECF157(708). He testified about digital twin ties that "could be also a way to access different services and events," such as "private sales, tie-tying classes, [and] meeting[s] with the artist who … worked on the tie design." ECF157(712). Hermès released "20 different NFTs" during an "innovation day" in collaboration with two digital artists, Dimitri Rybaltchenko and Neil Beloufa. ECF157(715–18).

Moulin testified that at present Hermès has released "internally" its NFT projects. ECF157(715). He explained that "when we work in digital, it's like

when we work with the physical project. We try to reach the highest standard of quality … [s]o we take the time to test internally." *Id.* If and when Hermès publicly releases a digital product, it would "combin[e] the best digital craftsmen" to make "beautiful and timeless objects for the digital world." Pl.Trial.Ex.27(31). Hermès decidedly would *not* "crank out" low-quality NFTs as fast as possible to "print some money." Moulin testified that, unfortunately, if Hermès now releases NFTs, "we will be always having questions and having people … thinking [about] MetaBirkin." ECF157(727).

     c.     Hermès finally presented two expert witnesses whose testimony supported a finding of substantial confusion caused by Rothschild's conduct and his profit from that confusion.[2]

*First*, Dr. Bruce Isaacson discussed a survey he performed to determine whether potential NFT purchasers would be confused by Rothschild's use of Hermès' trademarks. ECF157(731). (Because of the pseudonymous nature of the blockchain, it was not feasible to survey actual purchasers of the MetaBirkins NFTs.) Dr. Isaacson is the president of a survey research firm and holds an MBA and a DBA from Harvard Business School. ECF157(732–36). He designed a survey to determine "whether consumers who come to the *MetaBirkins.com* website are likely to[] be confused" based on "one of the most widely used methods for measuring likelihood of confusion." ECF157(738). He showed one group of potential consumers the actual MetaBirkins website—including the disclaimer—and another group a "control" website without the trademarks and compared their relative confusion about Hermès' affiliation. ECF157(738–45, 750–57). 21.6 percent of participants shown the MetaBirkins website were

---

[2] Hermès presented a third expert, Dr. Kevin Mentzer, who explained what an NFT was, the technical process for selling MetaBirkins NFTs, and calculated that Rothschild received at least $230,000 from the project. ECF151(66–102).

confused, compared to 2.9 percent of the control group, for a net confusion result of 18.7 percent. ECF157(757). Dr. Isaacson said this result is "of a magnitude … that I would typically interpret as meaning that there's a substantial likelihood of confusion." *Id.*[3]

*Second*, Dr. Scott Kominers explained that MetaBirkins NFTs were "branded NFTs" whose value likely derived from misapprehension that Hermès' was their source.[4] ECF157(12, 18–19). Dr. Kominers holds a Ph.D. in business economics from Harvard and is a professor of business administration at Harvard Business School and a faculty affiliate of the Department of Economics. ECF157(14). His research focuses on the structure and design of markets, particularly the crypto and NFT markets, and includes the first Harvard Business Review case study on NFTs and a book on the NFT marketplace. ECF157(14–17).[5] His methodology starts with ethnography and case studies, which he follows with an empirical analysis supplemented by economic theory; this is the standard methodology for market design experts. ECF157(19).

Dr. Kominers explained to the jury "two relevant submarkets" of the NFT market: the "art only" and the "digital brand" submarkets. ECF157(18). These terms are widely used by market participants. An "art only" NFT functions only to record ownership of an associated media file, whereas a "digital brand" NFT functions to record ownership of that media file *and* affords the holder various

---

[3] Rothschild introduced Dr. David Neal in rebuttal, who did not perform a survey but argued that Dr. Isaacson overcounted confused participants. ECF159(915, 925). Dr. Neal admitted that he based this criticism on the 1975 *Everready* decision that did not consider a survey performed with a control group and addressed unique circumstances (the potential source names sounded identical) where coding respondents was particularly difficult. ECF159(932).

[4] Rothschild orally moved to exclude Dr. Kominers' testimony. ECF114. The district court denied the motion. ECF153(336–37).

[5] This book was published last month. Steve Kaczynski & Scott Kominers, *The Everything Token: How NFTs and Web3 Will Transform the Way We Buy, Sell, and Create* (Penguin Random House 2024).

utilities and rewards designed to "build this very dedicated community of brand enthusiasts." ECF157(20–21). Dr. Kominers concluded that the MetaBirkins NFTs were "solidly within the digital brand submarket" because "Rothschild explicitly created various forms of utility around the NFTs" and "marketed and promoted them in ways consistent with the digital brand submarket." ECF157(30). For example, Rothschild encouraged consumers to "[c]hange your profile photo to your favorite #MetaBirkin." ECF157(639). He gave holders preferential access to his future projects and token-gated events. ECF157(637, 641, 663); ECF157(644) ("MetaBirkins are the key to unlock all my future projects."); Pl.Trial.Ex.255. And he announced that he would "AirDrop[]" a "horse charm" as a "gift for all first collection holders." ECF157(645). Dr. Kominers also explained that "despite being just an image," MetaBirkins NFTs "can be used in the metaverse platform." ECF157(651). These sorts of utilities and rewards are standard practice for branded NFTs. ECF157(21).

Dr. Kominers then discussed his "empirical analysis of the MetaBirkins trading prices" based on several metrics, including average trading market cap. ECF157(666). He "found that they … were significant outliers relative to the vast majority of the NFT projects" and had "patterns similar … to large-scale brand projects that had launched with significant support." ECF157(18). Unlike Rothschild's prior projects, "MetaBirkins were performing empirically on par with these massive digital brands … strongly suggest[ing] that … something was giving value to the MetaBirkins over and above." ECF157(669). Dr. Kominers "concluded that the most likely [reason] for the MetaBirkins outlier position … was the Hermès association." ECF157(19). This conclusion was consistent with the fact that when "MetaBirkins were originally sold … there was just … an image of a sheet over a pedestal," and thus "it doesn't seem like [customers were]

choosing on the basis of the individual item" as opposed to the brand. ECF157(670–71).

Moreover, there was a "significant price decline" after Hermès' "nonaffiliation [became] clearer to the market" following publication of Hermès' denial of affiliation in a *Financial Times* article on December 12, 2021. *Id.* Dr. Kominers created this demonstrative exhibit (*see* ECF157(670)) to visualize this effect:



3.      The district court instructed the jury at the outset of trial that "[b]ecause … MetaBirkins are at least in part legally protected artistic works, Mr. Rothschild cannot be held liable … unless Hermès can prove that Rothschild's use of its trademark name was either not artistically relevant to the images or was explicitly misleading as to their source of origin." ECF151(25).

At the charging conference, Rothschild objected to the draft instruction on *Rogers* for three reasons. *First*, Rothschild argued the *Rogers* instruction should come before the standard trademark claim instructions. ECF157(858). *Second*, Rothschild argued the *Rogers* test was "objective in the first factor, which is artistic relevance." ECF157(817). *Third*, Rothschild argued that "[a]n explicitly

misleading use" must "suggest [a] connection directly and unambiguously." ECF157(887).

The court revised the instructions in light of Rothschild's objections. Regarding the first objection, the court revised the wording from "First Amendment Defense" to "First Amendment Protection" and made clear that it was Hermès' burden to negate. ECF157(858). The court retained the *Rogers* instruction as instruction number 14, instead of moving it to number 11, because the court determined that it was "the more logical way for the jury to proceed" and because "it's possible that the *Rogers* test may not survive" the *Jack Daniel's* decision. ECF159(897). "In that case, if [the jury] found infringement … the Court could then reinstate the infringement conclusion without having to go through a whole new trial." *Id.*

Regarding artistic relevance, the court determined that "the defense has shown … that no reasonable juror could conclude that there wasn't any artistic expression in Mr. Rothschild's stuff." ECF159(900). The court therefore—over Hermès' objection—instructed the jury that "the MetaBirkins NFTs, including the associated images, are at least in some respects works of artistic expression" and otherwise omitted the first prong. *Id.*; ECF143(21).

