UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

Thurgood Marshall U.S. Courthouse    40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

MOTION INFORMATION STATEMENT

Docket Number(s): 23-1081 _____     _____ Caption [use short title] _____

Motion for: Leave to File Amicus Brief on Behalf

of The Digital Chamber of Commerce

_____

_____

Set forth below precise, complete statement of relief sought:

The Chamber of Digital Commerce requests

Leave to file the proposed Amicus brief, attached          Hermès International v. Mason Rothschild

concurrently to the filing of this Motion

_____

_____

_____

MOVING PARTY: The Chamber of Digital Commerce (Amicus Curiae)     OPPOSING PARTY: Mason Rothschild

☐ Plaintiff          ☐ Defendant

☐ Appellant/Petitioner   ☐ Appellee/Respondent

MOVING ATTORNEY: Jonathan E. Schmalfeld     OPPOSING ATTORNEY: Rhett O. Millsaps II

[name of attorney, with firm, address, phone number and e-mail]

Polsinelli PC                          Lex Lumina PLLC

100 S. Fourth Street, Suite 1000               745 Fifth Avenue, Suite 500

St. Louis, MO 63102                      New York, NY 10151

Court- Judge/ Agency appealed from: _____

Please check appropriate boxes:                    FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND
                                        INJUCTIONS PENDING APPEAL:
Has movant notified opposing counsel (required by Local Rule 27.1):    Has this request for relief been made below?   ☐ Yes ☐ No
☑ Yes  ☐ No (explain):_____    Has this relief been previously sought in this court?   ☐ Yes ☐ No
_____    Requested return date and explanation of emergency: _____

Opposing counsel's position on motion:                _____
☐ Unopposed ☑ Opposed ☐ Don't Know          _____
Does opposing counsel intend to file a response:            _____
☐ Yes  ☐ No  ☑ Don't Know                _____

Is oral argument on motion requested?   ☐ Yes ☑ No (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?   ☐ Yes ☑ No  If yes, enter date:_____

Signature of Moving Attorney:

/s/ Jonathan E. Schmalfeld  Date: 2/9/2024 _____   Service by: ☑ CM/ECF   ☐ Other [Attach proof of service]

HERMES INTERNATIONAL and )
HERMES OF PARIS, INC., )
                                         )
            *Plaintiff-Appellees,* )            No. 23-1081
v.                                        )
                                         )
MASON ROTHSCHILD,           )
                                         )
            *Defendant-Appellant.* )

**AFFIRMATION IN SUPPORT OF MOTION BY THE CHAMBER OF
DIGITAL COMMERCE, FOR LEAVE TO FILE *AMICUS* BRIEF**

Pursuant to Federal Rule of Appellate Procedure 29, The Chamber of Digital

Commerce (the "Chamber"), moves for leave to file a brief as *amicus curiae* in the

present case. Counsel for Plaintiff-Appellee consents to the Chamber's filing of an

*amicus* brief. Counsel for Defendant-Appellant does not consent to the Chamber's

filing of an *amicus* brief.

This case presents unique questions regarding the applicability of trademark

laws to digital goods. Specifically, the Court has been asked to address the extent

to which the test stated in *Rogers v. Grimaldi*, 875 F.2d 994, 999-1000 (2d Cir. 1989)

applies to marks used in the sale of digital goods and non-fungible tokens ("NFTs").

Digital goods, specifically NFTs, present unique considerations for the Court to

consider regarding extent to which the *Rogers* test should apply to a new class of

goods in which the line between "art" and "consumer good" is blurred beyond a simple test of artistic expression.

The Chamber, as the world's largest blockchain trade association, represents more than 200 diverse members of the blockchain industry globally, including cryptocurrency exchanges, leading consumer brands, NFT platforms and creators, startups, and other blockchain economy participants. The Chamber's interest in filing this *amicus* brief is to illuminate the importance of trademarks in the Metaverse and for NFTs, and to support laws that safeguard these marks.

The Chamber is a frequent participant as *amicus* in cases directly affecting the blockchain industry, including *SEC v. Binance Holdings Ltd*., Case No. 1:23-cv-01599 (D.D.C. June 5, 2023); *SEC v. Coinbase, Inc*., Case No. 1:23-cv-04738 (S.D.N.Y. June 6, 2023); *SEC v. Wahi*, Case No. 2:22-cv-01009 (W.D. Wash. July 21, 2022); *SEC v. Ripple Labs, Inc*., Case No. 1:20-cv-10832 (S.D.N.Y. Dec. 22, 2020); and *SEC v. Telegram Group, Inc*., Case No. 1:19-cv-09439 (S.D.N.Y. Oct. 11, 2019).

