# 23-1081-cv

## United States Court of Appeals

*for the*

## Second Circuit

HERMES INTERNATIONAL, HERMES OF PARIS, INC.,

*Plaintiffs-Appellees,*

— v. —

MASON ROTHSCHILD,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF OF *AMICI CURIAE* THE AMERICAN APPAREL
& FOOTWEAR ASSOCIATION, THE COUNCIL OF
FASHION DESIGNERS OF AMERICA, INC.,
THE ACCESSORIES COUNCIL, AND THE HALLOWEEN
& COSTUME ASSOCIATION**

JOHN P. O'HERRON
*Thompson*MCMULLAN, P.C.
*Attorneys for Amici Curiae*
100 Shockoe Slip, 3rd Floor
Richmond, Virginia 23219
(804) 649-7545

CP COUNSEL PRESS    (800) 4-APPEAL • (810078)

## Corporate Disclosure Statement

Pursuant to Federal Rule of Appellate Procedure 26.1, the American Apparel & Footwear Association, the Council of Fashion Designers of America, Inc., the Accessories Council, and the Halloween & Costume Association state that they are not publicly held corporations or other publicly held entities, that they do not have any parent corporations, and that no publicly held corporation or other publicly held entity holds 10% or more of their stock.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................ii

INTERESTS OF AMICI .................................................................. 1

SUMMARY OF ARGUMENT ......................................................... 3

ARGUMENT ................................................................................... 5

    I.    THE DEVELOPMENT OF THE DIGITAL WORLD
        AND ITS CONTENT ............................................................ 5

    II.   THE FOOTWEAR, APPAREL, AND FASHION
        ACCESSORIES INDUSTRIES NEED ROBUST
        INTELLECTUAL PROPERTY PROTECTION IN
        THE DIGITAL SPACE ........................................................ 12

    III.  ROTHSCHILD'S *ROGERS* APPLICATION WOULD
        STIFLE INDUSTRY'S DIGITAL POTENTIAL ................... 15

CONCLUSION .............................................................................. 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Dr. Seuss Enter. LP v. ComicMix LLC,*
  983 F.3d 443 (9th Cir. 2020)...............................................................15

*Vans, Inc. v. MSCHF Product Studio, Inc.,*
  88 F.4th 125 (2nd Cir. 2023) .............................................................16

**Statutes & Other Authorities:**

U.S. Const., amend. I .........................................................................3, 17

The American Apparel & Footwear Association ("AAFA"), the Council of Fashion Designers of America, Inc. ("CFDA"), the Accessories Council, and the Halloween & Costume Association respectfully submit this brief amicus curiae in support of Plaintiffs-Appellees Hermes International and Hermes of Paris, Inc.[1]

## INTERESTS OF AMICI

AAFA is a national trade association, which represents more than 1,000 name-brand apparel, footwear, travel goods, and other sewn product companies, and their suppliers. Through its public policy and political initiatives, AAFA protects American innovation, brands and their intellectual property, workers, and consumers. And through its Brand Protection Council, AAFA vigorously pursues brand protection efforts, with a focus on the global war against counterfeit apparel, footwear, accessories, and other supplier products that have proliferated on online marketplaces and social media platforms. For example, AAFA convened an NFT/Metaverse working group for member information sharing,

---

[1] No counsel for any party has authored this brief in whole or in part, and no person other than the *amici* or their counsel have made any monetary contribution intended to fund the preparation or submission of this brief.

submits comments annually to the United States Trade Representative related to counterfeiting and piracy, and advocates for anti-counterfeiting and the protection of IP.

The CFDA is a not-for-profit trade association with a membership of over 450 of America's foremost womenswear, menswear, jewelry, and accessory designers. The CFDA provides its members with thought-leadership and business development support. It also supports emerging designers and students through professional development programming and numerous grant and scholarship opportunities. In addition to hosting the annual CFDA Fashion Awards, the CFDA organizes the Official New York Fashion Schedule as part of the American Collections Calendar, as well as RUNWAY360, the digital destination for collection releases year-round. Through the CFDA Foundation, Inc., CFDA also mobilizes its membership to raise funds for charitable causes and engage in civic initiatives.

The Accessories Council is a not-for-profit trade association dedicated to helping accessories, jewelry, and footwear companies grow their businesses. The membership includes over 350 members, from large companies to start-ups. The Council hosts over 100 opportunities for its

members each year—including awards events, educational programming, legislative support, mentoring, press support, and sourcing assistance—and publishes a weekly newsletter and a quarterly digital magazine. Many of its members have small budgets and limited resources for protecting their designs from copies.

