# 23–1081-cv

IN THE

## United States Court of Appeals
### FOR THE SECOND CIRCUIT

HERMÈS INTERNATIONAL, HERMÈS OF PARIS, INC.,

*Plaintiffs-Appellees*,

v.

MASON ROTHSCHILD,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
(Honorable Jed S. Rakoff)

---

**BRIEF OF *AMICUS CURIAE* STARBUCKS CORPORATION IN
SUPPORT OF PLAINTIFFS-APPELLEES HERMÈS INTERNATIONAL
AND HERMÈS OF PARIS, INC.**

---

Douglas H. Hallward-Driemeier
ROPES & GRAY LLP
2099 Pennsylvania Avenue, N.W.
Washington, DC 20006
(202) 508-4600

*Counsel for Starbucks
Corporation*

## CERTIFICATION PURSUANT TO RULE 26.1

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Starbucks Corporation states that it does not have any parent company and no publicly held company has a 10% or more of its stock.

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ........................................................................ ii

STATEMENT OF INTEREST OF *AMICUS CURIAE*.............................................1

SUMMARY OF THE ARGUMENT ......................................................2

ARGUMENT ..................................................................................3

    I.     THE FIRST AMENDMENT DOES NOT SHIELD CREATORS FROM LANHAM ACT LIABILITY WHERE THE CREATOR SEEKS TO COMMERCIALIZE, OR TRADE ON, A BRAND OWNER'S TRADEMARK AS THEIR OWN....................................3

    II.    THE LANHAM ACT PROTECTS TRADEMARK HOLDERS FROM OTHERS' IMPERMISSIBLE *TRADEMARK USE* OF THEIR MARKS ............................................4

        A.    The Built-In Limitations of the Lanham Act Avoid Conflict With the First Amendment in Most Applications.......................5

        B.    Amici's Examples of Purported Protected Uses in Its Brief Fail to Appreciate the Trademark Use/First Amendment Distinction ....................................................................8

    III.    ATTEMPTING TO INSERT THIS COURT INTO LITIGATION PENDING ELSEWHERE, AMICI INACCURATELY CHARACTERIZE THE ORIGIN OF THE STARBUCKS MARKS AND THE USE OF THOSE MARKS TO COMMERCIALIZE A THIRD PARTY'S OWN GOODS OR SERVICES. ......................................12

        A.    The Starbucks Brand Name and Its Iconic Logos Are Famous Trademarks Entitled to Legal Protection ................................12

        B.    Amici Mischaracterize the Nature of Workers United's Use of the Starbucks Marks ................................................16

CONCLUSION ..........................................................................18

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*,
    598 U.S. 508 (2023)...................................................................................10

*Cedar Point Nursery v. Hassid*,
    594 U.S. 139 (2021).....................................................................................5

*Eldred v. Ashcroft*,
    537 U.S. 186 (2003).....................................................................................5

*Hermès Int'l v. Rothschild*,
    No. 22-cv-384, 2023 WL 4145518 (S.D.N.Y. June 23, 2023).........................11

*Jack Daniel's Props., Inc. v. VIP Prods. LLC*,
    599 U.S. 140 (2023)..............................................................................*passim*

*Lloyd Corp. v. Tanner*,
    407 U.S. 551 (1972).....................................................................................5

*Punchbowl, Inc. v. AJ Press, LLC*,
    90 F.4th 1022 (9th Cir. 2024) .......................................................................4

*Rogers v. Grimaldi*,
    875 F.2d 994 (2d Cir. 1989) ..........................................................................3

*Sally Gee, Inc. v. Myra Hogan, Inc.*,
    699 F.2d 621 (2d Cir. 1983) ..........................................................................6

*Starbucks Corp. v. Blood*,
    No. 7:15-cv-00206 (M.D. Ga. Mar. 28, 2017), ECF No. 14 .............................15

