## MOTION INFORMATION STATEMENT

**Docket Number(s):** 23-1081

Caption [use short title]

**Motion for:** supplementation of the record

Hermes International v. Rothschild, 23-1081

Set forth below precise, complete statement of relief sought:

Defendant-Appellant moves to supplement the
record with a transcript of proceedings in the
district court on February 20, 2024, concerning
the scope of the injunction at issue in this appeal.

**MOVING PARTY:** Mason Rothschild

**OPPOSING PARTY:** Hermes International and Hermes of Paris, Inc.

☐ Plaintiff ☑ Defendant

☑ Appellant/Petitioner ☐ Appellee/Respondent

**MOVING ATTORNEY:** Rhett O. Millsaps II

**OPPOSING ATTORNEY:** Gerald J. Ferguson

[name of attorney, with firm, address, phone number and e-mail]

Lex Lumina PLLC; 745 Fifth Avenue, Suite 500,
New York, NY  10151; (646) 535-1137;
rhett@lex-lumina.com

Baker & Hostetler LLP; 45 Rockefeller Plaza, New York,
NY 10111-0100; (212) 589-4238;
gferguson@bakerlaw.com

Court- Judge/ Agency appealed from: U.S. District Court for the Southern District of New York, Hon. Jed Rakoff

Please check appropriate boxes:

Has movant notified opposing counsel (required by Local Rule 27.1):
☑ Yes ☐ No (explain):_____

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUCTIONS PENDING APPEAL:**

Has this request for relief been made below? ☐ Yes ☐ No
Has this relief been previously sought in this court? ☐ Yes ☐ No

Requested return date and explanation of emergency:_____

Opposing counsel's position on motion:
☑ Unopposed ☐ Opposed ☐ Don't Know
Does opposing counsel intend to file a response:
☐ Yes ☑ No ☐ Don't Know

Is the oral argument on motion requested? ☐ Yes ☑ No (requests for oral argument will not necessarily be granted)

Has the appeal argument date been set? ☐ Yes ☑ No  If yes, enter date:_____

**Signature of Moving Attorney:**
/s/ Rhett O. Millsaps II  Date: 3/7/2024  Service : ☑ Electronic ☐ Other [Attach proof of service]

**Form T-1080** (rev. 10-23)

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

---

HERMÈS INTERNATIONAL and
HERMÈS OF PARIS, INC.,

        Plaintiffs-Appellees,

v.

MASON ROTHSCHILD,

        Defendant-Appellant.

Case No. 23-1081

---

## DEFENDANT-APPELLANT'S MOTION
## TO SUPPLEMENT RECORD ON APPEAL

Pursuant to Rules 10(e)(3) and 27 of the Federal Rules of Appellate

Procedure and this Court's Local Rule 27.1, Defendant-Appellant Mason

Rothschild respectfully requests that the Court supplement the record on appeal in

this case with the attached transcript of proceedings in the district court held on

February 20, 2024 (the "Transcript" or "Tr."), regarding the scope of the Order of

Permanent Injunction (the "Injunction") at issue in this appeal.

        1.     On February 20, 2024, the district court held an evidentiary hearing

regarding an application by Mr. Rothschild to clarify the scope of the Injunction, at

which the court questioned two witnesses: Dr. Blake Gopnik, a renowned art critic

and historian who served as an expert for Mr. Rothschild at the summary judgment

stage of this case (and whose exclusion as a testifying expert at trial is an issue in this appeal), and Mia Sundberg, the curator of the Absolut art collection of the Spritmuseum in Stockholm, Sweden.  A copy of the Transcript of that hearing is attached hereto as an addendum.

2.      The issue arose in December 2023, when the Spritmuseum reached out to Mr. Rothschild to ask for his permission to include some of his *MetaBirkins* artworks at issue in this case in an upcoming exhibition on Andy Warhol and Business Art curated by Dr. Gopnik.  Mr. Rothschild's counsel met and conferred with Hermès' counsel by email in an attempt to avoid a dispute over the issue. When that attempt failed, Mr. Rothschild filed an application asking the district court to make clear that Mr. Rothschild's giving such permission to the museum would not constitute a violation of the Injunction.  The district court then scheduled the February 20 evidentiary hearing, at which the court questioned Dr. Gopnik and Ms. Sundberg about the planned exhibition.  The court has not yet ruled on Mr. Rothschild's application regarding the scope of the Injunction.