Finally, regarding explicitly misleading, the court instructed the jury that *Rogers* requires Hermès to prove "that Mr. Rothschild's use of the Birkin mark was not just likely to confuse potential consumers but was intentionally designed to mislead consumers into believing that Hermès was associated with Rothschild's MetaBirkins project." ECF143(21). The court stated this captured the way *Rogers* applies to this case in terms the jury can understand. ECF159(897–98). Apart from this change to the explicitly-misleading prong of the *Rogers* instruction, the court said "[e]verything else will remain exactly as it is, and all objections thereto are preserved." ECF159(899). It then requested

comment on the revised language. ECF159(899–900). Rothschild's counsel did not object to the language, stating that "we here at this table believe that the instruction gives the jury words they can use to apply the principle, and we are satisfied with it." ECF159(901).

4.     The jury returned a unanimous verdict in favor of Hermès. ECF144.[6] It determined that Rothschild was liable for trademark infringement, dilution, and cybersquatting, and that the First Amendment did not bar liability. *Id.*

To reach this verdict, given the instructions, the jury necessarily found that Rothschild's use of Hermès' trademarks "is likely to confuse potential consumers into thinking that the MetaBirkins NFTs are made or sold or otherwise connected with, associated with, sponsored by or approved by Hermès" and that it is "likely to 'dilute' the distinctiveness of Hermès's Birkin mark." ECF143(15–18). The jury also necessarily found that, in using the domain name MetaBirkins.com, Rothschild "had a bad faith intent to profit from the Birkin mark." ECF143(20). And, as noted above, the jury necessarily found that Rothschild's "use of the Birkin mark was not just likely to confuse potential consumers but was intentionally designed to mislead consumers into believing that Hermès was associated with Rothschild's MetaBirkins project." ECF143(21).

The jury awarded Hermès $110,000 on the infringement and dilution claims and $23,000 in statutory damages on the cybersquatting claim. ECF144.

5.     Rothschild filed a motion for judgment as a matter of law or new trial. ECF173. Rothschild argued that the *Rogers* instruction should have been

_____

[6] During deliberations, a jury note asked "whether Rothschild would be able to continue selling the NFTs if they found him non-liable on First Amendment grounds." ECF191(6). With both sides' consent, the court responded that they should "disregard any consequences that would attach to their determination." *Id.*

number 11 instead of number 14. ECF173(5–9). After previously stating that he was "satisfied" with the language on the explicitly-misleading prong, *see* pp. 19, *supra*, Rothschild flipped and argued that the language improperly focused on subjective intent. ECF173(9–18).

Rothschild argued that prejudice regarding this purported error was established by comments of the jury forewoman. ECF173(25). After trial, Rothschild publicly attacked the jury and misrepresented its verdict, stating "[t]ake nine people off the street right now and ask them to tell you what art is but the kicker is whatever they say will now become the undisputed truth," and that the jury "feel[s] they have the right to choose what art IS and who IS an artist." ECF184-7. The forewoman clarified on LinkedIn that "Rothschild is misrepresenting the verdict saying we judged him for not attending art school or didn't like his art so [we are] just 9 idiots off the street …. We never decided he wasn't an artist nor if MetaBirkins were art! … I can't tell you how seriously we took the 1st amend." ECF184-4. She said "[n]obody questioned his actual artwork nor if he is or isn't an artist," but "[i]t was how he used this art" and "leveraged [Hermès'] trademarks to create hype and to profit" that "waived his [First Amendment] rights." ECF174-12.[7]

Rothschild also repeated his *Dastar* argument. ECF173(39–40).

Finally, Rothschild argued the court erred in excluding the testimony of his "business art" expert, Dr. Blake Gopnik. ECF173(30–38). The court excluded Dr. Gopnik's testimony after finding that it amounted to no more than his unreliable personal opinion. *See* ECF153(336). Among other failings, *see* pp.

---

[7] Rothschild also filed a motion to interview the jury based on the forewoman's statement that Rothschild was "[t]otally different than Warhol." ECF174-14. Rothschild does not appeal the denial of that motion, nor could he credibly do so. ECF191(35) ("[Rothschild makes] serious accusations … without the slightest support."); *see United States v. Reyes*, 795 F. App'x 10, 15 (2d Cir. 2019).

43–47, *infra*, Dr. Gopnik could not provide a coherent definition of "business art." *Id.* And he described his methodology as "look[ing] at the larger set of contextual clues that tell you, oh, this might be worth looking at as an artist's activity" but could never explain what this means. *Id.*

6.      The district court denied Rothschild's post-trial motion. ECF191. The court explained that, while it "instructed the jury that even the modest elements of artistic expression contained in Rothschild's works entitled him to total First Amendment protection[,] … the jury had no trouble concluding" that "Hermès proved that Rothschild *intentionally* misled consumers into believing that Hermès was backing [his] products." ECF191(1–2). "In effect, the jury found that Rothschild was simply a swindler." ECF191(2).

The court proceeded to reject Rothschild's challenges to the *Rogers* instruction. The court reiterated that listing it last was "the most logical way to structure the instructions." ECF191(5–6).[8] The court also rejected Rothschild's belated objection to the instruction's substance. First, the court stated that "there is a substantial argument … that the defendant waived this objection at the charging conference by stating, after the Court had made certain changes requested by defendant, that it was now satisfied with the relevant instruction." ECF191(8).

Second, the court explained that the instructions "were, if anything, more favorable to the defendant than the law even required." *Id.* "Whether the *Rogers* test even properly applies to a case like this one has now been cast in doubt by … *Jack Daniel's*," where the Supreme Court stated that *Rogers* does not apply "when an alleged infringer uses a trademark … as a designation of source for

---

[8] The court rejected Rothschild's argument that a jury note suggests it viewed the First Amendment as a defense. ECF191(6). It explained that both sides consented to the court's response and "[t]here is no reason to think the jury did not heed this clear instruction." *Id.*

the infringer's own goods." *Id.* (quotation marks omitted). "This, of course, is precisely what Rothschild did." *Id.* Moreover, the instruction "not only applied *Rogers*, but also applied it in a way highly favorable to the defendant": "[T]his Court … defin[ed] 'explicitly misleading' to mean not only objectively misleading but also intentionally misleading." ECF191(9). Here, Rothschild's "entire scheme was … to defraud consumers into believing … that Hermès was endorsing his lucrative MetaBirkins NFTs," and "nothing could be better established than that the First Amendment does not eliminate liability for intentional fraud." ECF191(10).

The court likewise rejected Rothschild's renewed *Dastar* argument. ECF191(14). Finally, it rejected Rothschild's argument regarding the exclusion of Dr. Gopnik, explaining that "Dr. Gopnik's deposition transcript revealed that he did not have a recognizable, describable methodology that he used to reach his conclusions." ECF191(14). Moreover, "any error here was harmless since … the Court instructed the jury as a matter of law that Rothschild's products contained an element of artistic expression." *Id.*

## SUMMARY OF ARGUMENT

The Court should affirm the judgment below, which is based on the jury's verdict that "Rothschild *intentionally* misled consumers into believing" that Hermès was associated with his MetaBirkins NFTs.  ECF191(1–2)

1.      Rothschild is wrong that the *Rogers* instruction requires reversal. As a threshold matter, Rothschild was not even entitled to a *Rogers* instruction in light of the Supreme Court's holding in *Jack Daniel's* that, when a trademark is used "'at least in part' for 'source identification' … *Rogers* has no proper role." 599 U.S. at 156. By using Hermès' trademarks to create a "MetaBirkins" brand to sell his digital goods and promote related projects—complete with a website and social media accounts, marketing slogans, and other brand-building efforts

23

that employed "MetaBirkins" as a trademark—source identification is precisely what Rothschild did.

Even if Rothschild were entitled to a *Rogers* instruction, there is no reversible error. Putting aside procedural improprieties in Rothschild's appeal, the district court's *Rogers* instruction—as the district court acknowledged—applied *Rogers* in an overly favorable way to Rothschild. The instruction required Hermès to prove that Rothschild's use of Hermès' trademarks was not only "objectively misleading but also intentionally misleading," ECF191(9), when either a subjective intent to mislead *or* objective misleadingness should have been sufficient. And Rothschild's argument that the *Rogers* instruction should have been instruction number 11 instead of 14 is frivolous.