Counsel for Defendant-Appellant's objection to the participation of the Chamber as *amicus* in this matter is regarding certain communications between Defendant-Appellant and an individual who sits on the Chamber's Advisory Board, who had a prior relationship with Defendant-Appellant. That individual in question is not, and has never been, an employee of the Chamber, and was not involved with the authorship or contents of the Chamber's proposed *amicus* briefing. Further, that

individual had zero communication or contact with the attorneys who authored the *amicus* briefing, and no employee from the Chamber has discussed the contents of the proposed *amicus* briefing with that individual prior to Counsel for Defendant-Appellant's objection to the participation of the Chamber as *amicus* in this matter.

Participation by Chamber as *amicus curiae* will not delay the briefing or argument in this case. The Chamber is filing its brief within the time allowed by Federal Rule of Appellate Procedure 29(a)(6).

Accordingly, The Chamber of Digital Commerce respectfully requests that the Court grant its motion for leave to file a brief as *amicus curiae* and that the Court accept for filing the brief that is being submitted contemporaneously with this motion.

Respectfully submitted,

/s/ Jonathan E. Schmalfeld
Jonathan E. Schmalfeld
Polsinelli PC
100 S. Fourth Street, Suite 100
St. Louis, MO 63102-1825
(314) 622-6621

Daniel P. Mullarkey
Polsinelli P.C.
1401 Eye ("I") Street, N.W., Suite 800
Washington, DC 20005
(202) 626-8305

*Attorneys for Amicus Curiae The*
*Chamber of Digital Commerce*

February 9, 2024

**PROPOSED AMICUS BRIEF**

# 23-1081-cv

## United States Court of Appeals

### *for the*

## Second Circuit

HERMES INTERNATIONAL, HERMES OF PARIS, INC.,

*Plaintiffs-Appellees,*

— v. —

MASON ROTHSCHILD,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF OF *AMICUS CURIAE* THE CHAMBER OF DIGITAL COMMERCE IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

DANIEL P. MULLARKEY
POLSINELLI PC
1401 Eye ("I") Street, N.W., Suite 800
Washington, DC 20005
(202) 626-8305

JONATHAN E. SCHMALFELD
POLSINELLI, P.C.
100 South Fourth Street, Suite 1000
St. Louis, Missouri 63102
(314) 889-8000

*Attorneys for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to the Federal Rule of Appellate Procedure 26.1, *amicus* discloses that:

The Chamber of Digital Commerce Foundation is a nonprofit, tax exempt organization incorporated in the District of Columbia. The Chamber has no parent corporation, and no publicly held company has 10% or greater ownership in it.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF INTEREST OF *AMICUS CURIAE*............................................1

SUMMARY OF ARGUMENT ...............................................................2

ARGUMENT ............................................................................4

    A.    BACKGROUND.................................................................4

        1.    MetaBirkins are NFTs................................................4

        2.    The Metaverse....................................................4

        3.    Web3 and Digital Goods............................................5

        4.    NFT Marketplaces and Consumer Buying Behaviors ...............6

        5.    Brands Have Entered the Web3 Space to Sell NFTs to Consumers and Directly Connect With Those Consumers..................................................9

    B.    *Rogers* Should Not Apply in the Digital Good Space ........................12

    C.    The *Rogers* Test Is Not Needed When Otherwise Applicable Trademark Law Principles Provide Ample First Amendment Protections ...........................................................16

    D.    Appellant's MetaBirkins were Expressive in the Same Way All NFTs are Expressive ....................................................20

CONCLUSION .........................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Anheuser-Busch, Inc. v. VIP Prods., LLC,*
 666 F. Supp. 2d 974 (E.D. Mo. 2008) ....................................................19

*Cliffs Notes, Inc. v. Bantam Doubleday Dell Pub. Grp., Inc.,*
 886 F.2d 490 (2d Cir. 1989) ...............................................................18

*Harley-Davidson, Inc. v. Grottanelli,*
 164 F.3d 806 (2d Cir. 1999) ...............................................................21

*Hormel Foods Corp. v. Jim Henson Prods., Inc.,*
 73 F.3d 497 (2d Cir. 1996) .................................................................20

*Jack Daniel's Properties, Inc. v. VIP Prod. LLC,*
 599 U.S. 140, 216 L. Ed. 2d 161 (2023).................................... *passim*

*Lombardo v. Dr. Seuss Enterprises, L.P.,*
 279 F. Supp. 3d 497 (S.D.N.Y. 2017),
 *aff'd,* 729 F. App'x 131 (2d Cir. 2018)......................................... 18, 19

*Rogers v. Grimaldi,*
 875 F.2d 994 (2d Cir. 1989) ........................................................ *passim*

*Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC,*
 221 F. Supp. 2d 410 (S.D.N.Y. 2002) .................................................21

*Tri-Star Pictures, Inc. v. Unger,*
 14 F. Supp. 2d 339 (S.D.N.Y. 1998) ...................................................20

*Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.,*
 996 F.2d 1366 (2d Cir. 1993) .............................................................19

*Vans, Inc. v. MSCHF Product Studio, Inc.,*
 88 F.4th 125 (2d Cir. 2023) ...............................................................17

*Virgin Enterprises Ltd. v. Nawab,*
 335 F.3d 141 (2d Cir. 2003) ...............................................................13