The Halloween & Costume Association is a trade organization whose mission is to promote and grow the safe celebration of Halloween and other costumed events throughout North America. It represents businesses that manufacture, import, and distribute Halloween products, including costumes, decor, novelty items, and party supplies.

Members of these organizations will be impacted by any expansion of First Amendment protection to Lanham Act claims and offer this brief for the Court's consideration on that question.

## SUMMARY OF ARGUMENT

For years now, some of the world's biggest and most successful technology companies have been investing significant resources into building the next digital frontier: the metaverse and virtual reality. To be sure, both the technology that undergirds it and the content that populates it remain young. But these global investments prove something

important: these digital worlds are here to stay, they create significant financial opportunities, and brands must figure out how to reach their customers and maintain a presence on them. As these digital worlds continue to populate with consumers and content, brands face a myriad of decisions on how best to tap into the potential and profit of the metaverse.

These companies, however, face a significant handicap out of the gate: copycats like Mason Rothschild taking their intellectual property and products, creating digital content based on them, and running away with the customer and the profits. As they weigh their offensive strategy for reaching consumers in the digital world, companies are already playing defense to guard against theft and consumer confusion. In this case, Rothschild proposes an expansive view of artistic license that would greenlight digital infringement. For the reasons briefly stated here, and set forth in the Hermes brief, the amici urge this Court to reject that view and affirm the district court.

But this case has enormous implications beyond just the parties here. As the next digital frontier continues to grow, companies around the world are jockeying for consumer loyalty and engagement in these

digital worlds. As they do so, companies deserve the benefit of using their own intellectual property, instead of losing it in the name of artistic license.

## ARGUMENT

### I. THE DEVELOPMENT OF THE DIGITAL WORLD AND ITS CONTENT.

In 2014, Facebook spent $2 billion to buy Oculus VR, Inc. an augmented and virtual reality company. *See* Congressional Research Service, Ling Zhu, R.47224, "The Metaverse: Concepts and Issues for Congress," Aug. 26, 2022 (hereafter, "CRS Metaverse") at 17.[2] Oculus, Facebook said in announcing the deal, was "the leader in immersive virtual reality technology" and "[w]hile the applications for virtual reality technology beyond gaming are in their nascent stages, several industries are already experimenting with the technology."[3] Citing the technology as "a strong candidate to emerge as the next social and communications platform," Facebook said it planned to extend the technology into

---

[2] The report is available at https://crsreports.congress.gov/product/pdf/R/R47224/1 (last visited Feb. 8, 2024).

[3] Meta, Press Release, "Facebook to Acquire Oculus," March 25, 2014, *available at* https://about.fb.com/news/2014/03/facebook-to-acquire-oculus/ (last visited Feb. 8, 2024).

"communications, media and entertainment, education and other areas." *Id.* Seven years later, given the investment it had made, Facebook took the next step: it changed its name to Meta Platforms, Inc. and announced that it was spending $10 billion to build the metaverse. *See* CRS Metaverse, 16-17.

While maybe the most attention-grabbing investment in this new digital frontier, Meta's pivot is not unique. Alphabet Inc., Google's parent company, has invested $39.5 million into its various multiverse projects, including augmented-reality technology that it plans to incorporate into its internet-based navigation and video content delivery services. *Id.* at 17. Apple Inc. and Microsoft Corporation are likewise investing in augmented and virtual reality. *Id.* Roblox Corporation has developed a virtual world platform that allows its users—more than 25 million of them—to play millions of independently developed games, shop for virtual items using virtual currency, and work collaboratively. *Id.* Epic Games, the developer of the popular game Fortnite, raised $1 billion from investors—including Sony—to develop applications, games,

and services in the metaverse. *Id.* at 18; McKinsey & Co., "The State of Fashion 2022," at 57.[4]

So what is this augmented and virtual reality that has some of the world's largest technology companies investing so heavily? The short answer: a digital ecosystem with the potential to transform how consumers work, play, shop, and communicate. The metaverse "generally refers to the concept of an immersive and persistent virtual world where users can communicate and interact with other users and the surrounding environment and engage in social activities, similar to interactions in the physical world." CRS Metaverse at 3. As numerous companies work to build the infrastructure of these digital worlds, others are building their "digital capabilities" to offer content to consumers there, "ranging from e-commerce offerings to analytics platforms, digital experiences, virtual workforce tools, and so much more." Accenture, Technology Vision 2022, "Meet me in the metaverse," (hereafter, "Accenture, Metaverse") at 24.[5]

---

[4] The report is available at https://www.mckinsey.com/~/media/mckinsey/industries/retail/our%20insights/state%20of%20fashion/2022/the-state-of-fashion-2022.pdf (last visited Feb. 8, 2024).