*Starbucks Corp. v. Serv. Emps. Int'l Union*,
    Civ. No. 3:23-cv-00068 (S.D. Iowa Oct. 18, 2023) .......................12, 16, 17, 18

*Starbucks Corp. v. Shulin*,
    Opposition No. 9129964 (T.T.A.B. Oct. 18, 2022)...........................................15

*State St. Glob. Advisors Tr. Co. v. Visbal*,
    431 F. Supp. 3d 322 (S.D.N.Y. 2020) .............................................................4

*TCPIP Holding Co. v. Haar Commc'ns, Inc.*,
    244 F.3d 88 (2d Cir. 2001) ................................................4

*United We Stand Am., Inc. v. United We Stand, Am. N.Y., Inc.*,
    128 F.3d 86 (2d Cir. 1997) ...........................................7, 8

*Vans, Inc. v. MSCHF Prod. Studio, Inc.*,
    88 F.4th 125 (2d Cir. 2023) ..........................................3, 4

*Workers United v. Starbucks Corp.*,
    Case No. 2:23-cv-04036 (E.D. Pa. Oct. 18, 2023) ...................12, 17

*Yankee Publ'g Inc. v. News Am. Publ'g Inc.*,
    809 F. Supp. 267 (S.D.N.Y. 1992) ....................................6

**Statutes**

15 U.S.C. § 1125(c) (Lanham Act)..................................*passim*

17 U.S.C. § 302 ......................................................15

**Other Authorities**

5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair
    Competition § 3:2 (5th ed. 2022).....................................4

Barton Beebe, *The Semiotic Analysis of Trademark Law*, 51 UCLA L.
    Rev. 621 (2004) .....................................................9

First Amendment to the United States Constitution ........................*passim*

## STATEMENT OF INTEREST OF *AMICUS CURIAE*

Starbucks Corporation is the largest coffeehouse company worldwide and has some of the strongest and most recognizable trademarks in the world. It has a strong interest in ensuring that the law reflects the balance between the rights of trademark owners to protect their marks from being appropriated by others for source identification purposes—including appropriation by others as their own trademarks—and rights of free speech under the First Amendment.[1] The brief filed by Amici MSCHF *et al*[2] includes discussion of unrelated legal actions, pending elsewhere, involving Starbucks trademarks. Amici's discussion of the Starbucks trademarks and those unrelated legal actions is rife with factual and legal mistakes. Starbucks submits this responsive brief in order to avoid any confusion or misunderstanding and to urge this Court not to delve into that unrelated dispute. But more importantly, Starbucks submits this brief to address the erroneous and profoundly troubling assertion by Appellant and Amici that the First Amendment

---

[1] Counsel for all parties have consented to the filing of this amicus brief. No counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than amicus curiae or its counsel made a monetary contribution to the brief's preparation or submission.

[2] As used herein, "Amici" refer to all amici curiae who filed the Brief of *Amici Curiae* MSCHF, CTHDRL, Alfred Steiner, Jack Butcher, and Authors Alliance in Support of Defendant-Appellant Mason Rothschild and Reversal, Docket No. 70-3 in this appeal ("Amici Br.").

protects a third party's appropriation of another's word or design mark when that third party is using the mark as a source-identifying brand, to commercialize and promote its own goods or services.

## SUMMARY OF THE ARGUMENT

The legal issues that are before the Court in this case are of significant interest to Starbucks and to anyone who has developed strong intellectual property rights in trademarks, which others impermissibly seek to commercialize for their own profit. This Court should reject the assertion by Appellant and Amici that the First Amendment protects a third party's appropriation of another's word or design mark when that third party is using the mark as an identifier of source to commercialize and promote its own goods or services.