3.      Mr. Rothschild respectfully requests that the Court supplement the record to include the Transcript, as the proceedings memorialized therein are relevant to Mr. Rothschild's arguments on the merits in this appeal.  *See Salinger v. Random House, Inc.*, 818 F.2d 252, 253 (2d Cir. 1987) (per curiam) (granting motion to supplement record under Fed. R. App. P. 10(e) where it "clarifie[d the

Court's] understanding of the process by which the District Judge reached the decision challenged on appeal."). Specifically, the district court's questions and statements memorialized in the Transcript demonstrate the court's improper, singular focus on Mr. Rothschild's subjective intent, which is inconsistent with the governing legal framework set out in *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989). *See Jack Daniel's Props., Inc. v. VIP Prods. LLC*, 599 U.S. 140, 157 (2023) (*Rogers* "offers an escape from the likelihood-of-confusion inquiry and a shortcut to dismissal").

4. The Transcript demonstrates that the district court has now branded Mr. Rothschild a "fraudster," even though there is no fraud claim in this case. Hermès did not, and could not, bring a fraud claim against Mr. Rothschild—Hermès was not a *MetaBirkins* purchaser, and in any event there is no evidence whatsoever that an actual purchaser was misled or confused about the source of *MetaBirkins*. *See Solow v. Citigroup, Inc*., 507 Fed. Appx. 81, 83 (2d Cir. 2013) (summary order) (quoting *Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001)) ("'Under New York law, to state a claim for fraud a plaintiff must demonstrate: (1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff.'"); Reply Br. [Doc. 119] at 3 n.2 (noting that Hermès adduced no

evidence that a single *MetaBirkins* purchaser was confused).  Nor could a purchaser plausibly plead reasonable reliance for a fraud claim, given that the evidence showed that Mr. Rothschild prominently and consistently identified himself as the creator of *MetaBirkins* and publicly disclaimed any association with Hermès.  Rothschild Br. [Doc. 56] at 11-15.

5.      The district court made statements throughout the hearing that illustrate its critical legal errors and their baleful consequences for Mr. Rothschild's First Amendment rights.  *See Book People, Inc. v. Wong*, 91 F.4th 318, 339-40 (5th Cir. 2024) (it violates the First Amendment to require speakers, even commercial speakers, to label their speech in ways that are neither factual nor uncontroversial) (citing *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 651 (1985), and *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 573 (1995)); *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 530 (D.C. Cir. 2015) (rejecting compelled commercial disclosures that conveyed moral responsibility).  For example, the district court asked Dr. Gopnik, "if I allow those images to be used, do you agree that you will prominently state that he was found by a jury to have committed fraud?"  Tr. at 8:9-11.  In its examination of Ms. Sundberg, the district court pushed this point further, suggesting that as a condition for granting Mr. Rothschild permission to have his *MetaBirkins* artworks publicly exhibited, the Swedish museum would be required

to identify Mr. Rothschild as a fraudster: "[H]ow can I allow the distribution over my prohibition to occur if the people in your museum and the people who come to see your exhibit don't understand that, unlike Mr. Warhol, Mr. Rothschild produced his works in order to defraud, intentionally defraud the public?"  Tr. at 12:24-13:3.

6.      The district court also pointed out that Mr. Rothschild's birth name is Sonny Estival and repeatedly characterized his artistic nom de guerre, Mason Rothschild, as a "totally phony, fake name" and a reason to believe that Mr. Rothschild is a fraud.  Tr. at 11:20-24.  This question the district court put to Dr. Gopnik is illustrative: "So I'm just curious as to why you think that unlike a great artist like Andy Warhol who, for example, in his Campbell soup -- what I'm curious about is why you think that a group of images that a jury has unanimously found were purposely designed by Mr. Estival under his fake name to confuse the jury, excuse me, confuse the public and consumers; in other words, a fraudster in every sense of the word, is something that I should allow to be part of your exhibit?"  Mr. Rothschild testified at trial that he has used the name "Mason Rothschild" for many years, adopting it long before he created *MetaBirkins*. District Court Docket No. 149 (transcript of January 31, 2023, trial proceedings) at 230-31 (Mr. Rothschild testifying about the origin of his name).  There is no evidence in this case that he adopted the name to defraud anyone.

7.     Mr. Rothschild notified Hermès of this motion and asked whether Hermès would oppose or consent to it.  Hermès' counsel responded: "Hermès does not agree that the post-judgment materials are relevant to Rothschild's appeal of the judgment, but otherwise takes no position on the request and will not be filing an opposition."