2.      Rothschild's *Dastar* argument fares no better. Rothschild's claim that the Lanham Act is inapplicable to intangible goods finds no support in *Dastar*, which merely rejected a "reverse passing off" claim under the Lanham Act where the plaintiff was trying to shoehorn a foreclosed copyright claim into trademark law. And the argument is at odds with the Act's text and the settled principle that "trademark law and the Lanham Act are fully operative in cyberspace." 5 McCarthy on Trademarks and Unfair Competition § 25A:1 (5th ed.) ("McCarthy"). Accepting Rothschild's argument would make a mess of trademark law, giving fraudsters carte blanche to deceive consumers online by branding software, e-books, and other digital goods with infringing trademarks.

3.      Finally, there is no reversible error in the district court's expert evidentiary decisions. Rothschild's expert, Dr. Gopnik, could neither define "business art" nor explain his methodology. The court correctly surmised that his testimony amounted to nothing more than his unreliable personal opinion. Indeed, according to Dr. Gopnik, the jury was incapable of determining whether Rothschild's MetaBirkins NFTs were art because "nonspecialists" have "no

sense" of art—the jury would have just had to take Dr. Gopnik's word for it. In any event, his testimony was irrelevant because the district court instructed the jury that the MetaBirkins NFTs contained elements of artistic expression.

The district court likewise did not err in admitting the testimony of Hermès' economics expert, Dr. Kominers, who explained how the MetaBirkins NFTs fell within the "digital brand" NFT submarket based on his ethnographical and case study research of the NFT market. Dr. Kominers also performed an empirical analysis which showed, among other things, that the likely explanation for the initial success of the MetaBirkins NFTs was their perceived association with Hermès and that their trading prices plummeted after Hermès' (lack of) involvement was made clear. Rothschild does not and cannot attack Dr. Kominers' credentials, his methodology, or the relevance of his testimony. Instead, Rothschild falsely states that Dr. Kominers opined that the MetaBirkins NFTs were not "art." This argument rests on a blatant mischaracterization of Dr. Kominers' testimony: Rothschild quotes no testimony from Dr. Kominers opining that the MetaBirkins NFTs are not art because that testimony does not exist.

## ARGUMENT

## I.    *ROGERS* DOES NOT REQUIRE REVERSAL

Rothschild's primary argument is that *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989), requires reversal because the district court erred in instructing the jury. As a threshold matter, Rothschild's *Rogers*-related claims of error all fail because the Supreme Court recently held that *Rogers* does not apply where, as here, a defendant uses a trademark as a source identifier. And even if *Rogers* applied, Rothschild's arguments have no merit.

## A. *Jack Daniel's* Held that *Rogers* Does Not Apply Where, As Here, a Trademark is Used as a Source Identifier

Rothschild's *Rogers*-related claims of error all fail because *Rogers* does not apply where a defendant, like Rothschild, uses a trademark as a source identifier.

In *Jack Daniel's Properties v. VIP Products*, the Supreme Court explained that "whatever you make of *Rogers* … it has always been a cabined doctrine." 599 U.S. 140, 155 (2023). *Rogers* applies at most to "non-trademark uses"—*i.e.*, "cases in which the defendant has used the mark at issue in a non-source identifying way." *Id.* at 155–56.[9] Lower courts appropriately have "confined" the doctrine to cases "in which a trademark is used not to designate a work's source." *Id.* at 154. For example, Aqua's use of "Barbie" in its song "Barbie Girl" did not "speak to the song's origin." *Id.* (alternation marks omitted). Nor did a reference to Louis Vuitton by a character in the *The Hangover: Part II* speak to the film's origin. *Id.*[10] And *Rogers* itself concerned the one-off use of "Ginger" in a movie title, as distinct from using the term in the title of a "series" of creative works in a manner that "indicate[s] that each member of the series comes from the same source." 2 McCarthy § 10:6; *Kelly-Brown v. Winfrey*, 717 F.3d 295, 310 (2d Cir. 2013) ("Repetition is important because it forges an association in the minds of consumers.").

*Jack Daniel's* held that, when a trademark is used "'at least in part' for 'source identification'—when the defendant may be 'trading on the good will of the trademark owner to market its own goods'—*Rogers* has no proper role." 599 U.S. at 156. A source-identifying use of allegedly infringing trademarks "falls

---

[9] The majority did not "decid[e] whether *Rogers* has merit in other contexts." *Id.* at 153; *see also id.* at 165 (Gorsuch, J., concurring) ("lower courts should handle *Rogers v. Grimaldi* … with care").

[10] Amici MSCHF, et al., state that artists should "remain able to reference [brands] in their work." Amici Br. 11. But amici concede that artists do not have special license to use another's trademarks for source-identification. *Id.* at 21.

within the heartland of trademark law, and does not receive special First Amendment protection." *Id.* at 145. In other words, "when trademarks are used as trademarks … *Rogers* does not apply." *Id.* at 155. For example, if a "luggage manufacturer uses an ever-so-slightly modified LV logo to make inroads in the suitcase market," it has committed "the cardinal sin" under trademark law and "that result does not change because the use of the mark [may have] other expressive content." *Id.* at 157.

The Supreme Court readily concluded that the defendant in *Jack Daniel's*, VIP Products, used the alleged infringing mark for source identification. The Court did so even though the visual and other differences between the products created by VIP Products and Jack Daniel's were considerably greater than the differences between MetaBirkins NFTs and Birkin bags. Specifically, VIP created a dog squeak toy named "Bad Spaniels"—a parody of Jack Daniel's— and designed the toy to "evoke [Jack Daniel's] distinctive beverage bottle [and] label." *Id.* at 149. Even though the product contained a disclaimer stating that it was not affiliated with Jack Daniel's, *id.* at 150, this did not alter the fact that the company treated "Bad Spaniels" as a trademark "to identify product source," *id.* at 160.

This Court recently relied on *Jack Daniel's* in *Vans, Inc. v. MSCHF Prod. Studio, Inc.*, 88 F.4th 125 (2d Cir. 2023), to hold that a purported parody was not entitled to special protection under *Rogers* on facts strikingly similar to those here. *Vans* concerned the plaintiff Van's trademarks and trade dress in its iconic "Old Skool" shoe. An art collective that "recontextualizes everyday objects as a means of commenting on contemporary society" produced a "Wavy Baby" shoe parodying the Old Skool shoe. *Id.* at 129. The collective chose the Old Skool shoe "because no other shoe embodies the dichotomies between 'niche and mass taste, functional and trendy, utilitarian and frivolous'" as perfectly as the shoe.

*Id.* at 130. The parody shoe "incorporate[d] and distort[ed]" Van's trademark and trade dress. *Id.* To generate "hype and excitement," the collective engaged in a social-media marketing campaign and "Tyga … released a music video in which he wore the Wavy Baby shoe." *Id.* at 133.

This Court held that "*Jack Daniel's* forecloses [the collective's] argument that Wavy Baby's parodic message merits higher First Amendment scrutiny under *Rogers.*" *Id.* at 138. Following *Jack Daniel's*, the Court reiterated that "*Rogers* does not apply if the mark is used at least in part for source identification." *Id.* (quotation marks omitted). The Court explained that "[a] trademark is used as a 'source identifier' when it is used 'to identify or brand a defendant's goods or services' or to indicate the 'source or origin' of a product.'" *Id.* at 138. And the collective used Vans' trademarks "to brand its own products, which constitutes quintessential trademark use." *Id.* at 139 (quotation marks omitted). The collective also copied the Old Skool shoe because of its iconic nature. *See id.* at 139. "In other words, [the collective] sought to benefit from the 'good will' that Vans … had generated over a decades-long period." *Id.*

Rothschild argues (Br. 44) that his use of Hermès' trademarks is "indistinguishable" from the use of "Ginger" in "Ginger and Fred" or "Barbie" in "Barbie Girl."[11] But Rothschild's use of Hermès' trademarks bears all of the problematic elements from *Jack Daniel's* and *Vans* and then some; he clearly used Hermès' trademarks "at least in part" for source identification of his digital goods. Rothschild used the term "MetaBirkins" as a trademark to prominently and repeatedly identify a large series of 100 NFTs, with plans to sell hundreds more, and to promote related goods and services. *See* pp. 7–9, *supra*. The term

---

[11] Rothschild also analogizes (Br. 44) to *Univ. of Alabama Bd. of Trustees v. New Life* Art, but the challenged use of Alabama's trademarks in that case was "their mere inclusion … in the body of the image which [defendant] creates." 683 F.3d 1266, 1279 (11th Cir. 2012).