**Statutes & Other Authorities:**

U.S. Const., Amend. I ...................................................................... 13, 16

iii

15 U.S.C. § 1125(c)(3)(A)(ii) ................................................................19

*adidas Metaverse Terms and Conditions*, adidas (Oct. 31, 2023)............9

Beeple Artworks, "Beeple" *christies.com* .............................................11

Brady Brewer & Adam Brotman, "Starbucks: Creating the Digital Third Place" *stories.starbucks.com*, (May 3, 2022) ....................................12

*DGFamily Boxes Drop Page*, Unxd ..........................................................9

Dixon, Chris, READ WRITE OWN: BUILDING THE NEXT ERA OF THE INTERNET (2024)...........................................................................................5

*Enter the Budverse*, Anheuser-Busch .........................................................9

Fed. R. App. P. 29(a)(4)(E)..........................................................................1

Jon M. Garon, *Legal Implications of a Ubiquitous Metaverse and a Web3 Future*, 106 MARQ. L. REV. 163 (2022)....................................................5

McKinsey & Company, "Value Creation in the Metaverse" *mckinsey.com* (June 2022)...........................................................................................4, 5

"Metaverse." *Merriam-Webster, Merriam-Webster.com Dictionary*........4

Meta Platforms, Inc., "Meta Reports Fourth Quarter and Full Year 2023 Results, Initiates Quarterly Dividend" *investor.fb.com*, (press release, February 1, 2024)...................................................................................5

*NFT General Terms and Conditions*, Prada (May 25, 2022) ....................9

*NFTiff FAQ*, Tiffany & Co. ......................................................................10

*NFTiff Terms and Conditions*, Tiffany & Co. ...........................................9

*RTFKT x Nike Dunk Genesis FAQ*, RTFKT..............................................9

S. Dogan & M. Lemley, *Grounding Trademark Law Through Trademark Use*, 92 IOWA L. REV. 1669 (2007) ...................................................................21

Second Circuit Local Appellate Rule 29.1 .................................................1

iv

# STATEMENT OF INTEREST OF *AMICUS CURIAE*

Founded in 2014, the Chamber of Digital Commerce (the "Chamber") is the world's largest blockchain trade association.[1] The Chamber represents more than 200 diverse members of the blockchain industry globally, including cryptocurrency exchanges, leading consumer brands, non-fungible token ("NFT") platforms and creators, startups, and other blockchain economy participants. The Chamber seeks to foster a legal and regulatory environment in which users can enjoy regulatory and legal certainty as they apply blockchain technologies to an array of commercial, technological, and social purposes. An important aspect of that mission is representing the interests of its members, including regularly filing briefs as *amicus curiae* in novel cases that implicate issues of importance to the blockchain community.

The interest of the Chamber is intrinsically linked to the outcome of this case. As representatives for the blockchain industry, we advocate for regulatory standards and best practices to ensure responsible development of the digital future. The Chamber's mission includes honoring the legacy of brands while embracing the possibilities of the digital frontier. In a realm where the physical goods are replaced

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E) and Second Circuit Local Appellate Rule 29.1, *amicus* certifies that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and that no person, other than amicus, its members, and its counsel, attributed money that was intended to fund preparing or submitting this brief.

by digital goods, trademarks transcend their traditional roles, becoming ever more critical in assuring consumers of the provenance and integrity of their digital purchases.

The protection of trademarks in the Metaverse and for NFTs is not merely a legal necessity; it is a consumer imperative. The economic potential of NFTs is vast and still unfolding with growing use cases in the sports, film, video game, and fashion industries. Recognizing and preserving trademarks within this domain is key to unlocking this potential. It is trademarks that will empower not only brands, but individual creatives and small businesses, to expand in the Metaverse with confidence that their endeavors and brand identities are protected. This assurance is crucial for the continued flow of not only creativity, but capital that fuels the Metaverse. The Chamber's interest in filing this *amicus* brief is to illuminate the importance of trademarks in the Metaverse and for NFTs, and to support laws that safeguard these marks.

## SUMMARY OF ARGUMENT

On appeal, Appellant argues that the District Court erred by not following the *Rogers* test, which Appellant contends would have led to a different result. The *Amicus* disagrees. Appellant sold a hundred digital goods using the trademark "MetaBirkins," a collection of digital Birkin handbags designed for use and display in the Metaverse. Appellant's actions generated substantial revenue by misleading

consumers into purchasing digital handbags believed to be sold, sponsored, or endorsed by Appellee, Hermès.

The expansion of Web3 and the Metaverse have created an entirely new marketplace for digital goods, giving longstanding brands and startups access to a novel and evolving industry. Companies are not constrained by the physical world limitations of manufacturing and distribution logistics. Digital goods create the opportunity for brands to directly interact with consumers in new and exciting ways.