[5] The report is available at https://www.accenture.com/content/dam/accenture/final/a-com-migration/custom/_acnmedia/thought-

In 2022, more than $120 billion was invested in the metaverse. McKinsey & Co., "Value creation in the metaverse," June 2022, at 19.[6] Some estimate this market to currently comprise over 15% of global GDP and expect it to grow to $1.25 trillion by 2026. Accenture, Metaverse, at 24. And while the relative newness of this market makes its future uncertain, one thing is clear: "our digital world is in the early stages of significant change," and "these technologies will become critical components of how enterprises orchestrate their digital strategies." *Id.* at 25; CRS Metaverse at 4.

Non-fungible tokens (NFTs) play a significant role in this digital frontier. NFTs are unique digital identifiers recorded on the digital blockchain. *See* Congressional Research Service, Kristen E. Busch, R47189, "Non-Fungible Tokens (NFTs)," July 20, 2022, at 1. The blockchain, in turn, is "a technology that permanently records information

---

leadership-assets/pdf-5/Accenture-Meet-Me-in-the-Metaverse-Full-Report.pdf (last visited Feb. 8, 2024).

[6] The report is available at https://www.mckinsey.com/~/media/mckinsey/business%20functions/marketing%20and%20sales/our%20insights/value%20creation%20in%20the%20metaverse/Value-creation-in-the-metaverse.pdf (last visited Feb. 8, 2024).

(e.g., commercial transactions) in an interconnected database called a ledger." CRS Metaverse, at 14. By attaching the NFT to a particular digital asset, the NFT can be used to authenticate the ownership and properties of the underlying asset. NFTs thus become a form of digital currency, allowing owners to use the NFT as the basis for "commercial transactions of virtual goods and identity management (of digital avatars, for example) in the metaverse." CRS Metaverse at 16; McKinsey, State of Fashion 2022, at 57 ("digital assets in the form of virtual fashion and [NFTs] are offering new ways for consumers to shop, exchange goods and inhabit those identities [in the metaverse]."). Because every NFT is unique and its underlying data has been verified, NFTs are used to authenticate a variety of digital assets.  It is this functionality that makes NFTs so important to brands looking to expand their footprint to the digital universe and why NFTs are no "passing fad." *See* Arun Sundararajan, *How Your Brand Should Use NFTs*, Harvard Business Review, Feb. 28, 2022.[7]

---

[7] Available at https://hbr.org/2022/02/how-your-brand-should-use-nfts (last visited Feb. 8, 2024).

The variety of digital content already available proves the point. Many brands are using NFTs and other digital tools as part of their omnichannel branding strategy to boost customer engagement, build customer loyalty, increase brand recognition, and generate revenue and goodwill. Companies in the fashion and apparel sector are particularly keen to integrate NFTs into their advertising strategy and have been launching NFT collections "at a dizzying pace." *Id.* A few examples suffice:

- Lacoste launched a customer loyalty program that allows its users to solve quests, engage with the company, and unlock exclusive benefits. Holders of its NFT can "participate in creative contests and interactive games with weekly mixed reality quests linked to the brand's history and storytelling alongside fashion design challenges";[8]

- Dolce & Gabbana has sold NFTs that allow exclusive access to digital experiences and real-life events, as well as physical versions of the digital items represented by the NFTs, both resulting in increased customer engagement with their brand;[9]

---

[8] Stephanie Hirschmiller, *Lacoste Reveals The Next Phase Of Its NFT UNDW3 Loyalty Program And It's Got Bite*, FORBES, June 29, 2023, https://www.forbes.com/sites/stephaniehirschmiller/2023/06/29/lacoste-reveals-the-next-phase-of-its-nft-undw3-loyalty-program-and-its-got-bite/?sh=2b326f7a27f8 (last visited Feb. 8, 2024).

[9] *Id.*

- Nike has generated over $185 million in revenue in NFT-related projects, including sales of digital sneakers and apparel;[10]

- The CFDA, one of your amici, collaborated with numerous designer brands to create a line of NFTs with unique perks, including exclusive event access, trips, physical items, and meet-and-greets with designers;[11]

- Puma collaborated with Roc Nation to release a sneaker collection that is tied to NFTs that unlock exclusive digital content such as mixtapes and behind-the-scenes video of artists.[12]

While some of these use cases may "seem too futuristic, niche, or disjointed, they are broader signals indicating the next digital revolution is beginning to appear on the horizon." Accenture, Metaverse, at 27. As Gucci's Chief Marketing Officer recently remarked, "brands are just

---

[10] Cappasity Blog, *Top Five Fashion Brands Generating The Most Revenue from NFTs,* MEDIUM (Oct. 24, 2022) https://medium.com/cappasity-blog/top-five-fashion-brands-generating-the-most-revenue-from-nfts-26f53f685f51 (last visited Feb. 8, 2024).