In their brief, Amici divert from these legal issues by making mistaken representations regarding Starbucks trademarks and the use of those trademarks by other parties. The nature of that use and the demonstrable customer confusion and extensive harm to Starbucks resulting from that use are *not* issues before this Court, but are instead the subject of pending multi-forum litigation elsewhere. While there is no reason for this Court to reference the Starbucks marks or the litigation regarding the uses of those marks raised by Amici, in order to correct the record, Starbucks briefly addresses the misstatements of Amici on those topics, along with a request that the Court not wade into these topics that are the subject of other litigation.

## ARGUMENT

**I. THE FIRST AMENDMENT DOES NOT SHIELD CREATORS FROM LANHAM ACT LIABILITY WHERE THE CREATOR SEEKS TO COMMERCIALIZE, OR TRADE ON, A BRAND OWNER'S TRADEMARK AS THEIR OWN**

While much of the briefing in this case has addressed the extent to which, under *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989), a trademark owner can prevent another from using their mark in a confusing manner, Starbucks here addresses a distinct but related issue—whether the First Amendment protects a third party's appropriation of another's trademark as a source-identifier, i.e., a brand, for its own goods or services.

The Supreme Court recently held in *Jack Daniels* that "it is not appropriate when the accused infringer has used [someone else's] trademark to designate the source of its own goods—in other words, has used a trademark as a trademark. That kind of use falls within the heartland of trademark law, and does not receive special First Amendment protection." *Jack Daniel's Props., Inc. v. VIP Prods. LLC*, 599 U.S. 140, 145 (2023); *see also Vans, Inc. v. MSCHF Prod. Studio, Inc.*, 88 F.4th 125, 138-39 (2d Cir. 2023). Neither Appellant nor Amici give proper weight to this holding, which confirms that a creator's First Amendment right does not trump a brand owner's property right in its trademark where the creator is using the trademark to brand and promote its own goods or services. To hold otherwise would eviscerate the protections a trademark affords, because such infringing use of

3

another's trademark as one's own will almost always involve some expressive act that would otherwise be entitled to First Amendment protection.

## II.    THE LANHAM ACT PROTECTS TRADEMARK HOLDERS FROM OTHERS' IMPERMISSIBLE *TRADEMARK USE* OF THEIR MARKS

The quintessential function of a trademark is to identify and distinguish a seller's goods or services from those sold by others. 5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition ("McCarthy") § 3:2 (5th ed. 2022). Use as a trademark means use as "a 'source identifier'," i.e., "'to identify or brand a defendant's goods or services' or to indicate the 'source or origin' of a product." *Vans, Inc.*, 88 F.4th at 138 (citing *Jack Daniel's*, 599 U.S. at 156). For example, "the Second Circuit has held … that use of a trademark like Fearless Girl in a URL … is a use 'as a mark.'" *State St. Glob. Advisors Tr. Co. v. Visbal*, 431 F. Supp. 3d 322, 342 (S.D.N.Y. 2020) (citing *TCPIP Holding Co. v. Haar Commc'ns, Inc.*, 244 F.3d 88, 104 (2d Cir. 2001)). Ultimately, the "primary mission" of trademark law is to protect this trademark usage, and "[t]he cardinal sin under the law . . . is to undermine that function." *Jack Daniel's*, 599 U.S. at 156-57; *see also Punchbowl, Inc. v. AJ Press, LLC*, 90 F.4th 1022, 1030 (9th Cir. 2024) ("From the perspective of the Lanham Act, 'whether the use of a mark is serving a source-designation function' is 'crucial' for the Act's objective of 'ensur[ing] that

consumers can tell where goods come from." (quoting *Jack Daniel's*, 599 U.S. at 163)).

**A.** **The Built-In Limitations of the Lanham Act Avoid Conflict With the First Amendment in Most Applications**

As a general matter, the First Amendment does not entitle a speaker to use the property of another to facilitate the speaker's communication. A protester cannot, for example, invoke the First Amendment as authority to steal another's megaphone, or trespass on another's private property, to spread their message. *See, e.g.*, *Lloyd Corp. v. Tanner*, 407 U.S. 551 (1972). Nor does the First Amendment protect entry onto another's property for purposes such as organizing workers to form a union. *See Cedar Point Nursery v. Hassid*, 594 U.S. 139 (2021). The same holds true with respect to private intellectual property. If a right to "free speech" could override another's property interest in its trademark or copyright, those property interests would be worth very little, if anything, as the infringing activity would almost always involve expression protected by the First Amendment.