Dated: March 7, 2024

Respectfully Submitted,

 /s/ *Rhett O. Millsaps II*
Mark A. Lemley
Mark P. McKenna
Rhett O. Millsaps II
Christopher J. Sprigman
Rebecca Tushnet
LEX LUMINA PLLC
745 Fifth Avenue, Suite 500
New York, NY 10151
(646) 898-2055

*Attorneys for Defendant-Appellant Mason Rothschild*

# ADDENDUM

O2KBHERH

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  HERMES INTERNATIONAL, *et al*,

4                Plaintiffs,

5           v.                              22 Civ. 384 (JSR)

6  MASON ROTHSCHILD,

7                Defendant.
                                           Hearing
8  ------------------------------x
                                           New York, N.Y.
9                                          February 20, 2024
                                           9:00 a.m.
10
   Before:
11
                      HON. JED S. RAKOFF,
12
                                           District Judge
13

14                      APPEARANCES

15 BAKER & HOSTETLER, LLP
        Attorneys for Plaintiffs
16 BY:  OREN J. WARSHAVSKY
        FRANCESCA ROGO
17      GERALD FERGUSON

18 LEX LUMINA, PLLC
        Attorneys for Defendant
19 BY:  RHETT MILLSAPS
        CHRISTOPHER SPRIGMAN
20

21

22

23

24

25

O2KBHERH

1          (Case called)

2          THE DEPUTY CLERK:  Will the parties state their

3    appearances for the record.

4          MR. WARSHAVSKY:  Good morning, your Honor.

5          Oren Warshavsky of Baker & Hostetler for Hermes.  With

6    me are my colleagues Francesca Rogo and Gerald Ferguson.

7          MR. MILLSAPS:  Good morning, your Honor.

8          Rhett Millsaps for defendant Mason Rothschild of Lex

9    Lumina, PLLC, and with me is my colleague Chris Sprigman.

10         THE COURT:  We're here on the request of the defendant

11   to allow him to have his images included in an exhibit in a

12   Swedish institution.  I understand there's someone here from by

13   zoom from the Swedish institution.  Would that person please

14   identify themselves.

15         I want to know that they can hear me in Sweden.  I

16   don't think they can, so I'm very glad the tech guy

17   disappeared.

18         THE DEPUTY CLERK:  Does anybody have communication

19   with this witness?

20         MR. WARSHAVSKY:  I just sent an email with the zoom

21   info as the judge was entering.  I can look to see if there's a

22   response if that's okay.

23         THE COURT:  Why don't you call down to tech again.

24         MR. WARSHAVSKY:  I just received a response from the

25   witness, "okay."

O2KBHERH

1        THE COURT:  They apparently can't hear me because

2    they're not responding.

3        MR. MILLSAPS:  Your Honor, we do have Dr. Gopnik who

4    is also a witness.

5        THE COURT:  I will get to Dr. Gopnik, but I think we

6    should try to get the Swedish witness. Did someone call our

7    tech people?

8        (Pause)

9        THE COURT:  Why don't we get Dr. Gopnik on the stand.

10   Dr. Gopnik come forward.

11        (Witness sworn)

12        THE DEPUTY CLERK:  Please state and spell your name

13   for the record.

14        THE WITNESS:  My name is Blake Gopnik, B-L-A-K-E,

15   G-O-P-N-I-K.

16        THE COURT:  Dr. Gopnik, I understand you had a role in

17   setting up this proposed exhibit?

18        THE WITNESS:  That's correct.  I was hired as a guess

19   curator at the SpritMuseum in Sweden to organize this

20   exhibition.

21        THE COURT:  How did that come about?

22        THE WITNESS:  They approached me.  I'm well-known as a

23   Warhol expert, and they approached me specifically to curate an

24   exhibition about Andy Warhol and the concept of business art.

25        THE COURT:  Can you hear me?

O2KBHERH

1          THE LAW CLERK:  AV is coming up right now.

2          THE DEPUTY CLERK:  The Swedish witness cannot see us,

3    and she cannot hear us.

4          THE COURT:  We can hear her, but she cannot hear us.

5          (Pause)

6          THE COURT:  You approached them or they approached

7    you?

8          THE WITNESS:  They approached me.

9          THE COURT:  And when was that?

10         THE WITNESS:  I believe that that was early in 2022.

11         THE COURT:  And what did you say to them?  What did

12   they say to you?

13         THE WITNESS:  They asked me if I would be interested

14   in curating an Andy Warhol exhibition for them.  The choice of

15   exact subject was left up to me.  They offered me a fee to do

16   it, and I accepted.

17         THE COURT:  And how much is that?

18         THE WITNESS:  The fee was $23,000, and it was

19   increased by 10,000 more dollars when it became clear that

20   there was a great deal of work involved in the project.

21         THE COURT:  How did it come about that images involved

22   in this case were suggested for part of the exhibition?

23         THE WITNESS:  The exhibition is on the subject of Andy

24   Warhol on business art.  About two-thirds or three-quarters of

25   the exhibitions will be works by Andy Warhol.  There will also

O2KBHERH

1  be a section about other artists who've explored the same

2  concept of business art.  Some of those artists from the early

3  1970s, and then there's what we're calling an epilogue which

4  will involve recent artists.