"MetaBirkins" contains the trademarked term "Birkin"—it does not just "evoke" the mark as in *Jack Daniel's* and *Vans*. Like *Jack Daniel's* and *Vans*, Rothschild's project also used Hermès' trade dress by copying the configuration of the Birkin bag. *See* pp. 7–8, *supra*. And like *Vans*, Rothschild used Hermès' trademarks because of the iconic status of the Birkin bag. *See* pp. 2–3, 10, *supra*. Rothschild even used Tyga (among other influencers) to "hype" his goods, just like the collective in *Vans*. ECF155(487).

What is more, Rothschild used "MetaBirkins" in bold and large fonts to identify his project on Twitter, Instagram, Discord, and NFT marketplaces in a manner that called attention to "MetaBirkins" as a source of goods and services. *See* pp. 7–9, *supra*. His continual use of MetaBirkins as "a symbol to attract public attention" to his projects is a trademark use. *Kelly-Brown*, 717 F.3d at 306 (quotation marks omitted). Rothschild further marketed the MetaBirkins NFTs from a website address using the Birkin trademark, MetaBirkins.com. *See* p. 8, *supra*. This Court "has held that any use of a word as a domain name is use as a 'mark.'" 2 McCarthy § 11:46 (citing *TCPIP Holding Co., Inc. v. Haar Communications, Inc.*, 244 F.3d 88 (2d Cir. 2001)). He also created marketing slogans with the trademark, like "Not Your Mother's Birkin." *See* p. 8, *supra*. These, too, are source-identifying uses. *See Kelly-Brown*, 717 F.3d at 309 ("[C]ourts have protected advertising slogans under the theory that companies have devoted a great deal of time and expense into creating an association in the minds of consumers between a slogan and a particular product.").

Moreover, as in *Jack Daniel's*, Rothschild created and treated "MetaBirkins" as a brand. Rothschild admitted that his entire project was to bring the Birkin brand into the metaverse, and Dr. Kominers explained at length how Rothschild created the NFTs as a digital brand. *See* pp. 15–16, *supra*. Significantly, Rothschild even complained about "counterfeit" MetaBirkins

infringing his brand. *See* p. 10, *supra*. The fact that Rothschild treated MetaBirkins as a brand is significant because that is the *sine qua non* of a trademark use. Indeed, it does not matter whether Rothschild intended consumers to associate the MetaBirkins brand with himself or Hermès. Under *Jack Daniel's*, *Rogers* does not apply where a defendant is using a challenged mark "to identify its products," even if the defendant in good faith intends no confusion. *Punchbowl, Inc. v. AJ Press, LLC*, 90 F.4th 1022, 1024 (9th Cir. 2024); *cf. Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 112 (2d Cir. 2009) ("Black Bear's use of the Charbucks Marks cannot qualify under the parody exception because the Charbucks Marks are used 'as a designation of source for [Black Bear's] own goods[, *i.e.*, the Charbucks line of coffee].").

To make matters worse for Rothschild, the jury determined that his use of Hermès' trademarks was "intentionally designed to mislead potential consumers into believing that Hermès was associated with Mr. Rothschild's MetaBirkins project." ECF143(21). The jury also concluded that, in using the Birkin trademark in his website address, he "had a bad faith intent to profit from the Birkin mark." *Id.* at 20. When a defendant uses another's trademark in bad faith to "capitalize on goodwill inherent in the [plaintiff's] trademark," the defendant has used the trademark "as a mark." *Nat'l Football League v. Coors Brewing Co.*, 205 F.3d 1324 (2d Cir. 1999). This is the "cardinal sin" of trademark law and under *Jack Daniel's* plainly not entitled to special First Amendment protection.

## B. Even if *Rogers* Applied, Rothschild's *Rogers*-Related Claims of Error Still Fail

Even if *Rogers* applied to this case, Rothschild's *Rogers*-related claims of error are meritless.

### 1.   *Rothschild Improperly Seeks Review of Fact-Bound Pretrial Rulings*

Rothschild argues that the district court should have granted his motions to dismiss (Br. 38–42) and for summary judgment (Br. 52–53) based on insufficient allegations and evidence, respectively, of an explicitly misleading use of Hermès' trademarks. Appellate review of these rulings is unavailable because the trial in this case "wholly supplant[s] [these] pretrial factual rulings." *Dupree v. Younger*, 598 U.S. 729, 735 (2023). The only exception to this rule is "a purely legal question … whose answer is independent of disputed facts." *Id.* at 737. And even if Rothschild could seek review of these rulings, the court did not err in denying Rothschild's pre-trial motions for the same reasons that the jury instructions were not erroneous and sufficient evidence supports the verdict. *See* pp. 18–22, *infra*.

### 2.   *The Order of the* **Rogers** *Instruction Was Not an Abuse of Discretion*

Rothschild argues (Br. 61–62) that the district court erred in instructing the jury on *Rogers* after it instructed the jury on the standard trademark claim elements. The ordering of the instructions is a matter of style that this Court reviews for abuse of discretion. *Parker v. Sony Pictures Ent., Inc.*, 260 F.3d 100, 106–07 (2d Cir. 2001).

There is no abuse of discretion here. As the district court explained, it was the "logical way for the jury to proceed." ECF159(897). "If Hermès doesn't satisfy the elements of a traditional trademark claim, then the jury doesn't need to consider *Rogers*." *Id.* The court also was concerned about the forthcoming *Jack Daniel's* decision. If *Rogers* were overturned, the instructions so ordered would permit the court to "reinstate the infringement conclusion without having to go through a whole new trial." *Id.* The court was cognizant of Rothschild's concern

that his First Amendment argument be front and center in the jury's minds. *See id.* at 898. The court therefore added a reference to it in the first substantive instruction and revised the *Rogers* instruction to avoid referring to it as a "defense." ECF143(13, 21).

Rothschild cites *no* authority for the proposition that a *Rogers* instruction must precede the standard trademark claim instructions. *Rogers* says nothing about jury instruction order, nor, to undersigned counsel's knowledge, does any other precedent. In fact, because *Rogers* requires the jury to apply the traditional trademark claim elements "with proper weight given to First Amendment considerations," *Cliffs Notes, Inc. v. Bantam Doubleday Dell Pub. Grp., Inc.*, 886 F.2d 490, 495 n.3 (2d Cir. 1989); *see* pp. 34–35, *infra*, it would make no sense to have the jury consider *Rogers* before introducing those traditional elements.

Even if the instructions had improperly framed the First Amendment as a defense, Rothschild has no coherent explanation for why that framing would be prejudicial. A defense, after all, is a complete bar to liability. And the district court made clear that it was Hermès' burden to negate. ECF143(21). Rothschild cites (Br. 62) the forewoman's comment that he "tried to hide under the 1st amendment," but this is an improper attempt to use a juror's post-trial statement to impeach a verdict. *See United States v. Baker*, 899 F.3d 123, 132 (2d Cir. 2018). Regardless, the statement is a fair characterization of Rothschild's conduct, and the totality of her comments emphasizes how carefully the jury considered Rothschild's First Amendment rights. *See* pp. 20–21, *supra*.[12] Rothschild's argument that the verdict would have been different if the *Rogers* instruction had been number 11 rather than number 14 is frivolous.

---

[12] Rothschild additionally cites (Br. 62) "[t]he jury's note during deliberations regarding the First Amendment," but never explains why it establishes prejudice.

### 3. The Substance of the **Rogers** *Instruction Was Not Plainly Erroneous*

Rothschild next argues (Br. 62–64) that the jury instructions "collapsed the distinction between explicit and implicit misleadingness" and "fail[ed] to distinguish between intent to reference and intent to confuse." These claims of error are simultaneously waived, meritless, and harmless.

*First*, Rothschild's claims are waived because, after the district court read the instruction's revised language, Rothschild's counsel stated he was "satisfied." ECF159(901); ECF160(1053) ("we agreed to that instruction because we understood … that someone who is just basically a scammer should not be taking advantage of First Amendment protection to perpetuate a scam"). Citing without specificity four docket entries and nearly fifty pages of transcript, Rothschild says "there was no waiver." Br. 76 n.23. But one searches in vain to find any objection based on explicit versus implicit misleadingness or intent to reference versus confuse in these pages. Indeed, Rothschild's proposed instruction neither contained the word "implicit" nor discussed the difference between an intent to reference versus confuse. ECF138(9).