To avoid consumer confusion, trademark protection in this space is imperative for brand recognition, value, and to ensure consumer expectations are protected, and confusion minimized. Utilizing a *Rogers* test is untenable when NFTs, absent identifying features, are simply expressions of code. It is difficult, if not impossible, to separate the art from the digital good with which it is associated. This is made more difficult when an NFT can be given utilities long after distribution that could further affect and confuse the analysis.

Considering the unique features of NFTs and the ways consumers buy, sell, and use those digital goods, we implore the Court to rule the *Rogers* test should not apply to digital goods or NFTs. When a digital good's name or design incorporates a third party's trademark, the infringement standard should be determined through a traditional likelihood of confusion analysis.

## ARGUMENT

### A. Background

#### *1. MetaBirkins are NFTs*

Appellant sold his MetaBirkins with the statement that the digital goods were "Metaverse ready." ECF153(444). Appellant used Web3 technology for the sale of his goods in the form of non-fungible tokens ("NFTs"). The *Amicus* contends that digital goods should be analyzed under traditional trademark tests, such as the *Polaroid* likelihood of confusion test. Thus, a background in the Metaverse, and what the Metaverse represents within the larger "Web3" ecosystem, will aid the Court's decision.

#### *2. The Metaverse*

The Metaverse is defined as "a persistent virtual environment that allows access to and interoperability of multiple individual virtual realities."[2] In the first six months of 2022, corporations, venture capital, and private equity had invested $120 billion into the Metaverse. This exceeded the $57 billion invested in 2021.[3] Some estimate "it may generate up to $5 trillion in impact by 2030—equivalent to

[2] "Metaverse." Merriam-Webster, *Merriam-Webster.com Dictionary*, https://www.merriam-webster.com/dictionary/metaverse (last accessed Dec. 28, 2023).
[3] McKinsey & Company, "Value Creation in the Metaverse" *mckinsey.com* (June 2022), https://www.mckinsey.com/~/media/mckinsey/business%20functions/marketing%20and%20sales/our%20insights/value%20creation%20in%20the%20metaverse/Value-creation-in-the-metaverse.pdf (last accessed Feb. 7, 2024).

the size of the world's third-largest economy today, Japan."[4]  Meta Platforms

invested over $30 billion into its Metaverse focused division Reality Labs in 2022

and 2023.[5]  The Metaverse is not a passing fad.

### 3. Web3 and Digital Goods

NFTs and their associated images differ from being merely images on the

internet because ownership of the NFTs can be verified through what is becoming

known as Web3 technology.  Put simply, Web3 is the next iteration of the internet.

One way of describing the evolution of the internet is read (Web 1.0), write (Web

2.0), and own (Web3).[6]  Web3 technologies utilize decentralized internet protocols

and rely on cryptographic proofs to verify the ownership of digital goods.  This

creates digital scarcity.  NFTs have the ability to be true digital "goods" purchased

and owned by a consumer.

Web3 represents a paradigm shift towards a more decentralized, user-

controlled internet, focusing on data ownership, privacy, and new economic models.

While it inherits the interactivity and social aspects of Web 2.0, it aims to solve the

---

[4] *Id.*

[5] Meta Platforms, Inc., "Meta Reports Fourth Quarter and Full Year 2023 Results, Initiates
Quarterly Dividend" *investor.fb.com*, (press release, February 1, 2024),
https://investor.fb.com/investor-news/press-release-details/2024/Meta-Reports-Fourth-Quarter-
and-Full-Year-2023-Results-Initiates-Quarterly-Dividend/default.aspx (last accessed Feb. 7,
2024).

[6] Dixon, Chris, READ WRITE OWN: BUILDING THE NEXT ERA OF THE INTERNET (2024). For more
information on the differences between Metaverses built on Web 2.0 rails compared to
Metaverses built utilizing Web3 technologies, *see* Jon M. Garon, *Legal Implications of a
Ubiquitous Metaverse and a Web3 Future*, 106 MARQ. L. REV. 163 (2022).

centralization and privacy issues prevalent in the Web 2.0 structure. For this reason, many entities are building marketplaces for the purchase, resale, and use of NFTs utilizing Web3 technologies.

Web3 Metaverses, in particular, offer additional levels of interoperability, across multiple games or worlds, operated by multiple decentralized entities. Using NFTs, individuals can verify ownership of digital goods, and the creators of those digital goods can preserve digital scarcity without relying on a centralized intermediary.

### 4. NFT Marketplaces and Consumer Buying Behaviors

NFTs are tokens which are often connected to some form of digital file. Besides the digital goods sold by Appellant, NFTs can also be used to represent ownership of anything digital, including art, photos, music, event tickets, video files, text, or gaming items. NFTs are often referred to as "digital deeds" as they provide a record on the applicable blockchain's ledger of the current and past ownership of the token. ECF157 (20). The "token creator" is the individual or entity that records the NFT on the applicable blockchain.

For example, the Chicago Bulls offered NFTs for attendees of certain home basketball games to claim as promotional giveaways.



Attendees could claim an NFT using that code and hold it in their digital wallet. But just like receiving a bobble head on bobble head night, the attendee can also offer to sell the NFT on the secondary market, as shown below.