[11] Madeline Schulz, "Michael Kors, Coach and more head to the metaverse with NFT launches," VOGUE BUSINESS, Dec. 1, 2022, https://www.voguebusiness.com/technology/michael-kors-coach-and-more-head-to-the-metaverse-with-nft-launches (last visited Feb. 8, 2024).

[12] Ali Shutler, "Jay-Z's Roc Nation and Puma Drop NFT-Enhanced Sneakers," YAHOO! FINANCE, July 14, 2023, *available at* https://finance.yahoo.com/news/jay-z-roc-nation-puma-203255258.html (last visited Feb. 8, 2024).

beginning to understand how they can add value through NFTs," but early investments have shown that "the virtual world can create a very significant new revenue stream." McKinsey, State of Fashion 2022, at 62-63.

## II. THE FOOTWEAR, APPAREL, AND FASHION ACCESSORIES INDUSTRIES NEED ROBUST INTELLECTUAL PROPERTY PROTECTION IN THE DIGITAL SPACE.

In 2021, the NFT market was valued between $11.3 billion and $15.7 billion.[13] Despite its recent downturn and some of the hype that has permeated the market to date, many believe the NFT market is just getting started. As the underlying infrastructure of the metaverse and digital environments grow, so will the content that populates these digital worlds and the options for consumers to interact with brands. Brands continue to explore the creation of new revenue streams, digital products to boost customer loyalty and engagement, and otherwise prepare themselves for customers spending more time in the metaverse.

---

[13] Gareth Jenkinson, *NFT market worth $231B by 2030? Report projects big growth for sector*, COIN TELEGRAPH, Jul. 14, 2022, https://cointelegraph.com/news/nft-market-worth-231b-by-2030-report-projects-big-growth-for-sector (last visited Feb. 8, 2024).

The apparel, footwear, and accessories industries are no different. The apparel and footwear industries collectively employ 3.2 million U.S. workers and contribute more than $490 billion in annual U.S. retail sales.[14] The footwear industry alone invests millions of dollars every year in innovations to their products, 2.7 billion pairs of which are supplied to the U.S. market every year.[15] Companies in these industries commit substantial resources to develop their products and brands, foster and protect creativity and innovation, and serve consumers across the world. As these companies commit more resources to the development of digital content, "the need to protect online assets will only intensify." McKinsey, State of Fashion 2022, at 98.

Not surprisingly, online assets are a critical part of brand marketing strategies. Brands use diverse marketing strategies to reach consumers across multiple channels, offline as well as across digital environments.

---

[14] Letter from Stephen Lamar, President and CEO of Am. Apparel & Footwear Assoc., to Hon. Daniel Lee, Office of the U.S. Trade Rep. (Oct. 6, 2023), https://www.aafaglobal.org/AAFA/AAFA_News/2023_Letters_and_Comments/AAFA_Files_2023_Notorious_Markets_Comments_USTR.aspx (last visited Feb. 8, 2024).

[15] Footwear Distrib. & Retailers of Am., Sourcing & Compliance, (Feb. 8, 2024), https://fdra.org/key-issues-and-advocacy/sourcing-compliance.

"[M]ultichannel retailing strategy gives the customer convenience to navigate with multiple online and offline touchpoints." SPRINGER NATURE, "Marketing in the metaverse era: toward an integrative channel approach" (hereafter, "Marketing in the Metaverse Era"), Zahy Ramadan, Mar. 17, 2023, at 5.[16] As technological advancement continues—for example, in the metaverse—the challenge becomes more pronounced: how can businesses offer their customers a seamless experience, and retain their engagement, as their customers journey from in-person shopping, to online retail, to the multiverse? How can companies ensure the customer who visits their store remains interested in their legitimate products when they leave? Or when they return home and engage in their multiverse platforms? *See generally id.*

As with any new technology, much remains to be seen as to how the development of the metaverse and its content will impact customer behavior. But one thing is for sure: brands should enjoy the benefit of their intellectual property as this digital frontier takes shape.

---

[16] The article is available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC10021049/pdf/10055_2023_Article_783.pdf (last visited Feb. 8, 2024).