Instead, just as the Copyright Act's "built-in free speech safeguards are generally adequate to address" any "First Amendment concerns," *Eldred v. Ashcroft*, 537 U.S. 186, 221 (2003), trademark law likewise has built-in limitations that are adequate as a general matter to avoid encroaching on free speech rights. Trademark law does not grant property rights over ideas. Nor does trademark law preclude

people from expressing their views. Rather, trademark law prohibits trading on (i.e., seeking to commercialize) the mark of another, something that a third party has no right to do.[3] *Jack Daniel's*, 599 U.S. at 146-48.

As the inherent balancing in trademark law already accounts for the need to define the exclusive rights of the trademark holder so as not to monopolize all speech, "trademark law generally prevails over the First Amendment." *Yankee Publ'g Inc. v. News Am. Publ'g Inc.*, 809 F. Supp. 267, 276 (S.D.N.Y. 1992). The First Amendment is *only* implicated and offers protection when the "unauthorized use of another's mark is part of a communicative message and not a source identifier." *Id.* Amici appear to argue that *any* use of someone else's mark constitutes a communicative message. *See* Amici Br. 4-12. However, as *Jack Daniels* confirmed, and as was already clear under existing trademark jurisprudence, the use of another's trademark *as a trademark* is not protected under the First Amendment. *See Jack Daniel's*, 599 U.S. at 156-57. Amici concede that a trademark "carries its own independent expressive value," even when it draws inspiration from other materials. *See* Amici Br. 6. Yet they fail to acknowledge the

---

[3] Trademark law also prevents dilution: (1) the blurring or "whittling down" of the identity or reputation of a famous mark and (2) the tarnishment of the affirmative associations a famous mark has come to convey. 15 U.S.C. § 1125(c); *Sally Gee, Inc. v. Myra Hogan, Inc.*, 699 F.2d 621, 625 (2d Cir. 1983).

legal framework for that "independent expressive value"—namely that the Lanham Act protects that value through trademarks that grant certain exclusive rights against unauthorized use both because the public relies on the source-indicating function of trademarks and because brand owners invest significant resources to develop the goodwill reflected in the marks.

Therefore, the First Amendment does not confer a right to use another's trademark as their own trademark—i.e., to trade on another's mark in the sale or promotion of one's own goods or services—and does not shield such uses of a mark from the Lanham Act's enforcement mechanisms. *See id.*; *see also United We Stand Am., Inc. v. United We Stand, Am. N.Y., Inc.*, 128 F.3d 86, 93 (2d Cir. 1997) ("[U]sing the slogan as a mark, . . . to suggest the same source identification as plaintiffs . . . is precisely the use that is reserved by the Lanham Act to the owner of the mark."). Appropriation of another's mark that "would cause significant consumer confusion" is "not protected by the First Amendment." *United We Stand*, 128 F.3d at 93. And, ultimately, "[w]hen a mark is used as a mark …, the likelihood-of-confusion inquiry does enough work to account for the interest in free expression." *Jack Daniel's*, 599 U.S. at 159. Hence, when there is a likelihood of consumer confusion as to the source or sponsorship of the product or service, as is the case here with Appellant's misappropriation of Hermès' marks to brand and commercialize his NFTs, those uses are not protected by the First Amendment.