5        THE COURT:  So it was you who suggested that it

6  include the -- I will refer to them as the images created by

7  Sonny Alexander Estival.

8        THE WITNESS:  That's correct.

9        THE COURT:  And why was that?

10       THE WITNESS:  Because the final section of the

11  exhibition is about artists in the last 10 or 15 years who were

12  exploring these same concepts of business art that Warhol did

13  in the 1960s and the 1970s, and I considered him one such

14  figure.

15       THE COURT:  Now you were aware of the jury's verdict

16  in this case?

17       THE WITNESS:  Yes, I'm aware of that, but this was

18  long before that.

19       THE COURT:  I understand that, but the exhibition is

20  in the future, right?

21       THE WITNESS:  Yes, that's correct.

22       THE COURT:  So you were aware that the jury

23  unanimously found that Mr. Estival had designed his images not

24  for kinds of reasons Mr. Warhol painted his paintings, but in

25  order to purposely confuse the public into believing that it

O2KBHERH

1  was sponsored by Hermes.  You knew that, yes?

2  THE WITNESS:  I'm aware that the jury decided that,

3  yes.

4  THE COURT:  And so in this exhibition are you going to

5  reveal that to the people attending the exhibition?

6  THE WITNESS:  We haven't got to the stage yet of

7  writing the wall text that go with each piece.  There certainly

8  will be some kind of explanation of the controversy of the

9  court case around this.  Wall text is only usually maximum a

10  hundred words, so we're going to have to figure out a way of

11  condensing the issues into a very short text.

12  THE COURT:  So I'm just curious as to why you think

13  that unlike a great artist like Andy Warhol who, for example,

14  in his Campbell soup -- what I'm curious about is why you think

15  that a group of images that a jury has unanimously found were

16  purposely designed by Mr. Estival under his fake name to

17  confuse the jury, excuse me, confuse the public and consumers;

18  in other words, a fraudster in every sense of the word, is

19  something that I should allow to be part of your exhibit?

20  THE WITNESS:  As an art critic, I often disagree with

21  other people's views about art, with the general public's views

22  about art.  I'm aware that the concept of business art is a

23  slight complex one, which is why I wanted to curate a show

24  about it.  I felt that his work was in fact a good example of

25  that particular kind of art within the context of the art

O2KBHERH

1   world, the art community within the context of aesthetics.

2            THE COURT:  No one was ever under the illusion, was

3   it, that Andy Warhol was trying to confuse people that he was

4   promoting Campbell soup?

5            THE WITNESS:  In the case of the Campbell soups, some

6   art critics did feel that something like that was going on.

7   One of the interesting things about Andy Warhol's business art

8   is that it always caused controversy and confusion about

9   whether in fact he was making artistic objections or whether he

10  was making commercial objects.  And that's actually the subject

11  of my exhibition.

12           THE COURT:  Commercial for, in the sense of commercial

13  for him?  That's why it's business art, yes?

14           THE WITNESS:  Trying to make money, yes.  People

15  accused him of only wanting to make money, and that his work

16  was completely empty of any aesthetic or artistic interest.

17           THE COURT:  Right.  Do you not see the distinction

18  between that and purposeful fraud.

19           THE WITNESS:  Of course, I do.  Yes, I do.

20           THE COURT:  And whether you agree with it or disagree

21  with it, the jury in this court unanimously found that

22  Mr. Estival had engaged in purposeful fraud.  You understand

23  that, don't you?

24           THE WITNESS:  I do.

25           THE COURT:  But you still think it's useful to promote

1    that, promote him in a different context?

2           THE WITNESS:  I don't consider my work promoting him

3    at all.  I have no interest in his success or failure.  I'm

4    interested in only the objects that he created and exploring

5    them in the context of business art.  His success or failure is

6    immaterial to me.

7           THE COURT:  So to make sure that one of the purposes

8    of my injunction, which is to prevent any further fraudulent

9    use of these images is accomplished, if I allow those images to

10   be used, do you agree that you will prominently state that he

11   was found by a jury to have committed fraud?

12          THE WITNESS:  I can certainly -- I should say that on

13   the conceptual period of this exhibition, so the actual

14   organizers of the museum have the final word on all such

15   things.  But, yes, I can't imagine not including some

16   discussion of what the jury's conclusion was in the exhibition.

17          THE COURT:  And by the way is his art going to be

18   portrayed under his fake name or his real name?

19          THE WITNESS:  That hasn't been decided yet.  We're not

20   at that point at all.  I imagine both things will be indicated;

21   his birth name and the name he's been using to show the art.