*Second*, even if Rothschild did not affirmatively waive these claims by assenting to the instruction, at most the Court reviews for plain error because he did not object on these grounds. *See Parker v. Sony Pictures Ent., Inc.*, 260 F.3d 100, 107 (2d Cir. 2001). And the instruction was not plainly erroneous.

The instruction required Hermès to prove that Rothschild's "use of the Birkin mark was not just likely to confuse potential consumers but was intentionally designed to mislead consumers into believing that Hermès was associated with Rothschild's MetaBirkins project." ECF143(21). As the district court explained, this instruction contains both an objective and subjective component: "[T]his Court … defin[ed] 'explicitly misleading' to mean not only

objectively misleading but also intentionally misleading." ECF191(9). Just like someone is "intentionally late" only if they subjectively intended to be late and objectively were late, Rothschild's use of Hermès' marks was "intentionally designed to mislead" only if it was subjectively intended to mislead and objectively misleading. Rothschild's counsel even told the jury that the "First Amendment protects Mr. Rothschild [if] he did not *intentionally and explicitly* mislead anyone about who created MetaBirkins …. *You will see that on page 21 of your jury instructions*." ECF159(1000) (emphases added). To emphasize, the jury could not have found Rothschild liable based on his subjective intent alone.

By requiring Hermès to prove a subjective intent to mislead *and* objective misleadingness, the jury instructions were far more favorable to Rothschild than the law required, as the district court acknowledged. ECF191(9). This Court has held that the explicit misleadingness under *Rogers* turns on whether there is a "particularly compelling" likelihood of confusion based on "application of the venerable *Polaroid*" factors. *Twin Peaks Productions, Inc. v. Publications Int'l*, 996 F.2d 1366, 1379 (2d Cir. 1993); *Cliffs Notes*, 886 F.2d at 495 n.3. The *Polaroid* factors guide the traditional trademark infringement claim analysis and include "actual confusion" and "[d]efendant's good faith."[13] The jury here had already determined, as a general matter, that the *Polaroid* factors tilted in Hermès' favor based on the standard trademark claim instruction. ECF143(14–15). *Rogers* requires plaintiffs challenging expressive works to make a sufficiently strong showing under those factors "to outweigh the First Amendment interest recognized in *Rogers*." *Twin Peaks*, 996 F.2d at 1379.

---

[13] "[T]he strength of his mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers." *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961).

Consistent with this precedent, the *Rogers* instruction should have stated, at a bare minimum, that the First Amendment does not protect Rothschild if there either was a subjective intent to mislead *or* objective misleadingness.[14] A bad faith intent to mislead constitutes a "particularly compelling" showing under the *Polaroid* factors, regardless of objective misleadingness. It is hornbook *law* that "the First Amendment does not shield fraud." *See United States v. Hansen*, 599 U.S. 762, 769 (2023); *United States v. Alvarez*, 567 U.S. 709, 719 (2012) (emphasizing defendant's subjective fraudulent intent negated First Amendment protection); *United States v. Williams*, 553 U.S. 285, 299 (2008) (similar). Defendants' subjective intent accordingly has been consistently considered by courts under *Rogers*. *See AM Gen. LLC v. Activision Blizzard, Inc.*, 450 F. Supp. 3d 467, 479 (S.D.N.Y. 2020) ("a willful attempt to garnish the trademark owner's goodwill for profit" is not protected); *Dita, Inc. v. Mendez*, No. CV 10-6277 PSG FMOX, 2010 WL 5140855, at *3 (C.D. Cal. Dec. 14, 2010) (allegations of "inten[t] to mislead the public as to the source or content of the work ... expressly negate the second prong of the *Rogers* test"). By requiring Hermès to prove subjective *and* objective misleadingness, the instruction put Hermès—not Rothschild—at a severe disadvantage.

Rothschild offers no authority supporting his assertion that the instruction should have addressed the difference between an intent to reference versus confuse. Rothschild was either trying to mislead or not; whether he was also trying to reference is irrelevant to this inquiry. Moreover, according to

---

[14] These are not the only instances where there may be a "particularly compelling" showing, and if Hermès had lost below it would have a strong argument that the *Rogers* instruction was too demanding.

Rothschild (Br. 6), the *Rogers* test is entirely objective.[15] He therefore is in no position to quibble with the court's phrasing of the added subjective element, which only increased Hermès' burden.[16] Rothschild concedes (Br. 6) that an objectively misleading use of Hermès' marks alone disqualifies him from special First Amendment protection under *Rogers*, which the jury also necessarily found based on the instruction.

Rothschild asserts (Br. 62–66) no other error in the *Rogers* instruction, but out of an abundance of caution, Hermès addresses one misconception that Rothschild raises in the context of challenging the denial of his motion to dismiss. Rothschild argues (Br. 39) that titles can be "explicitly misleading" only if they "overtly claim a connection that does not exist," such as "MetaBirkins by Hermès." But *Rogers* did not define "explicitly misleading" in this manner; it only contrasted titles that would be explicitly misleading ("Nimmer on Copyright") with titles that would not ("Bette Davis Eyes"), without suggesting that these examples were exhaustive. 875 F.2d at 999.

Rothschild's argument that the "explicitly misleading" inquiry turns on the name "MetaBirkins" alone conflicts with this Court's flexible, multifactor-based approach to the inquiry described above. Moreover, the Ninth Circuit has specifically rejected Rothschild's argument that "to be explicitly misleading, the defendant must make an affirmative statement of the plaintiff's sponsorship or endorsement." *Gordon v. Drape Creative, Inc.*, 909 F.3d 257, 269 (9th Cir. 2018) (cleaned up). "If an artist pastes Disney's trademark at the bottom corner of a

---

[15] Rothschild elsewhere describes (Br. 45) *Twin Peaks* as a "title-versus-title" case, but *Twin Peaks* does not feature such a limitation and *Rogers* does not even apply to title-versus-title cases. *See Rogers*, 875 F.2d at 999 n.5.

[16] Rothschild implausibly contends (Br. 64–65) that his (false) statements that he was in talks with Hermès, his belated website disclaimer, and his testimony about correcting mistaken media reports establish that he did not intend to mislead. Hermès addresses the sufficiency of the evidence *infra*, pp. 37–38.

painting that depicts Mickey Mouse, the use of Disney's mark … could explicitly mislead consumers … even if those words do not appear alongside the mark itself." *Id.* at 270. Here, Rothschild used the Birkin mark to brand a digital Birkin bag at the same time that other fashion houses began producing digital commodities, and even promised to "airdrop" horse charms linked to the digital bags. *See* pp. 4, 16, *supra*. In such circumstances, Rothschild did not need to call his NFTs "MetaBirkins by Hermès" to explicitly mislead.[17]

*Third*, any error in the *Rogers* instruction would be harmless. It is Rothschild's burden to establish prejudice. *Woods v. START Treatment & Recovery Centers, Inc.*, 864 F.3d 158, 169 (2d Cir. 2017). As explained, Rothschild was not even entitled to a *Rogers* instruction in light of *Jack Daniel's*. Moreover, Hermès presented overwhelming evidence that Rothschild's use of Hermès' trademarks was explicitly misleading. *See* pp. 37–38, *infra*. The proposition that the jury held Rothschild liable based on his subjective intent alone, without also engaging in conduct that is objectively misleading, does not track how this case was tried. *See, e.g.*, ECF157(835) (Hermès conceding that "the defendant could try to mislead and fail …. And then, of course, there is no claim"). There is no reasonable likelihood that the verdict would have been different had the jury been instructed as Rothschild now claims it should have.

### 4. *Sufficient Evidence Supports the Jury Verdict on* **Rogers**

Rothschild does not challenge the sufficiency of the evidence supporting the jury verdict on appeal, *see* Br. 1–2, 75–76, and therefore has forfeited any

---

[17] Rothschild also argues for the first time in a footnote (Br. 60 n.19) that the *Rogers* instruction "is erroneous because the district court made no attempt to distinguish between Rothschild's intent upon adopting the mark and whatever his state of mind might have been after." But the instruction appropriately focused on Rothschild's "use" of Hermès' trademarks—*i.e.*, on the times when Rothschild adopted the trademarks. (ECF143(21).

such challenge.[18] Out of an abundance of caution, Hermès explains why the evidence it presented to the jury was sufficient to support a finding of explicit misleadingness.