On the secondary marketplaces for the above Chicago Bulls NFTs, there is no verification checkmark, and the listed collection "creator" is not the official Chicago Bulls digital wallet.[7]   The collection title is the only way consumers on NFT marketplaces would know that the goods in that collection were officially licensed by the Chicago Bulls basketball organization.

Consumers would not see any potential disclaimer on the secondary marketplace, and because the official entity behind an NFT is frequently not listed as the NFT's creator, the collection title is often the only way consumers know where an NFT comes from.   Appellant's MetaBirkins digital goods were similarly displayed to consumers:



---

[7] The official Bulls digital wallet for tokens on the Ethereum network has an address of 0x4fa50Bab1DB719453A28A11367Ad45bb40F1Fe49.

***5. Brands Have Entered the Web3 Space to Sell NFTs to Consumers and Directly Connect With Those Consumers***

Virtually every major brand entering the NFT space has put their trademarks as the collection titles of their digital goods. There are ALTS by adidas,[8] Prada Timecapsule,[9] DGFamily Glass Boxes,[10] RTFKT x Nike Dunk CRYPTOKICKS,[11] Budverse Cans - Heritage Edition,[12] and NFTiff[13] amongst others. *Amicus* for Appellant, Jack Butcher, has stated:



[8] *adidas Metaverse Terms and Conditions*, adidas (Oct. 31, 2023), https://adidasapp.adidas.com/collect/tc.html (last accessed Feb. 8, 2024).
[9] *NFT General Terms and Conditions*, Prada (May 25, 2022), https://www.prada.com/prada-crypted/legal (last accessed Feb. 8, 2024).
[10] *DGFamily Boxes Drop Page*, Unxd, https://drops.unxd.com/dgfamily (last accessed Feb. 8, 2024).
[11] *RTFKT x Nike Dunk Genesis FAQ*, RTFKT, https://rtfkt.com/faq/dunk-genesis (last accessed Feb. 8, 2024).
[12] *Enter the Budverse*, Anheuser-Busch, https://us.budweiser.com/budverse (last accessed Feb. 8, 2024).
[13] *NFTiff Terms and Conditions*, Tiffany & Co., https://nft.tiffany.com/legal/ (last accessed Feb. 8, 2024).

The fact that a company offers its goods in a digital space should not result in those products or that company receiving any less trademark protection than physical goods sold in the real world. For example, Tiffany & Co. created its NFTiff collection and chose a digital medium for the NFTiff products. The collection is described as: "a collection of 250 digital passes, offered by Tiffany & Co. which may be minted when purchased and redeemed by CryptoPunks holders for the creation of a custom designed pendant and a NFT digital artwork that resembles the final jewelry design." [14]



While the NFTiff NFTs have referenced images to differentiate each other, the NFTs are, at their core, consumer goods. The utilities of these particular consumer goods are two-fold: (1) the NFTs can be used to digitally verify the owner's right to purchase a physical and visually identical pendant from Tiffany &

___

[14] *NFTiff FAQ*, Tiffany & Co., https://nft.tiffany.com/faq/ (last accessed Feb. 7, 2024).

Co.; and (2) the NFTs can be shown off as a status symbol in various digital worlds. Tiffany & Co. can further use those NFTs as digital tickets to in-person or digital events, gift other NFTs or digital goods to the wallets holding those NFTiff tokens, or otherwise directly engage with the owners of those NFTs. *See also* ECF157(18-30).

Some NFTs are released purely for the utility of owning the artwork referenced in the token's metadata. A popular example is an NFT created by digital artist Beeple, which sold at auction for over $69 million dollars.[15] Other NFTs are sold with other expected utilities, like access to physical goods, use within a Metaverse, access to exclusive events or online communities, or numberless other potential uses. Like the Tiffany example above, brands have the freedom to utilize established branding to create infinite designs, inventive promotions, and new products that transcend the physical world. Without the constraints of the physical world, the line between "art" and "consumer good" is blurred beyond a simple test of artistic expression. The underlying code is all that separates the digital form.

In the example of Appellant, he advertised that ownership of the MetaBirkins would be granted exclusive access to buy other digital goods Appellant was selling in the future. ECF149(185); ECF157(644). He stated the MetaBirkins were

---

[15] Beeple Artworks, "Beeple" *christies.com*,
https://www.christies.com/en/artists/beeple?lotavailability=All&sortby=relevance (last accessed February 7, 2024)

designed in 3D to be "Metaverse ready" for use in digital worlds.  ECF153(444).

Appellant referred to the collection of 100 NFTs as a "Genesis Collection," which has the understood meaning amongst consumers to be the first of multiple NFT releases.[16]  He sold them without the artwork revealed, indicating the more important aspect of the token was its utilities rather than the aesthetics of the artwork itself. ECF153(284).  In sum, the MetaBirkins were marketed and sold in the same manner as digital goods sold by countless other brands.