## III. ROTHSCHILD'S *ROGERS* APPLICATION WOULD STIFLE INDUSTRY'S DIGITAL POTENTIAL.

The enormous potential of the digital world means nothing if Rothschild's *Rogers* interpretation holds true. Rothschild invokes the *Rogers* test as follows: "Under *Rogers*, use of a trademark in the title or content of an expressive work does not violate the Lanham Act unless that use has 'no artistic relevance to the underlying work whatsoever' or, if it has some artistic relevance, if it 'explicitly misleads as to the source or the content of the work.'" Br. at 34 (quoting *Rogers*, 875 F.2d at 999).

Rothschild argues that his *MetaBirkins* are "artistically relevant" because the name "describes the content of" the "artworks": the "imaginary Birkin bags depicted." Br. at 18, 37. And he claims that he did not explicitly mislead because he did not "overtly claim a connection that does not exist." *Id.* at 39. In other words, Rothschild would have had to expressly lie and claim Hermes authorized his NFTs. *Id.* at 41; *see Dr. Seuss Enter. LP v. ComicMix LLC*, 983 F.3d 443, 462 (9th Cir. 2020) (requiring "the use to be an explicit indication, overt claim, or explicit misstatement about the source of the work.").

But the Supreme Court in *Jack Daniel's* clarified that whatever the full scope of the "cabined doctrine" was, it has only ever applied when

"the defendant has used the mark at issue in a non-source-identifying way." 599 U.S. at 155-56. The "use of trademarks as trademarks, to identify or brand a defendant's goods or services" falls outside its reach. *Id.* (cleaned up). As Hermes argues in its brief, this is precisely how Rothschild used the Birkin marks: to brand his own goods—the NFTs he sold—for use in the metaverse. Branding his own products with the Birkin marks "constitutes quintessential trademark use subject to the Lanham Act." *Vans, Inc. v. MSCHF Product Studio, Inc.*, 88 F.4th 125, 138-39 (2nd Cir. 2023). Like the defendant in *Vans*, Rothschild "sought to benefit from the good will that [Hermes]—as the source of the [Birkins bag] and its distinctive marks—had generated over a decades-long period." *Id.* (cleaned up).

To escape the ruling in *Jack Daniels* and *Vans*, Rothschild presents a novel and expansive theory: use of a mark is not source-identifying if a user like him uses it in "the title and content of artworks." Br. at 44. This theory of *Rogers* would allow indiscriminate trademark infringement in the metaverse so long as the infringer uses the actual name of the mark and calls it art. So, for example, Rothschild could next introduce a line of NFT shoes, conjure an artistic message of any kind, and

just retain the name of the brand he copied. MetaCrocs. MetaNikes. MetaSperry's. And so on. Easy enough, and—he believes—artistic enough to trigger First Amendment protection and insulate him from liability for trademark infringement.

This sort of license to steal in the name of art would have significant ripple effects. Consider, for example, the consumer confusion that arises with the *MetaBirkins*. Instead of a blockchain-based asset that is meant to prove authenticity, this infringing NFT does the exact opposite by illicitly copying the authentic Birkin bag. And if the infringing NFT, in turn, becomes a physical product—think Rothschild selling physical *MetaBirkins*—consumer confusion only increases.

But at a more basic level, Rothschild's *Rogers* expansion would curb the economic potential of the metaverse in its infancy. While Rothschild invokes artistic license and creativity, his legal theory would stifle creativity and curb progress and product development in the metaverse before companies have even had a chance to explore its potential. Fashion, accessory, and apparel companies, immediately facing NFT copycats of their products, will no longer enjoy the enormous potential of their intellectual property in the metaverse. Instead, they will face yet another

digital frontier in the already daunting "digital devalue chain." From fake websites and fraudulent ads, to dupe influencers, hidden links, and fake text messages, brands face a cacophony of online fraudsters stealing their intellectual property and putting consumers at risk.[17] They can ill afford a digital world populated by copycats of their products.

## CONCLUSION

As the metaverse and its enormous potential continues to emerge, companies must retain the benefits of their intellectual property. Without them, American companies will enter this new frontier two steps behind. This court should reject Rothschild's attempts to enshrine these impediments into law and affirm the district court.

Date: February 9, 2024

By: /s/ John P. O'Herron
John P. O'Herron (VSB No. 79357)
*Thompson*McMullan, P.C.
100 Shockoe Slip, Third Floor
Richmond, Virginia 23219
Telephone: (804) 649-7545
Facsimile: (804) 780-1813
joherron@t-mlaw.com
*Counsel for Amici Curiae*

---

[17] *See* American Apparel & Footwear Assoc., "Digital Devalue Chain of Counterfeits," https://www.aafaglobal.org/counterfeitdevaluechain (last visited Feb. 8, 2024).

**CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B), the word limit of Local Rule 32.1(a)(4) (A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f): this document contains 3,221 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: February 9, 2024