**B.** **Amici's Examples of Purported Protected Uses in Its Brief Fail to Appreciate the Trademark Use/First Amendment Distinction**

As discussed *supra* and contrary to Amici's argument, brand owners finding inspiration from the public domain to develop a trademark is not akin to creators appropriating a company's mark or brand for use *as a source identifier*. Amici inaptly analogize taking inspiration from creative works in the public domain, as Starbucks did from the name of a character in a public domain book discussed *infra*, with "borrow[ing] from brands to communicate" in an attempt to illustrate that "freedom of speech is appropriative." Amici Br. 4-5. Amici's analogy fails to acknowledge that trademarks may not be appropriated and used by another as a trademark where such use leads to consumer confusion. *See United We Stand*, 128 F.3d at 93.

As a threshold matter, Amici's proffered examples of companies "borrowing" from creators, *see* Amici Br. 4-12., did *not* involve use of protected intellectual property. Indeed, even assuming that Supreme "borrowed" the color red and the basic white font that appear in Barbara Kruger's *I shop therefore I am* to create its trademark—neither the color red nor the white lettering are protectable elements in Kruger's piece and instead were in the public domain when adopted by Supreme for use as a novel and unique source identifier for its apparel. Similarly, as discussed *infra*, Starbucks inspiration for its name from First Mate Mister "Starbuck" in the

novel *Moby-Dick* and its inspiration for its logo of a mythological twin-tailed siren—both of which are likewise in the public domain—do not support Amici's "everyone's doing it" argument: that is, everyone copies so the law should allow every form of copying, even copying another's protected intellectual property. Neither names of literary characters from a century-old publication nor generalized mythical creatures nor geographic names, on their own, are subject to trademark protection; they must be used in connection with particular goods and services and point to a source of those goods and services. Barton Beebe, *The Semiotic Analysis of Trademark Law*, 51 UCLA L. Rev. 621, 649 (2004) ("[T]he term 'trademark' refers to the relational system consisting of the tangible signifier(s) [i.e., a word or image], the source or goodwill signified, and their connection to a referent or a set of referents.").

Moreover, none of Amici's examples of creators borrowing from brand owners involve use of the trademark owner's mark *as a trademark*. Amici point to various examples of famous paintings—Édouard Manet's *A Bar at the Folies-Bergére*; Pablo Picasso's *Pipe, Glass, Bottle of Vieux Marc*; Richard Hamilton's *Just what is it that makes yesterday's homes so different, so appealing?*; and Andy Warhol's *Cambell's Soup Cans*—to argue that "[a]rtists' use of familiar imagery to both question consumerism and mirror everyday life is not a new phenomenon." Amici Br. 8-10. The ways these artworks reference trademarks and incorporate

creative material vary greatly and whether they infringed any rights at the time of their creation would require separate analysis. None of the cited artworks use the third-party trademarks in the same way as Appellant—namely, to create the impression that the third-party trademark owner has put out or authorized Appellant's product. This broad argument that the "ubiquity of brands in every day life requires that artists, like [Appellant], remain able to *reference* [those brands] in their work, whether or not they first obtain permission from trademark owners[,]" mischaracterizes the nature of Appellant's conduct accused in this case. *Id.* at 11 (emphasis added). Unlike those artists, Appellant misappropriated Appellees' trademarks to brand his work. Indeed, the Supreme Court has expressly rejected the broad legal principle advocated by Amici—that the First Amendment protects all expression that "references" another's work, including by appropriating it. In *Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508 (2023), the Supreme Court confirmed that an artist has *no* right to sell another artist's copyright-protected work as their own, even if the copying artist has modified it. *Id.* at 550 (distinguishing Warhol's use of a copyrighted image of Prince to make another image of Prince for sale as Warhol's own from Warhol's use of the Campbell's Soup logo in art making commentary on consumerism).

Amici's argument would eviscerate the protections afforded to trademark owners under the Lanham Act. A holding that any purportedly "referential" use of

another's mark—even *use as a trademark*—is immune under the First Amendment from Lanham Act liability would undermine the stated intent of the Lanham Act to protect the source-indicating function of a trademark. This case is about Appellant's confusing *trademark* use of the Hermès trademarks, and neither Amici nor Appellant have adequately addressed that essential fact.