22   You know, Andy Warhol's real name was not Andy Warhol.  It was

23   Andrew Warhola.

24          THE COURT:  Well, it was almost Warhol. It was

25   Austrian/Hungarian, and he just, as many people do, changed it

O2KBHERH

1   to Americanize it to, instead of Warhola to Warhol, right?

2           THE WITNESS:  Yes.

3           THE COURT:  By contrast, Rothschild is not an

4   Americanization of Estival, is it?

5           THE WITNESS:  No, it does not seem to be.

6           THE COURT:  One would haphazardly guess that

7   Mr. Estival used that name to try to associate his images with

8   the famous Rothschild name, another instance of fraudulence.

9   That' seems like a reasonable possibility, does it not?

10          THE WITNESS:  Could be, yes.

11          THE COURT:  So your work on this is going to be done

12   from here in the United States?

13          THE WITNESS:  That's correct.  I will be at the

14   SpritMuseum for a few days at the very end of the exhibition,

15   probably just before it opens.  Otherwise, my work will all be

16   in the United States.

17          THE COURT:  Tell me what you know about the museum?

18          THE WITNESS:  I've never actually been there.  I've

19   obviously done some research on it.  It's a museum founded

20   originally to explore the history of Swedish alcohol

21   consumption.  For complicated reasons, it has a rather notable

22   art collection as well.  And part of its mandate and part of

23   its activities involves some really quite notable exhibitions

24   about contemporary art.

25          THE COURT:  All right.  Those are all the questions I

O2KBHERH

1    have.  You can step down.  Thank you very much.

2            (Witness excused)

3            THE COURT:  Let's see if we can now --

4            THE WITNESS:  Hello, do you hear me?  I hear you.

5            THE COURT:  Can you hear me?

6            THE WITNESS:  Yes.

7            THE COURT:  I'm Judge Rakoff.  Will you please

8    identify yourself for the record.

9            THE WITNESS:  My name is Mia Sundberg, and I am the

10   curator of the Absolute art collection here at SpritMuseum.

11           THE COURT:  Thank you for appearing.  We're sorry we

12   had all those troubles.

13           THE WITNESS:  I'm sorry too.  It maybe on my end.  I'm

14   not sure.  I'm sorry.

15           THE COURT:  Tell me a little bit about your museum.

16           THE WITNESS:  The museum is like Gopnik was saying is

17   a museum that explores the history of alcohol here in Sweden,

18   but also around the world.  But in 2007, it received an art

19   collection, the Absolute art collection.  And this is 850

20   artworks approximately that all are a portrait of the famous

21   bottle, the Swedish vodka bottle.  And we now have that

22   collection, and we have a mandate to exhibit it and to create

23   art shows with it and also with that collection as a departure.

24           THE COURT:  So my understanding from Dr. Gopnik that

25   you are the ones who originated the idea for the exhibit that

1  we're concerned with here in this hearing.  Is that right?

2           THE WITNESS:  Yes, that's right.  This was our

3  initiative, and we invited Dr. Gopnik to be our guess curator.

4           THE COURT:  And that was because of his expertise in

5  Andy Warhol?

6           THE WITNESS:  Yes, because I was inspired by his book,

7  his biography on Andy Warhol that he published I believe 2022.

8  And when I started researching this project, I quickly bumped

9  into that book and read it and saw that there were new

10  perspectives that would be interesting to explore in an

11  exhibition about Warhol.

12           THE COURT:  So was it his idea or your idea to

13  conclude in this exhibition the images that we're concerned

14  with in the case before me?

15           THE WITNESS:  This was an artist that, like Gopnik

16  pointed to.  I did not know him previously, and Blake expressed

17  interest in it and suggest that we might include it, and I

18  agreed so.  And then from there, I took over and contacted the

19  artist and asked if we could show the work.

20           THE COURT:  Are you aware that the artist's real name

21  is Mr. Estival?

22           THE WITNESS:  No, I was not aware of this.

23           THE COURT:  And that he adopted a totally phony fake

24  name of Mr. Rothschild?

25           THE WITNESS:  I did not know he had another name.

O2KBHERH

1        THE COURT:  Were you aware that the jury in the trial

2    before me unanimously found that Mr. Estival's intent and

3    purpose in making these images and distribute them the way he

4    did was to purposely confuse consumers into believing that

5    these images were sponsored by Hermes?

6        THE WITNESS:  I know of the judgments.

7        THE COURT:  Well, did you know that the jury

8    specifically found that he was a fraudster?

9        THE WITNESS:  Yes, I understood that, yes.  I know

10   that that word was used in the judgment, yes.