Hermès presented the strongest possible case under *Rogers*. First and foremost, Hermès showed that Rothschild used Hermès' trademarks to deliberately mislead consumers into believing that Hermès was associated with the MetaBirkins NFTs—*i.e.*, that he adopted the mark in bad faith. *See* pp. 10–11, *supra*. Hermès further showed that Rothschild *did* in fact mislead potential consumers. Specifically, Hermès presented evidence of actual confusion in the form of the expert testimony of Dr. Isaacson detailing his survey on the likelihood of confusion, multiple high-profile media reports mistakenly attributing the MetaBirkins NFTs to Hermès, and other comments making the same mistake. *See* pp. 14–15, 12–13, *supra*.

Finally, it bears emphasis that many of the *Polaroid* factors—such as the strength of Hermès' marks and the similarity between the marks—were undisputed at trial. Hermès further presented uncontested evidence that it had plans to "bridge the gap" by producing and selling its own NFTs. *See* pp. 12–14, *supra*. Rothschild also admitted that he was competing for the same consumers as Hermès, Pl.Trial.Ex.244, and the evidence established that the MetaBirkins NFTs and Hermès' products were both marketed as "[l]uxury products[s]." ECF149(152-53); Pl.Trial.Ex.242(5). And Hermès showed that the NFT marketplace is immature and highly speculative and the consumers were therefore not particularly sophisticated. ECF152(74); ECF157(19). On appeal, Rothschild does not even attempt to explain why Hermès did not establish a "particularly compelling" case under these *Polaroid* factors. Nor does Rothschild

---

[18] Rothschild argues (Br. 52–59) only that Hermès' evidence was insufficient to withstand summary judgment—a pre-trial factual ruling that cannot be appealed. *See* p.30, *supra*.

attempt to address the evidence supporting the jury determinations in Hermès' favor on the traditional elements of its dilution and cybersquatting claims, which also bolsters the strength of Hermès' showing.

In the context of challenging the court's summary judgment decision, Rothschild picks only at the edges of this wealth of evidence. He argues (Br. 57) that the survey performed by Dr. Isaacson was "riddled with methodological mistakes that cooked the books in Hermès' favor."[19] Rothschild bases this argument on the disputed testimony of Dr. Neal, which the jury was entitled to discredit. Dr. Neal's primary criticism was based on how Dr. Isaacson counted confused respondents. ECF159(915). Dr. Neal admitted that he based this criticism on a decision that did not consider a survey performed (as in this case) with a control group and addressed a circumstance where the identical-sounding names of the potential sources (Everready and Ever-ready) made coding respondents particularly difficult. ECF159(932). Rothschild also argues that the percent confusion found by Dr. Isaacson—18.7 percent—was too low. This argument conflicts with the testimony of his own expert, as Dr. Neal testified that "if you get 15 percent or above … you can reach a conclusion that confusion exists." ECF159(917); *see also RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058, 1061 (2d Cir. 1979) (15-20% percent sufficient to find confusion); *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 466–467 (4th Cir. 1996) (15-20% establishes "significant degree" of confusion); *Exxon Corp. v. Texas Motor Exch. of Houston, Inc.*, 628 F.2d 500, 507 (5th Cir. 1980) (15% is "strong evidence" of confusion).

Rothschild additionally argues (Br. 56) the jury "ignored the evidence that he … correct[ed] mistaken media outlets." Rothschild introduced no concrete evidence of even once having corrected a mistaken reporter, such as an email or

---

[19] Survey evidence is not even required to prove actual confusion. *See The Sports Auth., Inc. v. Prime Hosp. Corp.*, 89 F.3d 955, 964 (2d Cir. 1996).

a statement from his publicist. Instead, Rothschild half-heartedly testified that "Yeah. It was always to make sure it was not, um, a collaboration or done by Hermès. We have corrected the press on numerous occasions where they accidentally said it was Hermès and we said, Hey, like, that's incorrect." DE153(304). Given Rothschild's repeated lies, *see* pp. 6, 10–11, *supra*, the jury was entitled to take this self-serving, cursory testimony with a grain of salt. And whether Rothschild corrected reporters does not undermine the abundant evidence discussed above that Rothschild's use of Hermès trademarks was explicitly misleading. To the contrary, if Rothschild did in fact have to correct reporters on "numerous occasions," that would only add to Hermès' anecdotal evidence of confusion.

Finally, Rothschild argues (Br. 54) that the mistaken media reports and social media statements attributing the MetaBirkins NFTs to Hermès are not evidence of confusion. But "courts in this Circuit have accepted online customer reviews and comments on social media as anecdotal evidence of actual confusion." *Hope Organics LLC v. Preggo Leggings LLC*, No. 21-CV-2416, 2021 WL 5919367, at *8 (S.D.N.Y. Dec. 15, 2021) (collecting cases). "[N]ews articles and media reports" are also highly probative. *Bulman v. 2BKCO, Inc.*, 882 F. Supp. 2d 551, 562 (S.D.N.Y. 2012). Rothschild cites a few cases (Br. 54–55) where the anecdotal evidence *in that case* was not particularly persuasive, but those fact-bound decisions do not speak to the anecdotal evidence here, which was bolstered by Dr. Isaacson's survey and Dr. Kominers' analysis. *See* ECF191(13) (Dr. Isaacson's survey "was itself sufficient to show confusion"). Moreover, even if this evidence was not relevant to actual confusion, the district court explained that it was "indisputably relevant as circumstantial evidence regarding the likelihood of confusion," ECF191(13 n.3)—a finding Rothschild

does not challenge. Rothschild cannot credibly claim that the evidence before the jury was legally insufficient.

### 5. *Rothschild Is Wrong that* **Rogers** *Applies to Cybersquatting Claims*

Rothschild incorrectly asserts (Br. 47) that *Rogers* applies to Hermès' cybersquatting claim. Undersigned counsel is aware of no precedent holding that it does, and there is no reason why artists should have special license to use another's trademark in a domain name with a "bad faith intent to profit from that mark." 15 U.S.C. § 1125(d)(1)(A). Rothschild cites *Lamparello v. Falwell*, but *Lamparello* states that Congress tailored the elements of section 43(d) to not "impinge the First Amendment rights of critics and commentators," 420 F.3d, 309, 313–14 (4th Cir. 2005), suggesting that no *Rogers*-related "gloss" on the subsection is necessary. Accordingly, at the very least, Rothschild's *Rogers*-related claims of error do not support reversal as to this claim.

## II. THE DISTRICT COURT CORRECTLY HELD THAT *DASTAR* DOES NOT PRECLUDE TRADEMARK CLAIMS CONCERNING INTANGIBLE GOODS

The district court correctly denied Rothschild's motion to dismiss based on his argument that *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003), precludes Lanham Act claims concerning intangible goods.[20] The Court reviews this decision *de novo*. *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 194 (2d Cir. 2008).[21]

---

[20] *Dastar* addressed the scope of section 43(a)(1)'s cause of action for infringement based on confusion as to the "origin" of "goods, services, or commercial activities." 539 U.S. at 29–38. *Dastar* is inapplicable to Hermès' section 43(b) dilution or 43(d) cybersquatting claims, as these sections do not use those terms. *Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 990 (9th Cir. 2008) ("*Dastar* was limited to the first prong of § 43(a)(1).").

[21] Appellate review properly extends to Rothschild's motion to dismiss because this is a "purely legal issue." *Dupree*, 598 U.S. at 731.