**B.**     ***Rogers* Should Not Apply in the Digital Good Space**

Trademark law protects the interests of brands, artists, and consumers.  Artists are free to sell the manifestations of their expression, even in ways which parody or provide commentary on existing brands, so long as they do it in a way which does not confuse consumers as to their source, origin, or affiliation.  While this is true for physical goods, it is especially true for NFTs, which by their very nature will always be otherwise unremarkable nameless and faceless lines of computer code, absent their identifying and expressive features.

---

[16] Brady Brewer & Adam Brotman, "Starbucks: Creating the Digital Third Place" *stories.starbucks.com*, (May 3, 2022), https://stories.starbucks.com/stories/2022/starbucks-creating-the-digital-third-place/  ("We plan to start with our first NFT collection, membership and community later this year, based on coffee art and storytelling. It will come with a host of unique experiences and benefits, worthy of a genesis NFT collection from Starbucks. And this first collection will form the core digital community and backbone against which we hope to build future collections and collaborations – all building on the same new ecosystem.") (last accessed Feb. 7, 2024).

The *Rogers* decision found (under a prior version of the Lanham Act) that an artist (film director, author, or otherwise) should be able to title art as the artist sees fit, protected by the First Amendment. However, the *Rogers* decision also described that competing artists should also be able to rely on the Lanham Act. *See Rogers v. Grimaldi*, 875 F.2d 994, 998 (2d Cir. 1989) ("[I]t would be ironic if, in the name of the First Amendment, courts did not recognize the right of authors to protect titles of their creative work against infringement by other authors"). This idea of competition and branding has been more clearly expressed in the recent *Jack Daniel's* and *Vans* decisions described further below.

But the initial *Rogers* decision did not contemplate that competing artists would be subject to its test because that would fall squarely under the Lanham Act. *See Virgin Enterprises Ltd. v. Nawab*, 335 F.3d 141, 150 (2d Cir. 2003) (stating "[w]hen the two users of a mark are operating in completely different areas of commerce, consumers are less likely to assume that their similarly branded products come from the same source. In contrast, the closer the secondary user's goods are to those the consumer has seen marketed under the prior user's brand, the more likely [it is] that the consumer will mistakenly assume a common source").

In the digital medium, NFTs which are pure consumer goods and NFTs that could be considered "art" are both represented at their core by the same thing: lines of code. This is not like the physical world where distinctions of product are made

by things other than mere expression. Brands have more opportunities to be creative in the digital world and the line between "art" and "digital good" can blur easily. *Rogers* was meant to distinguish "art" from traditional trademark analysis. When "art" and the commercial product are one in the same, there is no simple distinction. Therefore, application of *Rogers* would be a test without any limiting factor when applied to the sale of NFTs.

Appellant highlights the Renè Magritte artwork *The Treachery of Images* and makes the case that "it is not a pipe and Rothschild's MetaBirkins are not handbags." Dkt. 56, pg. 28. Along those same lines, no digital good is anything but various forms of expression, displayed through lines of computer code. *Id*. Just as the Renè Magritte artwork would just be a blank canvas without the name and attached artwork, a MetaBirkin NFT would be merely token # 16/100 deployed through smart contract address 0x566b73997F96c1076f7cF9e2C4576Bd08b1A3750. Without the MetaBirkin name or token referenced image, the token would appear as:



While still an NFT, it would be difficult to identify by all but the most tech-savvy and serve limited value as a digital good. So instead of being nameless and imageless lines of code, NFTs are given collection titles, recognizable images, and individual labels. It is the identifying features attached to otherwise nameless and faceless lines of computer code which allow those digital goods to be bought and sold online in similar ways to how physical goods are bought and sold online.[17]

The 200 Tiffany NFTiffs and their associated images are not any less minimally artistically relevant than Appellant's 100 MetaBirkin NFTs. The very

---

[17] Critics may argue that because the provenance of NFTs are cryptographically verified, that trademarks take on a less important role. Indeed, one of the powers of blockchain technologies is that it is impossible to create a knockoff which survives cryptographic scrutiny. However, this ignores the reality that the average consumer of NFTs is not a crypto forensics expert, in the same way the average buyer of a physical Birkin handbag may not be able to distinguish between a genuine bag and a high-quality knockoff.

nature of NFTs is that they all have some artistic relevance, whether the images referenced in the tokens are commissioned at the behest of brands or at the behest of individuals, as was the case here. *See* Pl.Trial.Ex.272(2-3) (Appellant discussing with the designer who made the images regarding the style to be used). For the threshold test to be whether the good being sold is "expressive," as under *Rogers*, is a test without meaning when applied to NFTs. Dismissing traditional trademark principles under the guise of First Amendment protection has the potential to cause significant harm to both brand owners and consumers in the digital marketplaces.