As the lower court correctly noted, "Defendant's entire scheme here was to defraud consumers into believing, by his use of variations on Hermès' trademarks, that Hermès was endorsing his lucrative MetaBirkins NFTs. Nothing in the First Amendment insulates him from liability for such a scheme." *Hermès Int'l v. Rothschild*, No. 22-cv-384, 2023 WL 4145518, at *4 (S.D.N.Y. June 23, 2023). Yet, Appellant asks this Court to ignore the fact that he used Hermès's marks in a source-identifying way in order to find that the First Amendment broadly protects use of another's trademarks. Allowing a trademark to be taken and used by another entity as a designation of source or indication of sponsorship undermines the critical protections of trademark law against consumer confusion. *See Jack Daniel's*, 599 U.S. at 145. Therefore, this Court should uphold the core purpose of the Lanham Act—to protect trademark holders from their marks being used by others *in a trademark way* (i.e., to identify source)—and affirm the judgment below.

**III. ATTEMPTING TO INSERT THIS COURT INTO LITIGATION PENDING ELSEWHERE, AMICI INACCURATELY CHARACTERIZE THE ORIGIN OF THE STARBUCKS MARKS AND THE USE OF THOSE MARKS TO COMMERCIALIZE A THIRD PARTY'S OWN GOODS OR SERVICES.**

The use of the STARBUCKS word mark and Starbucks logos (the "Starbucks Marks") by Workers United and associated entities (collectively, "Workers United") is currently at issue in litigation pending before two district courts.[4] Notwithstanding Amici's attempt to insert the specific facts of that dispute into this litigation, this Court should reject Amici's effort to lure the Court into making comments about those other pending legal actions. To correct the record, however, Starbucks will briefly address Amici's misrepresentations.

**A. The Starbucks Brand Name and Its Iconic Logos Are Famous Trademarks Entitled to Legal Protection**

For its name, the original Starbucks founders hired a designer who found inspiration in the 1851 book *Moby-Dick* by Herman Melville and the company's location in the Pacific Northwest. Drawing from the name of the ship's chief mate—Starbuck—and a local mining camp in the Cascade Range—Starbo—the company adopted the name "Starbucks." *Moby-Dick* had entered the public domain in 1893,

---

[4] *See Starbucks Corp. v. Serv. Emps. Int'l Union*, Civ. No. 3:23-cv-00068 (S.D. Iowa Oct. 18, 2023); *Workers United v. Starbucks Corp.*, Case No. 2:23-cv-04036 (E.D. Pa. Oct. 18, 2023).

and the word "Starbucks" had, to the company's knowledge, never previously been used as the name of any other establishment or otherwise as a commercial source indicator.

The name "Starbucks" was first used as a trademark in 1971 when the predecessor-in-interest to Starbucks Corporation opened its first store in Pike Place Market, Seattle, Washington. The company has continuously used the brand name "Starbucks" since its founding in 1971, and has obtained trademark registrations for the wordmark.[5]

From its inception, Starbucks has also viewed itself as tied to the seafaring world. This includes the proximity of its first retail location (and now its headquarters) to the sea, as well as the fact that most of the high-quality coffee beans sourced by Starbucks travel by sea to reach roasting facilities and customers' cups. This naval theme led Starbucks to its first logo design: a mythological twin-tailed

---

[5] Starbucks registrations for the STARBUCKS word mark include, but are not limited to: (i) U.S. Trademark Reg. No. 1,444,549 (registered June 23, 1987); (ii) U.S. Trademark Reg. No. 2,073,104 (registered June 24, 1997); and (iii) U.S. Trademark Reg. No. 3,235,732 (registered May 1, 2007), all of which relate to the distribution and sale of coffee and more generally to retail store and restaurant, café and coffee house services.