11       THE COURT:  Well, the jury unanimously found it.

12       THE WITNESS:  Yes, I understand that.

13       THE COURT:  And so my concern I have in order to

14   prevent further fraud, I have prohibited his distribution and

15   other such uses of these works.  And so the question for me is

16   if I nevertheless allow his works to be used in your exhibit,

17   will the public know that he designed them for the purpose of

18   fraud, not just for artistic purposes?

19       THE WITNESS:  We have not yet decided whether we will

20   discuss the lawsuit in text context, in text of the exhibition.

21   We have not at all each reached the point where we started to

22   discuss, Dr. Blake and I, what the context of the text around

23   this artwork will be.

24       THE COURT:  From my standpoint, how can I allow the

25   distribution over my prohibition to occur if the people in your

O2KBHERH

1    museum and the people who come to see your exhibit don't

2    understand that, unlike Mr. Warhol, Mr. Rothschild produced his

3    works in order to defraud, intentionally defraud the public?

4         THE WITNESS:  NFTs are new territory in art, and a new

5    crossroad for art, between art and commerce, and this is what

6    the exhibition is exploring.  So we are trying to when we -- in

7    this section that is about younger artists, we are trying to

8    ask questions about what would have art interested Warhol if he

9    had been alive, what would he have been exploring.  And we are

10   showing other contemporary artists that are exploring value

11   systems in art, or the question of market value in art and the

12   conflict around that.

13        So this is one of the artists that we are showing in

14   that section where their artwork is presented with kind of

15   open -- will be presented as kind of open-ended questions about

16   what their position is, what the boundaries or the frontiers

17   between art and commerce can be, and how artists are dealing

18   with those questions today.

19        THE COURT:  But you don't think it's important for the

20   people who visit your exhibition that unlike Warhol, this

21   alleged artist using a fake name designed his images in order

22   to deceive the public into believing that Hermes was sponsoring

23   his images?

24        THE WITNESS:  I'm not sure we would express it that

25   way.  Perhaps we would -- when you as I curate and when you

1  write text for the public, you discuss things in a more

2  opened-ended way.  So I would not be telling my public, this is

3  an artist who is a fraud.  This is an example of an artist who

4  has explicitly made it his project to deceive someone.  That

5  would not be a way of expressing myself in a text in an

6  exhibition.

7          THE COURT:  Well, I can understand that from your

8  standpoint, but now it seems to me that you've just told me

9  that I can't permit this to happen because the whole point of

10  my injunction is to prevent the further confusion of the public

11  with respect to what the jury determined was a flatout fraud.

12          THE WITNESS:  I've had a letter from Mr. Ferguson, and

13  one of the things he asked was, agree to have a disclaimer,

14  that this has nothing with Hermes to do.  And that is -- we're

15  absolutely prepared to do that.  So on the title sign along

16  with the title of the artwork, there would be a text saying

17  that this has nothing to do with the brand of Hermes.  That's

18  what I know today.

19          THE COURT:  Supposing someone was an expert

20  counterfeiter of Swedish money, do you think it would be

21  appropriate in an exhibition on Warhol and his legacy to

22  include without disclosure that it was a counterfeit, an image

23  produced by someone like I just described?

24          THE WITNESS:  I wouldn't be interested in exhibiting a

25  work by someone who is not an artist and who is not producing a

O2KBHERH

1   work of art, even if that work of art is controversial.  As a

2   curator in a museum, that awakens my interest when I see things

3   that can be discussed about that artwork.  I don't see why I

4   would exhibit counterfeiters as you say if that's not an

5   artist.

6           THE COURT:  So supposing the counterfeiter said, my

7   real name is Estival, but I'm going to change it to Rembrandt

8   and pretend to be an artist.  That would change your mind?

9           THE WITNESS:  That wouldn't make sense to me.

10          THE COURT:  Okay.  I really appreciate your being

11  available, and thank you for very much, and we'll sign off at

12  this point.

13          THE WITNESS:  Thank you.

14          THE COURT:  All right.  I will take this matter under

15  advisement.  Now there was another matter regarding a challenge

16  to some subpoenas.  I can't seem to find it offhand.  Let me

17  hear from defense counsel as to the nature of the challenge.

18          MR. MILLSAPS:  Thank you, your Honor.  So the

19  challenge here is straightforward from our view.  Hermes served

20  subpoenas on our law firm, the Harris law firm which

21  represented Mr. Rothschild at trial.  Dr. Gopnik and Dr. Neil

22  who were hired as experts during discovery in the case, and

23  Dr. Neil also testified at trial.  And on Consilio, which is

24  the eDiscovery vendor that we at Lex Lumina used for this case

25  and used for other cases for discovery matters.