*Dastar* concerned Dastar's production of a video set by copying and editing material from a Fox television series that was in the public domain. 539 U.S. at 26. Dastar used none of Fox's trademarks and marketed the video set as its own. *Id.* at 27. Fox alleged a "reverse passing off" claim under section 43(a) of the Lanham Act—*i.e.*, that Dastar was trying to pass off Fox's work as its own. *Id.* The Supreme Court held that Dastar did not misrepresent the "origin" of its video set because Dastar *was* its manufacturer. *Id.* at 38. As the district court explained, "*Dastar* said nothing at all about the general applicability of the Lanham Act to intangible goods." ECF61(13). *Dastar* merely "aimed to draw a sharper distinction between copyright and trademark by requiring consumer confusion as to the defendant's goods—whether tangible or intangible—rather than with respect to their creative content." ECF61(14–15).[22] Indeed, the Seventh Circuit has applied *Dastar* to claims concerning *tangible* goods. *Bretford Mfg., Inc. v. Smith Sys. Mfg. Corp.*, 419 F.3d 576, 580–81 (7th Cir. 2005); *Williams v. UMG Recordings, Inc.*, 281 F. Supp. 2d 1177, 1184 (C.D. Cal. 2003) (applying *Dastar* to services).

Contrary to Rothschild's argument, "[t]here is no doubt that trademark law and the Lanham Act are fully operative in cyberspace." 5 McCarthy § 25A:1; ECF61(16–17 & n.5) (collecting cases for the proposition that "the Lanham Act extends to trademark claims against intangible, as well as tangible, goods"); ECF54(7–8) (same). This Court in *Kelly-Brown*, for instance, applied the Act to Oprah's use of the trademark "Own Your Power" on her website. 717 F.3d at 302–03. The Eleventh Circuit in *B and F System, Inc. v. LeBlanc* similarly held that *Dastar* did not preclude claims concerning the use of trademarks on a

---

[22] *See WickFire, L.L.C. v. Laura Woodruff; TriMax Media, L.L.C.*, 989 F.3d 343, 351 (5th Cir. 2021) (*Dastar* "stand[s] for the general proposition that one cannot shoehorn … a putative copyright violation into a Lanham Act claim."); *Warner Bros. Ent. V. X One X Prods.*, 840 F.3d 971, 980 (8th Cir. 2016) (*Dastar* bars "disguised copyright claims").

website. 519 F. App'x 537, 539 (11th Cir. 2013); *see Yuga Labs, Inc. v. Ripps*, No. CV 22-4355-JFW(JEMX), 2023 WL 3316748, at *5 (C.D. Cal. Apr. 21, 2023) (NFTs are "goods" under the Lanham Act).

By contrast, no court has held that the Act is inapplicable to intangible goods.[23] Cabining it in this fashion would contravene the plain text of section 43(a), which refers to "goods, services, or commercial activities" without regard to tangibility. 15 U.S.C. § 1125(a). Congress's 1989 addition of "commercial activities" to section 43(a) confirms its breadth. *See Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1272–73 (10th Cir. 2000). Ignoring the plain meaning of this statutory language would require a compelling constitutional argument, but the only potentially relevant constitutional provision, the First Amendment, does not distinguish between tangible versus intangible creations.

Excluding intangible goods from the Lanham Act would upend trademark law. Scammers could have a heyday filling the AppStore with counterfeit Venmo and Uber apps. A two-bit studio could stream a movie under the name "Disney." And a wannabe author could release a "Harry Potter" Book 8 e-book. Rothschild's rule would work a gross distortion of the Act to the disadvantage of American technological innovation, creators, and consumers.

## III. THE DISTRICT COURT'S EXPERT EVIDENTIARY RULINGS WERE NOT AN ABUSE OF DISCRETION

The expert evidentiary rulings were not an abuse of discretion. *See Restivo v. Hessemann*, 846 F.3d 547, 575 (2d Cir. 2017). Rothschild suggests that because

---

[23] Rothschild cites *Phoenix Ent. Partners v. Rumsey*, but *Rumsey* assumed "that a digital file counts as a tangible good for purposes of the trademark analysis" and simply rejected a claim against a bar playing bootleg copies of karaoke tracks after finding that the bar's conduct created no confusion as to the source of those tracks. 829 F.3d 817, 828–829 (7th Cir. 2016); *Slep-Tone Ent. Corp. v. Wired for Sound Karaoke & DJ Servs., LLC*, 845 F.3d 1246, 1250 (9th Cir. 2017) (rejecting similar bootleg karaoke claim); *Phoenix Ent. Partners, LLC v. J-V Successors, Inc.*, 305 F. Supp. 3d 540, 548 (S.D.N.Y. 2018) (same).

Hermès' expert was allowed to testify, his should have been allowed too. *See* Br. 73. But there is no tit-for-tat provision in the Federal Rules of Evidence. The district court appropriately considered whether each expert independently satisfied the criteria for admission and reasonably concluded that "there's no comparison between" them. ECF153(337).

### A.    The District Court Properly Excluded Dr. Gopnik

The district court did not exceed its "broad latitude" to act as a gatekeeper for "non-scientific expert testimony" in excluding Dr. Gopnik, *Altschuler v. Univ. of Pennsylvania Sch. of L.*, 201 F.3d 430, at *2 (2d Cir. 1999) (quotation marks omitted), who Rothschild offered as an expert on "business art," ECF153(335). The court reasonably found that Dr. Gopnik's testimony was based on his personal opinion and not any reliable expert methodology. ECF153(336). Indeed, during his deposition, Dr. Gopnik's answers were incoherent, evasive, and dripping with disdain for anyone outside the "art world." *See* ECF122-2.

Dr. Gopnik testified that there is no "agreed-upon method in the art criticism profession for resolving" a dispute over whether "a particular item is art." ECF122-2(117). He stated that "[t]here is no consensus among art historians about anything"—including the Mona Lisa, which he dismissed as "trivial"—"so there cannot be a consensus on fur-covered Birkin Bags." ECF153(335); ECF122-2(130–31). When asked about his methodology, Dr. Gopnik said that he "looks at the larger set of contextual clues that tell you, oh, this might be worth looking at as an artist's activity." ECF122-2(118). He never could explain what this means. He could not even give a coherent definition of "business art." ECF153(336). He testified that business art could include "investing money in the stock market, creating a corporation, the public sale of works at auction, opening a restaurant, adopting the trademark of another company, activity geared towards provoking a lawsuit, and making money."

ECF120(4). "[P]laying at plutocracy" could be art. ECF122-3. As could "playing a football game"—at least if people in the "art world" dubbed it so. ECF122-2(204). And "taking actions that cause you to be sued"—including infringing another's trademark to "creat[e] confusion" and "mak[e] money"— could be art. ECF122-2(14, 237–39).

The district court did not err in determining that this testimony would not assist the jury. In fact, when asked how a "nonspecialist" could evaluate whether something was business art, Dr. Gopnik said they couldn't because "a nonspecialist has no sense of art." ECF122-2(131).

Rothschild argues (Br. 67) that the court "abused its discretion by requiring scientific rigor from an art expert," but it did no such thing. For non-scientific experts, "the court must still assess whether the expert employs 'the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Restivo*, 846 F.3d at 577 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). Courts may consider the *Daubert* factors in conducting this assessment. *Id.* This is precisely what the district court did.

*United States v. Isaacs* is instructive. The district court excluded the art expert there, explaining that "Defendant could provide no methodology in determining whether something qualifies as art or has serious artistic value. Instead, Defendant only provided vague and self-serving (and at times circular) descriptions, such as art is what an artist does." No. 07-732, 2011 WL 13286161, at *3 (C.D. Cal. Mar. 2, 2011). The Ninth Circuit affirmed, explaining that this "application of the expert-testimony standard was logical." *United States v. Isaacs*, 565 Fed. App'x 637, 640 (9th Cir. 2014) (quotation marks omitted); *see also United States v. Stagliano*, 729 F. Supp. 2d 222, 230 (D.D.C. 2010) (excluding testimony of artistic expert because her "methodology—what little can be gleaned from it—is so nebulous, subjective, and lacking in rigor and detail as to

cast serious doubt, not only on the reliability of her opinion testimony, but on its usefulness to the jury").

Rothschild cites a handful of inapposite cases. Many do not concern questions of Rule 702 admissibility. *See e.g.*, *Castillo v. G&M Realty L.P.*, 950 F.3d 155 (2d Cir. 2020); *Luke Records v. Navarro*, 960 F.2d 134 (11th Cir. 1992); *Cohen v. G&M Realty L.P.*, No. 13-C-05612, 2017 WL 1208416 (E.D.N.Y. Mar. 31, 2017). Those that do concern facts far afield from those here. *See, e.g., Deputy v. Lehman Bros.*, 345 F.3d 494 (7th Cir. 2003) (handwriting expert); *U.S. v. Onumonu*, 967 F.2d 782 (2d Cir. 1992) (drug trafficking expert); *Alcantar v. Foulk*, No. 1:14-CV-00747, 2016 WL 3001242 (E.D. Cal. May 25, 2016) (gang expert).