**C.** **The Rogers Test Is Not Needed When Otherwise Applicable Trademark Law Principles Provide Ample First Amendment Protections**

The likelihood-of-confusion standard functions as a built-in mechanism to avoid any First Amendment concerns. In this Court's *Rogers* ruling, it held:

> for example, the hit song "Bette Davis Eyes," and the recent film "Come Back to the Five and Dime, Jimmy Dean, Jimmy Dean." To some people, these titles might implicitly suggest that the named celebrity had endorsed the work or had a role in producing it. Even if that suggestion is false, the title is artistically relevant to the work. In these circumstances, the slight risk that such use of a celebrity's name might implicitly suggest endorsement or sponsorship to some people is outweighed by the danger of restricting artistic expression, and the Lanham Act is not applicable.

*Rogers v. Grimaldi*, 875 F.2d 994, 999-1000 (2d Cir. 1989). But then the Court went on to say that "consumers frequently look to the title of a work to determine what it is about, they do not regard titles of artistic works in the same way as the names of ordinary commercial products." *Rogers*, at 1000. This recognizes that while some

consumers may be confused, the ordinary and reasonable consumer would not be confused because the titles of artistic works are less likely to convey source, origin, or affiliation than the names of consumer goods.

It is unclear, then, when a two-part *Rogers* test would be necessary since the likelihood of confusion test is flexible enough to accommodate considerations for parodies or other non-confusing uses, especially when "titles" are often all that consumers have to go on in the digital marketplace. This is consistent with the Supreme Court's ruling in *Jack Daniel's*, stating that "a trademark's expressive message—particularly a parodic one ... — may properly figure in assessing the likelihood of confusion." *Jack Daniel's Properties, Inc. v. VIP Prod. LLC*, 599 U.S. 140, 161 216 L. Ed. 2d 161 (2023); *see also id.* at 159, 143 S.Ct. 1578 (noting that "the likelihood-of-confusion inquiry does enough work to account for the interest in free expression"). *See also Vans, Inc. v. MSCHF Product Studio, Inc.*, 88 F.4th 125, 139 (2d Cir. 2023).

Additionally, while the Supreme Court in *Jack Daniel's* did not reach the issue as to the validity of the *Rogers* test as a whole, it implicitly called into question the need for a separate test which is only applicable in "cases in which the defendant has used the mark at issue in a non-source identifying way." *Jack Daniel's*, at 155–56. The Court went on to explain that *Rogers* is inapplicable "if the mark is used at least in part for source identification" and defined "source identification" in this context

to mean when a mark "'is used to identify or brand a defendant's goods or services' or to indicate the source or origin of a product." *Id*. at 156.

If the mark is used in a way which does not create some express or implicit impression as to the item's source, origin, or affiliation, then it also would not create a likelihood of confusion.  There is no need for a separate test for separate types of goods or services.  Put differently, in any of the three cases which this Court has applied the *Rogers* test since its inception, does the result differ under a likelihood of confusion analysis?

In *Bantam*, this Court based its reasoning on the fact that "we do not believe that there is a likelihood that an ordinarily prudent purchaser would think that Spy Notes is actually a study guide produced by appellee, as opposed to a parody of Cliffs Notes." *Cliffs Notes, Inc. v. Bantam Doubleday Dell Pub. Grp., Inc*., 886 F.2d 490, 495 (2d Cir. 1989).

In *Lombardo*, this Court affirmed the lower court's reasoning that a play in which "Cindy–Lou drinks hard alcohol, abuses prescription pills, and smokes a substance she identifies as 'Who Hash,' which she describes as just 'like a prescription' which keeps her in check to avoid a conniption'" was not likely to be confused as being from, or affiliated with, Dr. Seuss.  *Lombardo v. Dr. Seuss Enterprises, L.P.,* 279 F. Supp. 3d 497 (S.D.N.Y. 2017), <u>aff'd,</u> 729 F. App'x 131 (2d Cir. 2018).  "The public interest in free expression clearly outweighs any interest in

avoiding consumer confusion, the likelihood of which is extremely minimal given the parodic nature of the Play." *Id*. at 514, <u>aff'd</u>, 729 F. App'x 131 (2d Cir. 2018).

In *Twin Peaks*, the Court held that "[t]he question… is whether the title is misleading in the sense that it induces members of the public to believe the Book was prepared or otherwise authorized by TPP. This determination must be made, in the first instance, by application of the venerable *Polaroid* factors." *Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.,* 996 F.2d 1366, 1379 (2d Cir. 1993).

Certainly, some goods should enjoy heightened protections against trademark claims, which is why the Lanham Act excludes "nominative or descriptive fair use" from any trademark dilution claims, including designations used in connection with "identifying and parodying, criticizing, or commenting upon the famous mark owner or the goods or services of the famous mark owner." 15 U.S.C. § 1125(c)(3)(A)(ii). But incorporating a parody element into a consumer good does not transform the consumer good into an artistic work. *Anheuser-Busch, Inc. v. VIP Prods., LLC*, 666 F. Supp. 2d 974, 985 (E.D. Mo. 2008) ("the cry of 'parody!' does not magically fend off otherwise legitimate claims of trademark infringement or dilution. There are confusing parodies and non-confusing parodies.").