siren.[6] The logo was later modernized and redesigned with Starbucks signature green, black, and white colors in 1987, and then redesigned again in 1992 to reach its unique and immediately identifiable logo (the "Siren Logo"). In 2011, Starbucks also created another version of the Siren Logo to celebrate the brand's 40th anniversary (the "40th Anniversary Logo"). The Siren logo and the 40th Anniversary Logo, in their various incarnations, are subject to trademark and copyright protection.[7] Starbucks has continuously used its Siren Logo since 1992 and its 40th Anniversary Logo since 2011 to promote and identify Starbucks products and services. The logos were, to the company's knowledge, never previously used as the logo of any other establishment or otherwise as a commercial source indicator.

---

[6] Contrary to the allegation by Amici, the Starbucks siren does not refer to a specific figure named "Melusine." Amici Br. 6. Rather, the image in the Starbucks logo belongs to a long tradition of two-tailed mermaids.

[7] Starbucks trademark registrations for its logos include, but are not limited to: (i) U.S. Trademark Reg. Nos. 1,815,937 (registered January 11, 1994); (ii) U.S. Trademark Reg. No. 2,266,352 (registered August 3, 1999); and (iii) U.S. Trademark Reg. No. 4,635,864 (registered November 11, 2014), all generally in connection with, *inter alia*, coffee, retail stores, and restaurant, café and coffee house services, as well as "[t]-shirts, polo shirts, sweatshirts, caps, hats, jackets, aprons and vests." Starbucks copyright registrations for its logos include United States Copyright Reg. No. VA 875-932 in the work titles "Starbucks Coffee Siren Logo" and United States Copyright Reg. No. VA 1-768-520 in the work titled "40th Anniversary Siren design."

The Starbucks Marks are famous under the Lanham Act. *See* 15 U.S.C. § 1125(c). Starbucks has 38,000 branded retail locations worldwide, including over 17,000 U.S. stores. Over the past twenty-five years, Starbucks has invested nearly four billion dollars in its advertising, all of which has featured one or more of the Starbucks Marks or variations thereof. Various brand studies routinely recognize Starbucks among the most recognized and valuable brands in the world. *See, e.g.*, "BrandZ Top 100 Most Valuable Global Brands | 2023" (ranking Starbucks as the 27th most valuable global brand, placing Starbucks at about the same position as T-Mobile and Walmart, and higher than other famous brands like YouTube, Netflix, and The Walt Disney Company). Courts and the United States Patent and Trademark Office too have recognized the fame of the Starbucks Marks. *See, e.g.*, Civil Judgment and Order, *Starbucks Corp. v. Blood*, No. 7:15-cv-00206 (M.D. Ga. Mar. 28, 2017), ECF No. 14; *Starbucks Corp. v. Shulin*, Opposition No. 9129964 (T.T.A.B. Oct. 18, 2022).

Needless to say, Starbucks has extremely strong and valuable property rights in its trademarks. Amici thrust these trademarks into this conversation by using them as an example of brand owners "borrowing from creators," as discussed *supra*. While *copyright* protections might extend to characters created by other authors, such rights in the characters pointed to by Amici would have expired long ago, moving those characters into the public domain for others to use. *See* 17 U.S.C. §

302; *see also supra* I.C.  Unlike the facts of the present litigation, when Starbucks adopted its name, Herman Melville's character (from a book written in 1851, by an author who died in 1891) had been in the public domain for decades already, and the concept of a twin-tailed mermaid in the public domain for centuries.  Starbucks made the word "Starbucks" and the Siren logo into trademarks that uniquely identify Starbucks as the purveyor of the high-quality coffee bearing the marks.  In adopting its branding, Starbucks did *not* appropriate anyone else's branding—unlike Appellant.  Indeed, Amici's example is inapposite to the facts of the case actually before this Court.