O2KBHERH

1    And Mr. Rothschild has moved for a protective order

2    here under rule 26 because these subpoenas are seeking

3    information regarding payments not only to our law firms, but

4    also to the experts and our discovery vendor in this case for

5    services that were rendered largely prior to the judgment in

6    this case for most of these individuals and entities.  And

7    these payments are not -- the subpoenas seeking information

8    regarding these payments and retainer agreements are not

9    actually designed to uncover assets that are available to

10   satisfy the judgment.

11   Any payments by Mr. Rothschild to his legal counsel or

12   to the experts who worked for him in the case or to

13   Lex Lumina's discovery vendor would be payments for services

14   rendered.  Those would become the assets of those individuals

15   and entities upon payment.  There are no allegations and had

16   never been any allegations by Hermes that any of

17   Mr. Rothschild's counsel, our firm, or anyone else have been

18   working to help conceal Mr. Rothschild's assets or holding any

19   of Mr. Rothschild's assets.  And in fact in the submissions

20   submitted prior to the Court on Mr. Rothschild's motion to stay

21   discovery, Mr. Rothschild and our firm explained that

22   Mr. Rothschild in fact owes our firm more than $50,000 for

23   expenses that we advanced.  And so the subpoenas were served

24   two weeks before Mr. Rothschild's reply on the appeal is due.

25   They in our view are designed -- they're relevant to uncovering

O2KBHERH

1   assets that could satisfy the judgment.  And so in our view

2   they're plainly designed to annoy and harass Mr. Rothschild's

3   counsel and others who have supported him in this case.  And so

4   for that basis Mr. Rothschild has moved for a protective order

5   under rule 26.

6          THE COURT:  If Mr. Estival is not paying his lawyers,

7   perhaps he ought to consider changing his name not to

8   Rothschild, but to trump.  But in any event, let me hear from

9   plaintiff's counsel.

10          MR. WARSHAVSKY:  Thank you, your Honor.  Your Honor, I

11   guess in our papers we note that first of all relevance isn't a

12   ground for a protective order.  We don't know that

13   Mr. Rothschild actually has standing to bring it.  We cited

14   authority for that.  Put putting that aside, the request

15   themselves are very narrow, and they're meant to understand

16   Mr. Rothschild's financial relationships, the accounts he paid

17   from, the amounts that were received, other debts he may have

18   to these firms.

19          THE COURT:  Let's take the law firms to begin with

20   because it seems to me that at least a subpoena to a law firm

21   regarding payments by a client could have a potentially

22   chilling effect on the representation.  So what is it -- you

23   just heard defense counsel say that these were for services

24   they rendered.  In fact, they haven't even been fully paid.

25   What is it that you want to find out from them?

O2KBHERH

1        MR. WARSHAVSKY:  We'd like to find out from them the

2    wire transfer information, checking account information,

3    cryptocurrency if it was transferred, NFTs.  We want to know

4    how to get into Mr. Rothschild's bank accounts.  We know that

5    he paid the vendors.  And so what we've asked for was documents

6    sufficient to show any agreements about payments so we can know

7    if payments are going to be coming in.

8        THE COURT:  That's a different question.  Let me

9    interrupt you and ask defense counsel.  So do you have any

10   problem with providing them with Mr. Rothschild's bank account

11   number?

12       MR. MILLSAPS:  Your Honor, that's not what the

13   subpoenas call for.

14       THE COURT:  I understand that.  But apparently it's

15   what their aim is.

16       MR. MILLSAPS:  Well, your Honor, it's curious because

17   they haven't served Mr. Rothschild with a subpoena.  And they

18   say, well, here is some text messages where he's been dishonest

19   with his associates and things like that in private text

20   messages.  In fact, in this case Mr. Rothschild responded to

21   all discovery requests and produced all of these text messages

22   that have been very embarrassing to him and have been used

23   against him.

24       So if they were to serve Mr. Rothschild with a

25   subpoena for that information, we represent Mr. Rothschild.

O2KBHERH

1   Mr. Rothschild would duly respond to that and would produce

2   that information.

3           THE COURT:  I'm still not getting an answer to my

4   question.  So let us suppose that in this cold cruel cynical

5   world that they figured they would get a more honest answer by

6   getting the bank account numbers from you than from

7   Mr. Rothschild, so they subpoena you in my hypothetical for his

8   bank account numbers.  Any problem with that?

9           MR. MILLSAPS:  Your Honor, we think that it would be

10  appropriate for them to subpoena Mr. Rothschild but for

11  subpoenaing his counsel.

12          THE COURT:  Why?  Let's take a more extreme case.  So

13  if some creditor of Bernard Madoff wanted to know about the

14  numerous transfers that Mr. Madoff involved himself in, you

15  would say that before they could go to the innumerable banks

16  and other entities that Madoff used as a cover, they would have

17  to first as a matter of law subpoena Madoff for his records,

18  for his bank account numbers?  What's your basis for that?