Rothschild primarily relies (Br. 68–69) on the Eighth Circuit's decision in *United States v. Vesey* and the Fifth Circuit's decision in *United States v. Arthur*. But *Vesey* simply held that a drug-trafficking expert was sufficiently reliable: The expert "had extensive knowledge of the sale, use, and distribution of narcotics" which "[h]e used … to formulate general rules of drug trafficking behavior" and "then applied … to the behavior of the actors in this case." 338 F.3d 913, 917–18 (8th Cir. 2003).

*Arthur* is also unhelpful. *Arthur* reversed the exclusion of a "licensed clinical psychologist and board-certified sex therapist with a master's degree in psychology, a PhD in clinical psychology, and twenty years of [clinical] experience." 51 F.4th 560, 573 (5th Cir. 2022). The expert would have testified that "narrative accounts of sexual abuse" can have "scientific and clinical uses" based on studies using "methods commonly accepted in the fields of sex therapy and clinical psychology." *Id.* at 574. The expert also would have testified that "the charged stories and drawings" are comparable to "art that is generally accepted as having serious artistic or literary value." *Id.* at 573. The court explained that "[n]either the district court nor the Government has explained

why this comparative method is unreliable, and … comparing the content … in the charged materials with works a reasonable person would understand as having literary or artistic value is a logical method." *Id.* at 574.

*Arthur* sheds no light on the reliability of Dr. Gopnik's testimony. His method—so far as he could describe it—was entirely contextual, not comparative. According to Dr. Gopnik, making comparisons to "generally accepted" art is impossible because a reasonable person has no sense of art and there is no understanding among experts that anything is art. ECF153(335). Employing his undefined contextual method, he apparently would find no serious artistic value in a piece comparable to the Mona Lisa but would find artistic value in operating an Ponzi scheme based on his personal opinion about "context."

Moreover, Dr. Gopnik's testimony was irrelevant—and consequently any error in its exclusion was also harmless—because the district court instructed the jury that Rothschild's use of the Hermès marks was artistically relevant. ECF143(21); ECF191(14). Rothschild claims (Br. 70) that his testimony "would have enabled the jury to understand the artistic traditions and practices in which Rothschild was operating." But, to reiterate, "artistic traditions and practices" is orthogonal to the issues that were before the jury. The introduction of Dr. Gopnik's incoherent and irrelevant testimony would have only risked confusing them.

Moreover, Dr. Gopnik's report conceded that "[t]he very public, showy sale of the 'MetaBirkins[]' us[ed] all the techniques and 'utilities' of digital branding." ECF122-1(13). According to Dr. Gopnik, "[t]he more that art might be confused with commerce, the more likely it was to have impact as truly novel and significant art that might puzzle and disturb." ECF122-1(10). He states that "[t]he cultural disturbance caused by Mason Rothschild's 'MetaBirkins'—

including to the Hermès company—indicates that they are exploring similar terrain": "By participating in the word of digital brands … Rothschild gets to probe how fine art and branding interact in the 21st century." ECF122-1(10–11). In other words, in Dr. Gopnik's opinion, *the fraud, if extreme enough, is the art*. Dr. Gopnik may or may not be right that Rothschild's work is "truly novel and significant art," but *Jack Daniel's* makes clear that his use of Hermès' trademarks to build a brand and mislead consumers receives no special First Amendment protection.

### B. The District Court Properly Admitted Dr. Kominers

The district court likewise did not abuse its discretion in admitting the testimony of Dr. Kominers. As the court explained, Dr. Kominers' methodology was clear, as was the relevance of his testimony. ECF153(336–37). Courts routinely admit the testimony of economics experts using qualitative and empirical methods to define markets like those of Dr. Kominers. *See* pp. 15–17, *supra* (describing Dr. Kominers' methodology); *e.g.*, *US Airways, Inc. v. Sabre Holdings Corp.*, No. 11 CIV. 2725 (LGS), 2022 WL 986232 (S.D.N.Y. Apr. 1, 2022). "Where, as in this case, the district court decides to admit the testimony of well-credentialed experts relying on scientific methodology, [this Court] should and will be reluctant to upset that decision as an abuse of discretion." *Zuchowicz v. United States*, 140 F.3d 381, 387 (2d Cir. 1998).

Rothschild's appeal rests on his false assertion that Dr. Kominers "effectively was offered to testify that MetaBirkins was not art even though he had no qualifications to do so."[24] Br. 74. While Dr. Kominers did testify that the MetaBirkins NFTs were "branded NFTs," that testimony said *nothing* about

---

[24] Rothschild argues (Br. 74) that Dr. Kominers' testimony underscores the prejudice in excluding Dr. Gopnik, who could have explained that certain aspects of branded NFTs like "utilities" can be "artistic expression." *Id.* But, for the same reasons, that point is irrelevant and does not rebut Dr. Kominers' testimony.

whether they were art. There is no "either or" distinction between "brands" and "art." Some "branded NFTs" are artistic; some are not. *See* ECF157(20–21). Dr. Gopnik in fact conceded that "artistic" NFTs could be digital brands and that Rothschild's business art involved building the MetaBirkins NFTs as a brand. ECF122-1(7). By testifying that the MetaBirkins NFTs were part of the digital brand submarket, Dr. Kominers in no manner commented on their artistic value.

Rothschild noticeably does not quote *any* testimony from Dr. Kominers commenting on whether the MetaBirkins NFTs are art. Br. at 25, 72–74.[25] Such testimony does not exist. As Rothschild acknowledges (Br. 74), the district court in fact carefully monitored Dr. Kominers' testimony to ensure that it did not include "any comment on whether or not [MetaBirkins] is art." ECF157(28). When his testimony at one point even came "close" to commenting on art, the court instructed the jury to disregard it. ECF157(28–29) (instructing jury to disregard quotation of Rothschild's statement criticizing Gucci NFTs for being "purely art"); *see Britt v. Garcia*, 457 F.3d 264, 272 (2d Cir. 2006) ("[A] jury is presumed to follow the instructions of the trial judge.").

*　　*　　*

Try as he might, Rothschild cannot turn this case into a referendum on whether his MetaBirkins NFTs are art. The jury decided this case assuming that they are, but nevertheless found that Rothschild intentionally branded and marketed them to mislead consumers and profit off that confusion. Simply put, the law does not give artists special license to build their own brands using

---

[25] Rothschild falsely states, without quotation, that Dr. Kominers' report opines that Rothschild's use of Hermès' trademarks was not "artistically relevant." Br. 74. Regardless, the report was not admitted at trial.

another person's trademarks, much less use those trademarks to deceive consumers.

## CONCLUSION

This Court should affirm the judgment below.

Respectfully submitted,

Dated: February 2, 2024

/s/ *David B. Rivkin, Jr.*

GERALD J. FERGUSON
OREN J. WARSHAVSKY
HEATHER J MCDONALD
BAKERHOSTETLER
45 Rockefeller Plaza
New York, NY 10111
(212) 589-4238
gferguson@bakerlaw.com

DAVID B. RIVKIN, JR.
MARK W. DELAQUIL
KRISTIN A. SHAPIRO
BAKERHOSTETLER
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036
(202) 861-1731
drivkin@bakerlaw.com

*Counsel for Hermès International and Hermès of Paris, Inc.*

## CERTIFICATE OF COMPLIANCE WITH
## FEDERAL RULE OF APPELLATE PROCEDURE 32(a)

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 13,970 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Calisto 14-point font.

Respectfully submitted,

Dated: February 2, 2024

GERALD J. FERGUSON
OREN J. WARSHAVSKY
HEATHER J MCDONALD
BAKERHOSTETLER
45 Rockefeller Plaza
New York, NY 10111
(212) 589-4238
gferguson@bakerlaw.com

/s/ *David B. Rivkin, Jr.*

DAVID B. RIVKIN, JR.
MARK W. DELAQUIL
KRISTIN A. SHAPIRO
BAKERHOSTETLER
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036
(202) 861-1731
drivkin@bakerlaw.com

*Counsel for Hermès International and Hermès of Paris, Inc.*