As reflected through the parody and other lines of cases, the *Polaroid* likelihood of confusion factors provide ample opportunities for protection of free speech. *Jack Daniel's Properties, Inc. v. VIP Prod. LLC*, 599 U.S. 140, 159, 143 S.

Ct. 1578, 1591, 216 L. Ed. 2d 161 (2023). If the alleged infringer was "in good faith" trying to make a statement and not trade on another party's goodwill/infringe a trademark, or uses a mark is in a way which creates little to no "actual confusion" then there is no infringement. *Tri-Star Pictures, Inc. v. Unger*, 14 F. Supp. 2d 339, 354 (S.D.N.Y. 1998); *see also Hormel Foods Corp. v. Jim Henson Prods., Inc*., 73 F.3d 497, 503 (2d Cir. 1996).

In sum, even when *Rogers* is applied, the end result is always determined by whether there is a likelihood of confusion.

**D.** **Appellant's MetaBirkins were Expressive in the Same Way All NFTs are Expressive**

Appellant would have this Court believe his NFT works were in the same vein as Andy Warhol's Campbell's Soup paintings. Dkt. 56, pg. 5, 14. But Andy Warhol was not selling soup at a grocery store. Nor was Appellant selling physical paintings; he was selling NFTs in the same way Tiffany & Co. was selling their NFT consumer goods and the same way the Chicago Bulls offer their promotional giveaway NFTs. Consumers would also expect Hermès to sell its own digital goods in this way. When products are competing through the same marketplaces, traditional trademark analysis applies.

The Supreme Court made clear in *Jack Daniel's*, and this Court reiterated in *Vans*, that regardless of whether the products at issue contain artistic expressions to be analyzed under *Rogers* or as arguably noncommercial exclusions from dilution

liability under Lanham Act, neither provides protections against infringement when the use of a mark is source-identifying. *Jack Daniel's* at 163.

> [T]he *Rogers* test has applied only to cases involving non-trademark uses—or otherwise said, cases in which the defendant has used the mark at issue in a non-source-identifying way. The test has not insulated from ordinary trademark scrutiny the use of trademarks as trademarks, to identify or brand [a defendant's] goods or services.

*Jack Daniel's* at 155-56. (quoting S. Dogan & M. Lemley, *Grounding Trademark Law Through Trademark Use*, 92 Iowa L. Rev. 1669, 1684 (2007)) (cleaned up). As explained in *Tommy Hilfiger*, relying on this Court's precedent from *Harley-Davidson*, a New York District Court ruled that when a mark is used "at least in part" for "source identification" then the use may be impermissibly "trading on the good will of the trademark owner to market its own goods;" *Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*, 221 F.Supp.2d 410, 414-416 (S.D.N.Y. 2002) (citing *Harley-Davidson, Inc. v. Grottanelli*, 164 F.3d 806, 813 n. 14 (2d Cir. 1999)). Similarly, if there is no consumer confusion, no infringement liability would attach. The same protections are afforded to Appellant as any other participant in United States commerce.

Appellant has been quoted as saying "People don't realize how much you can get away with by saying in the style of." Pl.Trial.Ex.272(56). While Appellant's brief on appeal argues his MetaBirkins are in the style of Andy Warhol, the record shows that they were in the style of Hermès.

## <u>CONCLUSION</u>

For the reasons stated above, Amicus respectfully requests that this Court to rule the *Rogers* test should not apply to digital goods or NFTs,  and affirm the finding of infringement at trial on the basis of likelihood of confusion.

Respectfully submitted,

*/s/ Jonathan E. Schmalfeld*
Jonathan E. Schmalfeld
Polsinelli P.C.
100 S. Fourth Street, Suite 100
St. Louis, MO 63102-1825
(314) 622-6621

Daniel P. Mullarkey
Polsinelli P.C.
1401 Eye ("I") Street, N.W., Suite 800
Washington, DC 20005
(202) 626-8305

*Attorneys for Amicus Curiae The Chamber of Digital Commerce*

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I hereby certify that:

This brief complies with the type volume limitations of Fed. R. App. P. 32(a)(7)(b) and the Second Circuit Local Rule 29.1(c). This brief contains 4,056 words as calculated by the word count feature of Microsoft Word, exclusive of sections exempted by Fed. R. App. P. 32(f).

This brief is written in 14-point Times New Roman font and complies with the formatting requires of Fed. R. App. P. 32(a)(5)(A) and (a)(6).

Dated: February 9, 2024

*/s/ Jonathan E. Schmalfeld*
Jonathan E. Schmalfeld
Polsinelli P.C.
100 S. Fourth Street, Suite 100
St. Louis, MO 63102-1825
(314) 622-6621

Daniel P. Mullarkey
Polsinelli P.C.
1401 Eye ("I") Street, N.W., Suite 800
Washington, DC 20005
(202) 626-8305

*Attorneys for Amicus Curiae The Chamber of Digital Commerce*