**B.     Amici Mischaracterize the Nature of Workers United's Use of the Starbucks Marks**

In addition to mischaracterizing the nature and strength of the Starbucks Marks and logos as identifying the source of Starbucks products and services, Amici also mischaracterize the nature of third parties' use of those marks and logos and the dispute that has arisen as a result.

Starbucks sued Workers United in the Southern District of Iowa on October 18, 2023, asserting that the union has infringed Starbucks trademark and copyright rights in its marks and works, including those identified in Amici's brief.  *See* Am. Compl., *Starbucks Corp. v. Serv. Emps. Int'l Union*, Civ. No. 3:23-cv-00068 (S.D.

Iowa Oct. 18, 2023), ECF No. 13.[8]   In that litigation, Starbucks makes highly detailed allegations that Workers United uses infringing versions of the Starbucks Marks in commerce as source-identifier branding for the union's services and goods. More particularly, as Starbucks alleges in its complaint, Workers United is impermissibly using the Starbucks Marks *as trademarks*, including on merchandise sold to the public; to fundraise and solicit cash tips from customers; to identify itself via social media names, avatars, and "profile pictures;" as well to make social media posts advocating about a variety of political and social issues, including issues unrelated to any unionizing efforts. *See id.* ¶¶ 50-54.[9]   Starbucks alleges that these uses have caused and will continue to cause consumer confusion as to the source and sponsorship of Workers United's various activities and to harm Starbucks, including through dilution of the Starbucks Marks. *See id.* ¶¶ 83-126. Specifically, the public

---

[8] Workers United filed a counter-suit in the U.S. District Court for the Eastern District of Pennsylvania seeking a declaratory judgment that it is not infringing the Starbucks Marks. *See Workers United v. Starbucks Corp.*, Case No. 2:23-cv-04036 (E.D. Pa. Oct. 18, 2023).

[9] To be clear, Starbucks respects Workers United's right to express their viewpoints about political and social issues; Starbucks did not initiate the litigation with an intent to stifle their speech or express a view on their positions or those issues. Instead, Starbucks brought the action to protect the safety of those working in its retail locations around the world, and to halt the damage to its business that has resulted from Workers United's misuse of Starbucks name and logos when expressing their views.

has mistakenly attributed these uses to Starbucks, and as a direct consequence, Starbucks has suffered boycotts, threats to its employees, vandalism to its stores, and brand and reputational harm.  *See id.*

To clarify, Starbucks is not asking this Court to comment or rule upon the union's use and appropriation of the Starbucks Marks.  To the contrary, it highlights the nuanced, complicated facts underlying the ongoing litigation to correct Amici's mischaracterization of that use and to seek to avoid a decision by this Court addressing the merits of a dispute not before it.

## CONCLUSION

For the foregoing reasons, the Court should affirm the judgment below in this case and refrain from commenting on the merits of the ongoing litigation pending in two district courts between Starbucks and Workers United.

Dated: February 9, 2024

Respectfully submitted,

By:     */s/ Douglas H. Hallward-Driemeier*
Douglas H. Hallward-Driemeier
ROPES & GRAY LLP
2099 Pennsylvania Avenue, N.W.
Washington, DC 20006
(202) 508-4600

*Counsel for Starbucks Corporation*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a) and Fed. R. App. P. 29(a)(5) because it contains 4,255 words, excluding the parts exempted by Fed. R. App. P. 32(f).  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman 14 point font.

Dated: February 9, 2024

*/s/ Douglas H. Hallward-Driemeier*
Douglas H. Hallward-Driemeier

*Counsel for Starbucks Corporation*

## CERTIFICATE OF SERVICE

On February 9, 2024, the undersigned caused the foregoing document to be filed electronically by using the Court's CM/ECF system. All parties are represented by registered CM/ECF users and will be served by the appellate CM/ECF system.

*/s/ Douglas H. Hallward-Driemeier*
Douglas H. Hallward-Driemeier

*Counsel for Starbucks Corporation*