19          MR. MILLSAPS:  Your Honor, that may not be the case as

20  a matter of law.  The basis for the application here is based

21  on this Court's discretion under rule 26.  And our argument is

22  that Mr. Rothschild has complied with all subpoenas and

23  discovery requests in this case and has provided information.

24  During five months of discovery in this case, Hermes never had

25  to file a motion to compel for anything because we worked

O2KBHERH

1    diligently to provide everything responsive that could be

2    reasonably located that was responsive to their request.

3    Mr. Rothschild turned over all his communications to us.  And

4    forcing the lawyers to respond to subpoenas that are in

5    Mr. Rothschild -- for information that are in Mr. Rothschild's

6    possession, and which he would respond to if simply served with

7    a subpoena is going to the lawyers in this case where you're

8    talking about an individual and this amount of money and with

9    the representations that have already been made to the Court

10   under oath, it's harassing to the lawyers to force us to

11   respond to these subpoenas when Mr. Rothschild has all this

12   information in his possession and would respond to a subpoena

13   if served on him.

14        THE COURT:  Let me ask plaintiff's counsel first.  Why

15   haven't you subpoenaed Mr. Rothschild or Mr. Estival.  I'm not

16   going to use his fake name.  Mr. Estival for his bank records

17   and things like that?

18        MR. WARSHAVSKY:  We don't trust him, and we think that

19   we'd rather -- throughout this case, I don't agree with my

20   colleague's recitation of what happened during discovery.  I

21   don't think that the evidence bore out that Mr. Rothschild

22   would provide it.  And frankly we know that if we ask for

23   certain information -- and again we tried to make these very

24   narrow request.  We would get information about originating

25   bank accounts, originating cryptocurrency wallets and the like.

O2KBHERH

1    THE COURT:  Did you, for example -- and I'm sorry I

2    didn't bring the papers with me, but I was too distracted by

3    communications with Sweden, but did you subpoena from his

4    counsel the number of the identifying information on his bank

5    account?

6    MR. WARSHAVSKY:  We did, your Honor.  I was surprised

7    to hear Mr. Millsaps say to the contrary.  In fact, in all the

8    subpoenas -- and I'm going to read it.  It's the last in each

9    subpoena.  "To the extent not provided in response to any of

10    the foregoing, all documents concerning payments from

11    Rothschild to you, including without limitation all checks, all

12    deposits, bank records, wire information, receipts, transfers

13    of digital currency, and transfers of any other tangible or

14    intangible assets, such as NFTs, artworks, etc."  That's

15    specifically --

16    THE COURT:  So I come back to the question that I

17    didn't get really a full answer from.  So supposing a new

18    subpoena issued, and the new subpoena said, among other things,

19    but we'll just leave it for the moment to one thing, please

20    provide us with the numbers and other identifying information

21    regarding Mr. Rothschild's bank accounts to which you were

22    paid.  You're going to oppose that?

23    MR. MILLSAPS:  Your Honor, I think we would have no

24    problem providing Mr. Rothschild's bank account number.

25    THE COURT:  Okay.  So what about, did he pay you in

O2KBHERH

1  cryptocurrency?

2         MR. MILLSAPS:  No, your Honor.  We've never received

3  anything in cryptocurrency, nor any in NFTs, nor any other form

4  of assets from Mr. Rothschild.

5         THE COURT:  So even if there were a subpoena to ask

6  for that, it would take you less than two seconds to respond

7  saying we have no such documents?

8         MR. MILLSAPS:  Yes, your Honor.

9         THE COURT:  What else you wanted?  You wanted bank

10  account information.  You wanted cryptocurrency.  What else did

11  you want?

12         MR. WARSHAVSKY:  Anything else that was other

13  consideration of counsel represent that everybody was only paid

14  in U.S. dollars, then I think bank account information would be

15  sufficient.  I would accept counsel's representation about

16  that.

17         THE COURT:  So it sounds to me like a much narrower

18  subpoena can be formulated and served and responded to without

19  opposition.  Now there was some other subpoenas not involving

20  the law firms.  Are they all in the same category?

21         MR. WARSHAVSKY:  They are, your Honor.  They're

22  actually more limited.

23         THE COURT:  I think the easy solution is to prepare a

24  new subpoena, group of subpoenas along the lines I've

25  indicated.  Serve them promptly.  Make them promptly

O2KBHERH

1   returnable.  And barring something extraordinary, I think that

2   will be approved.  Okay.  Anything else we need to take up

3   today?

4           MR. WARSHAVSKY:  No, your Honor.

5           MR. MILLSAPS:  No, your Honor.

6           THE COURT:  Very good.  Thank you.

7           (Adjourned)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25